IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID HOLT II, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | NO. 10-5510 |
| PENNSYLVANIA, et al., | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    June 25, 2014

David Holt II (alternately "Holt" or "Plaintiff"), an African American male and a Pennsylvania State Police ("PSP") Sergeant, filed this action against the Commonwealth of Pennsylvania, the PSP, retired Captain Steven Johnson, retired Lieutenant Gerald Brahl, retired Captain Kathy Jo Winterbottom, and Lieutenant Kristal Turner-Childs. ("Defendants").[1]  He brought a Fourteenth Amendment equal protection claim and a First Amendment retaliation claim under 42 U.S.C. § 1983 against all four individual Defendants.  He also brought an aiding and abetting racial discrimination and retaliation claim against Johnson under the Pennsylvania Human Relations Act ("PHRA") and a discrimination and retaliation claim under Title VII against the PSP.

His claims were tried before a jury between October 30, 2013 and November 6, 2013. (Doc. Nos. 105-110.)  At the close of the evidence, Defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a)(2).  (N.T. 11/05/13 at 230-310.)  We granted the motion

---

[1] All of the events giving rise to this lawsuit occurred when the three individually-named Defendants were still employed by the PSP. Furthermore, since Plaintiff does not allege that the Commonwealth of Pennsylvania took any actions that were distinct from those taken by his employer, the PSP, we will refer only to the PSP.

with respect to all claims against Lieutenant Kristal Turner-Childs, and dismissed her from the case.  (Doc. No. 89.)  We also granted the motion on the Title VII and PHRA claims with respect to the actions taken by Brahl and Winterbottom in 2011 due to Plaintiff's failure to exhaust his administrative remedies.  (N.T. 11/06/13 at 30.)  As Plaintiff does not challenge these rulings, we need not discuss them further.

We reserved ruling on the other legal questions and had the Fourteenth Amendment equal protection claims (against Johnson, Brahl, and Winterbottom), the First Amendment retaliation claims (also against Johnson, Brahl, and Winterbottom), the Title VII discrimination and retaliation claims (against the PSP), and the PHRA aiding and abetting racial discrimination and retaliation claims (against Johnson) submitted to the jury.[2]  (Doc. No. 93 at A.-F.)

On November 7, 2013, the jury returned with a partial verdict.  It found for Holt and against Brahl on the Fourteenth Amendment equal protection claim for the roll call comments, (*Id.* at A.2.a.), and for Holt and against Brahl on the First Amendment retaliation claim concerning Brahl's initiation of an Internal Affairs Division ("IAD") investigation for what came to be referred to as the "day off" incident.  (*Id.* at B.2.)  It also found that Holt suffered an actual injury, and, allocating the entire sums to the roll call comments, awarded him $25,000 in compensatory damages and $25,000 in punitive damages.  (*Id.* at G.1.; G.2.a.; G.2.b.; G.4.b.2.) The jury failed to reach a verdict on any of the remaining claims. (*Id.*)

---

[2] The Title VII claims and the PHRA claims both involve the same actions taken by Johnson. Since these claims are adjudicated under the same standard, *Woodson v. Scott Paper Co.,* 109 F.3d 913, 919-20 (3d Cir. 1997), it follows that any reference we make here to Title VII necessarily applies to the PHRA.  In this light, we also treat any reference made by Defendants to Title VII to apply to the PHRA, leaving us to dismiss Plaintiff's argument that Defendants have waived their right to argue that the PHRA claims should be dismissed as a matter of law due to their failure to explicitly state that their Title VII Rule 50(b) arguments also applied to the PHRA claims.

Pursuant to Fed.R.Civ.P. 50(b) and 59, Defendants now bring this "Post-Trial Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial." ("Def. Br.") (Doc. No. 121.) Holt responds with "Plaintiff's Response in Opposition to Defendants' Motion for Judgment as a Matter of Law or in the Alternative a New Trial," ("Pl. Br.") (Doc. No. 131); and "Plaintiff's Statement of Facts." ("Pl. Facts") (Doc. No. 131-1.) Oral argument on Defendants' motion was held on May 7, 2014. This matter is now ripe for resolution.

## I.     FACTUAL HISTORY

Holt has been employed with the PSP since 1994, and has been a Sergeant since 2006. (N.T. 10/30/13 at 46, 49.) Over the course of his career, he has been posted at various PSP Troops throughout the state. (*Id.*at 46-52.) In 2008, he was assigned to Troop L (Reading) as Special Projects Coordinator. (*Id.* at 50.) In the spring of 2011, he was transferred to Troop T (Turnpike) at his own request and assigned a Station Command at Pocono. (N.T. 10/31/13 at 21, 34-35.) He remained at Troop T through the fall of 2011 when the last of the events relevant to our proceeding occurred. During this three year period, Holt had a number of interactions with certain supervising officers which resulted in discipline being imposed upon him limiting his ability to receive promotions and assignments that he felt would advance his career in a more favorable manner.

The difficulties began in the fall of 2008 with the "Philips incident" where Holt allowed himself to get involved in supporting a family friend, Ms. Philips, who faced a criminal charge from a local police agency. (N.T. 10/30/13 at 65-74.) He made inquiries on Ms. Philips's behalf with the office of a district justice, presented information to the local police detectives and prosecuting attorneys and on October 23, 2008, the day of Ms. Philips's initial hearing, he appeared in court in full uniform and then sought out and spoke to the prosecuting attorney to

inform him that the victim of the alleged assault was and had been deceased for some two years. (*Id.*) The district justice observed Holt conferring with the prosecuting attorney and was sufficiently concerned that he called the state police barracks and reported what he had seen. (Pl. Exh. 9 at 8.) This led to an internal investigation being initiated against Holt by Captain Johnson, the Troop L commanding officer, and, ultimately, discipline in the form of suspension being imposed. (Pl. Exh. 13) (Def. Exh. 6.)

As this investigation and internal administrative process was proceeding, Holt sought but was denied a favored assignment as a Reading Patrol Sergeant, was taken off of the Reading Troop's Officer-of-the-Day roster, was involuntarily reassigned to what he believed to be the lesser position of Reading Staff Services Sergeant, and sought but was denied an assignment to the Station Commander positions at both Jonestown and Schuylkill Haven. (N.T. 10/30/13 at 114-15, 140-43; N.T. 10/31/13 at 108-13) (Pl. Exh. 11, 22, 45.) Unhappy with these developments, which he attributed to racial discrimination, he brought claims against the PSP and the officers involved through an internal EEO process, with the PHRC, and ultimately in this court. (Pl. Exh. 11, 38, 39.)

In early 2011, while his discrimination and retaliation claims were pending in this court, he put in for a transfer to Troop T (Turnpike). (N.T. 10/31/13 at 21.) The transfer was granted. (*Id.* at 25.) He then learned that there were two open station command positions for which he would be qualified – one at King of Prussia ("KOP") and the second at Pocono on the Turnpike's Northeast Extension. (*Id.* at 21, 34.) He advised Captain Winterbottom, who by this time was the commander of Troop T, of his interest and preference for KOP. (N.T. 11/05/13 at 151) (Pl. Exh. 23.) This preference, however, was not honored and he was assigned to Pocono. (N.T. 10/31/13 at 231-32) (Def. Exh. 8.) Before this decision was made, however, he learned that

Lieutenant Brahl, who reported to Captain Winterbottom, had in May and June 2011 made comments at roll call at the KOP barracks denigrating him and drawing a comparison in crude language between him and another African American sergeant who had been subject to previous discipline and was construed, at least by some troopers, as derogatory if not overtly discriminatory as to Sergeant Holt.  (*Id.*at 25-26, 29; N.T. 11/01/13 at 79, 81-83, 95-96.)  Upon learning about this he raised the issue with Lieutenant Brahl and Captain Winterbottom in July 2011 and expressed concern about the nature of Brahl's comments and its implications. (N.T. 10/31/2013 at 30-31; N.T. 11/05/13 at 85, 156.)  He failed to receive what he believed to be a proper response to his concern.  (N.T. 10/31/2013 at 30-31.)  These complaints were followed in August and September by three separate incidents where Holt had internal affairs investigations initiated against him for insubordination, use of insulting language to superior officers, and for taking time off without providing proper verification up the chain of command.  (*Id.* at 55-57; 11/05/13 at 94-95, 134-36.)

## II.     STANDARD OF REVIEW

"[A] party in a civil jury trial that believes the evidence is legally insufficient to support an adverse jury verdict will seek a judgment as a matter of law by filing a motion pursuant to [Fed.R.Civ.P.] 50(a) before submission of the case to the jury, and then (if the Rule 50(a) motion is not granted . . .) a [post-trial] motion pursuant to Rule 50(b)."  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 396 (2006).  In ruling on a Rule 50(b) motion, we must determine "whether viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

"Although judgment as a matter of law should be granted sparingly, we will grant it where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict." *Id.* (quoting *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995). Accordingly, "[t]he question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Id.* (citing *Gomez*, 71 F.3d at 1083 (citations omitted)).

## III.   DISCUSSION

### A.   Claims of Racial Discrimination

Plaintiff's racial discrimination claims are brought as denials of equal protection under 42 U.S.C. § 1983 against all three remaining individual Defendants; violations of Title VII against the PSP based on Johnson's actions; and violations of the PHRA against Johnson.  We discuss these claims here and then turn to our consideration of the retaliation claims.

#### 1.   Legal Standard for Section 1983 Denial of Equal Protection and Title VII Discrimination Claims

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, [a plaintiff] must prove the existence of purposeful discrimination." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. Of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir. 1990)).  Similarly, in the Title VII context, in order to "show that an employer's discriminatory reason was more likely than not a motivating cause of the employer's action . . . a plaintiff may, for example, show . . . that the employer has treated other similarly situated employees not within the protected class more favorably." *Smith v.*

*Walgreen Co.*, 964 F. Supp. 2d 338, 348 (D. Del. 2013 ) (citing *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994); *Simpson v. Kay Jewelers,* 142 F.3d 639, 645 (3d Cir. 1998)).

"Equal protection discrimination claims under § 1983 are evaluated under the same framework as Title VII claims." *Middleton v. Deblasis,* 844 F. Supp. 2d 556, 565 (E.D. Pa. 2011) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 n.1 (1993)). Under the familiar three-step burden-shifting framework set forth for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff is first required to establish a *prima facie* case of discrimination. *Id.* at 802. In order to do so, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Young v. St. James Mgmt., LLC*, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). If the plaintiff succeeds, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision. *Id.* at 288-89 (citing *McDonnell,* 411 U.S. at 802). Then, "[i]f the defendant succeeds, the burden returns to the plaintiff to show that the employer's stated reason [] was merely a pretext for discrimination." *Id.* at 289 (citing *McDonnell*, 411 U.S. at 804.) A plaintiff may do so by "provid[ing] evidence that '(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative factor" of the adverse employment action. *Dellapenna v. Tredyffrin/Easttown Sch. Dist.,* 449 Fed. App'x. 209, 213 (3d Cir. 2011) (quoting *Fuentes*, 32 F.3d at 763)).

    **2.**    **Claims Against Johnson**

The jury was charged to determine whether Johnson discriminated against Holt by (1) initiating the IAD investigation relating to the "Philips incident;" (2) not selecting Holt for the Reading Patrol Sergeant position in January and February 2009; (3) reassigning Holt to Staff Service Sergeant at Reading in March 2009; (4) removing Holt from the Officer-of-the-Day roster at Reading in March 2009; and (5) not assigning Holt for the Station Commander positions at Jonestown and Schuykill Haven stations in July 2009.  The jury did not reach a verdict as to any of these claims.  In their motion, Defendants address each claim separately, asserting that they are entitled to judgment as a matter of law on Holt's discrimination claims against Johnson and the PSP due to Holt's failure to identify proper comparators, failure to establish that he suffered an adverse action, and/or failure to rebut Defendants' evidence that there were legitimate non-discriminatory reasons for their actions.  We begin by examining the parties' arguments surrounding the Philips incident.

### a.     The Philips Incident

Defendants argue that Johnson is entitled to judgment as a matter of law with respect to his initiation of the IAD investigation in that Holt has failed to present evidence of similarly situated comparators. (Def. Br. at 25-26, 32-33.)  However, before reaching the merits of Holt's argument, we must first address his contention – made at oral argument, but not in his brief – that Defendants failed to preserve the issue as they did not raise it in their Rule 50(a)(2) motion.  We accept that "[u]nder normal circumstances, a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997).  Defendants acknowledge this principle but they argue that our statement when

*Plaintiff* raised the issue during the 50(a) colloquy, that "Title 7's going to the jury," obviated their need to do so.  (N.T. 11/05/13 at 308.)  In light of the circumstances here, we agree.

We reach this conclusion with the purpose of Rule 50(a)(2) in mind.  *See Williams*, 130 F.3d at 571-72 (stating that the purpose of the rule is to put a plaintiff on notice about the defendant's argument); *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 183 (3d Cir. 1992) (compliance with Rule 50(a) "ensures that . . . the moving party will not gain an unfair advantage through surprise") (quotations and citation omitted); *see also Rankin v. Evans*, 133 F.3d 1425, 1432 (11th Cir. 1998) (stating that the purpose of Rule 50(a) is to "provid[e] notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury") (citation omitted)).  Plaintiff here certainly has long known that the question of comparator evidence would be a central feature of this aspect of the case.  He cannot credibly claim surprise.  Defendants vigorously made the argument in their motion for summary judgment.  (Doc. No. 55 at 29-30.)  Plaintiff responded to it on the merits.  (Doc. No. 56 at 12-13, 23-24.)  Plaintiff again sought to address the issue in his response to Defendants' oral Rule 50(a)(2) motion.  (N.T. 11/05/13 at 308.)  Plaintiff then discussed it fully in his response to Defendants' Rule 50(b) motion, (Pl. Br. at 12), yet failed to raise the waiver issue in those papers.

During the Rule 50(a)(2) oral argument, counsel for the Plaintiff began to address the issue of comparator evidence, arguing that "there's a lot of comparative evidence on the record. Going to Title 7 --."  (N.T. 11/05/13 at 308.)  At that point, we did in fact cut her off, and directed that she need not address anything with regard to Title VII, since "Title 7's going to the jury."  (*Id.*)  While we recognize that the comparator evidence about the Philips incident also extends to the § 1983 denial of equal protection claims, we agree with Defendants that our

9

statement about Title VII going to the jury could have indicated to them that no further statement was needed on their part to preserve the issue of similarly situated comparators.  Under these circumstances, we are unwilling to sustain Plaintiff's waiver argument.   We will address Defendants' argument on the merits.

Holt has argued that the record contains legally sufficient evidence to support his contention that there are similarly situated comparators outside of his protected class who engaged in similar activity but did not have IAD investigations initiated against them.  As a general matter, he points to his own testimony, where he testified that "troopers attended court hearings 'all the time' to 'simply give information to a detective' or prosecuting attorney, or to the local court house or DJ's [District Justice's] office for non-state related business, and that none of these troopers had [IAD] investigations initiated against them."  (Pl. Br. at 12) (citing N.T. 10/30/13 at 81, 91-92.)   He points more specifically to the conduct of "Trooper Alex Simone [who] went to a preliminary hearing at the same District Court when he was stationed at Reading.  His fiancée, who is now his wife, also worked as a caregiver.  She was assaulted.  He sat in the back of the courtroom . . . during the preliminary hearing."  (*Id.* at 80.)

Holt also points to the testimony of Lieutenant Damore, who testified that "it was common practice in the PSP to share information regarding a crime with the investigating authorities," and that she "[was] not aware of Johnson ordering [IAD] investigations against white troopers without a third party complaint."  (*Id.*) (citing N.T. 11/04/13 at 107, 117, 119.) Here, while DJ Dougherty did call Lieutenant Thomas McDaniel of the PSP to tell him that he had a "problem that day with Sergeant Holt" at the courthouse, the DJ did not file a formal complaint.  (Pl. Exh. 9 at 8.)

Holt also testified that he was aware of three white PSP employees – Trooper David Bain, Corporal Kevin Brennan, and Trooper Eric Beral – under the command of Johnson who engaged in unbecoming conduct but did not have IAD investigations initiated against them. (N.T. 10/30/13 at 94.)   He testified that Trooper Bain "had a difficult time" making the "transition[] from dispatching at the stations to a consolidated dispatch center," as he was "not very professional over the air, constantly complaints coming in about this behavior over the air, his uncooperativeness with respect to the dispatchers."  (*Id.* at 95.)  He testified that Corporal Brennan's work was "shoddy," and that he was "tard[y], unprofessional[] . . . just not performing his duties as a crime supervisor."  (*Id.* at 97.)   Finally, Holt testified that Johnson did not initiate an IAD investigation against Trooper Beral even though Beral had "falsified" the information in PSP's stolen weapon and missing persons database.  (*Id.* at 102.)

While Holt certainly has proffered evidence of PSP employees outside of Holt's protected class and under Johnson's command who engaged in conduct that might be considered "unbecoming" and did not have IAD investigations initiated against them, we do not find that these comparators are sufficiently similar to support Plaintiff's claim.  We first note that neither Bain, Brennan, nor Beral were sergeants – Holt was of a higher rank than all of them.  Further, none of the three engaged in conduct where they directly involved themselves in court proceedings that resulted in such concern of the judicial officer that the trooper's command was notified.  According to Holt's own testimony, their conduct involved general malfeasance in the workplace - being uncooperative with dispatchers, general shoddy work, and falsifying information in a computer database.[3]

---

[3] We further observe that, according to Holt's own testimony, while Brennan did not have an IAD initiated against him for his "[t]ardiness, unprofessionalism, shoddy work . . . there was a

We are also unconvinced by Holt or Damore's testimony that it was common practice for troopers to go down to the courthouse to share information with investigating authorities, and that this was the only time Johnson initiated an IAD investigation without a third party complaint.   While this may very well be true, we find the fact that DJ Dougherty called Lieutenant McDaniel to tell him he had a "problem that day" with Holt to be highly relevant to our inquiry on similarly-situated comparators.   (Pl. Exh. 9 at 8.)   As Johnson testified, "the perception from the local authority of the state police" is a critical concern of the PSP.   (N.T. 11/04/13 at 151.)   Holt has proffered no evidence that Johnson failed to initiate an IAD investigation against any other trooper, black or white, whose conduct resulted in a direct call by a judge to the troop command about the trooper's actions in a case where the trooper had no official responsibility.   We therefore conclude that Holt has failed to show that "[he] received different treatment from that received by other individuals similarly situated." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. Of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir. 1990)); *see also Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (stating the similarly-situated comparator requirements in the Title VII context).

We acknowledge that the lack of a similarly situated comparator would not be enough to defeat Plaintiff's claim if he is able to present sufficient evidence for "the factfinder to infer that discrimination was more likely than not a motivating or determinative factor" of the adverse employment action. *Dellapenna v. Tredyffrin/Easttown Sch. Dist.,* 449 Fed. App'x 209, 213 (3d Cir. 2011) (quoting *Fuentes,* 32 F.3d at 759). Here, as Plaintiff acknowledged during oral argument, as of the end of 2008 and the first few months of 2009, there is no evidence of

---

special order that was cut removing him from th[e] position [of crime supervisor for Troop L] and placing him back in patrol, which is a less desirable position." (N.T. 10/30/13 at 97.)

ongoing antagonism or a pattern and practice of discrimination by Johnson from which the jury could infer that racial discrimination played a part in the commander's decision. Accordingly, we conclude that Defendants' motion for judgment as a matter of law with respect to Johnson's initiation of this IAD investigation under Rule 50(b) must be granted.

### b.      Last Four Adverse Actions

With respect to the last four adverse actions – (2) not selecting Holt for the Reading Patrol Sergeant position in January and February 2009; (3) reassigning him to Staff Services Sergeant at Reading in March 2009; (4) removing him from the Officer-of-the-Day roster at Reading in March 2009; and (5) not assigning him for the Station Commander positions at Jonestown and Schuykill Haven stations in July 2009 – Defendants argue that "Holt put forth no evidence for the jury to disbelieve Johnson's articulated legitimate reasons or that an invidious discriminatory reason was more likely than not a motivating or determinative factor in any of Johnson's decisions." (Def. Br. at 26.) Further, and with respect to Holt's reassignment to Staff Services Sergeant and his removal from the Officer-of-the-Day roster, Defendants argue that, as a matter of law, these do not amount to adverse actions. We discuss each of these arguments in turn.

### i.      Reading Patrol Sergeant Position in 2009

In January 2009, Holt applied for the position of Reading Patrol Sergeant. (N.T. 10/30/08 at 108.) He met the qualifications for that position. (*Id.* at 109-10.) In that same month, Johnson temporarily assigned Corporal Wayne Elser, a white trooper of lesser rank, to the position, and in February 2009, permanently assigned Andrew Wenger, a white sergeant, to the position. (*Id.*) Both of these officers met the qualifications for the position but Holt testified without challenge that he had a higher rank and more seniority than Elser, and more leadership,

training and patrol experience than Wenger.  (*Id.* at 109-13.)  Johnson testified that he did not

assign the position to Holt as Sergeant Wenger had more directly relevant experience doing the

same job in a neighboring Troop.  (N.T. 11/04/13 at 143-44.)  Johnson also testified that he had

received information that Holt did not get along well with the members of the patrol section who

he would be supervising.  (*Id.* at 144.)  While we accept that these proffered reasons could well

establish a non-discriminatory basis for passing on Holt for this assignment, it is for the fact-

finder, not us, to assess Johnson's credibility and motivation.  Defendants' motion with respect

to this adverse action is denied.

### ii.      Reassignment to Staff Services Sergeant in March 2009

On March 19, 2009, Johnson involuntarily reassigned Holt from his position as Special

Projects Coordinator to a purportedly less desirable position of Staff Services Sergeant.  (N.T.

10/30/13 at 114-15.)  Holt contends that this reassignment was racially motivated and constituted

an adverse action in that "it removes all patrol related decisions and has very little supervisory

responsibility."  (Pl. Br. at 12) (citing N.T. 10/30/13 at 115.)  Defendants argue that judgment as

a matter of law with respect to this allegation of discrimination against Johnson should be

granted since this reassignment does not amount to an adverse action.  (Def. Br. at 33.)  We

disagree.

In order to establish a *prima facie* case of discrimination under Title VII, or to bring a

successful claim for denial of equal protection under § 1983, a plaintiff must, among other

things, establish that "he suffered an adverse employment action."  *Young v. St. James Mgmt.,*

*LLC*, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010) (citation omitted).  "The Supreme Court has

defined a tangible [adverse] employment action as a 'significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  In other words, an adverse employment action is one that "affect[s] the terms or conditions of [a plaintiff's] employment."  *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001).

Holt has testified that the reassignment "removed . . . all patrol-related activities," and that "the main responsibilities of the staff service sergeant was securing evidence."  (N.T. 10/30/13 at 115-16.)   We accept that this transfer constituted a "reassignment with significantly different responsibilities," *Durham Life Ins. Co.*, 166 F. 3d at 152-53, particularly as it limited his opportunity to demonstrate supervisory and leadership responsibilities.   Accordingly, we deny Defendants' motion for judgment as a matter of law.

### iii.      Removal from Officer-of-the-Day Roster

On March 18, 2009, Johnson removed Holt from the Officer-of-the-Day roster. (Pl. Exh. 22.)   Defendants argue that judgment as a matter of law with respect to this allegation of discrimination against Johnson must be granted since this removal did not amount to an adverse action.  We agree.

As Holt described it:

> The Officer-of-the-Day roster is a roster that covers each day of the month . . . [S]ergeants and lieutenants are given the opportunity to act in the capacity of the troop commander after hours, after working hours, in the case of a serious incident.  So if a serious incident comes in, the Officer-of-the-Day, they have your cell phone number, they have your home number, you have to be accessible . . . So you're effectively working in lieu -- or in the capacity of the troop commander essentially.   And it's basically distributed on a random basis.

(N.T. 10/30/13 at 128-29.)

The question before us now placed in context is whether Holt's removal from the roster constitutes a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co.*, 166 F.3d at 152-53 (quoting *Burlington Indus., Inc.*, 524 U.S. at 761). While Holt characterized his removal as demeaning, it was clearly not a denial of promotion, a change in benefits, or a significant alteration of job responsibilities. The Officer-of-the-Day is on call in the case of "serious incident," and when the commanding officer is not on duty. (N.T. 10/30/13 at 128.) We are unable to conclude that this removal constitutes an adverse employment action. Defendants' motion for judgment as a matter of law as to this alleged adverse action for purposes of both the § 1983 denial of equal protection claim and the Title VII discrimination claim is granted.

### iv.     Non-Assignment to Station Commander in July 2009

In April 2009, Johnson applied for the Station Commander positions at Jonestown and Schuykill Haven Station. (*Id.* at 141-42.) Johnson awarded Sergeant Paul Gaspich, a white sergeant, the position at Jonestown, and Steve Stinsky also a white sergeant, the position at Schuylkill Haven. (*Id.* at 142-43.) Holt testified that he had more seniority as a sergeant than both of those troopers. (*Id.*)

In their brief, Defendants do not articulate with specificity what Johnson's legitimate, non-retaliatory reasons for not assigning Holt to one of the Station Commander positions were. In his testimony however Johnson stated that he did not assign Holt to one of the positions as he relies on his Station Commanders "to make sound judgments," and that he has found that "past behavior is . . . the best predictor of future behavior." (N.T. 11/04/13 at 157-58.) He then stated that on several occasions, including the Philips incident, Holt "was not displaying good

judgment." (N.T. 11/04/13 at 157-58.) Johnson also testified that the fact that Holt had a "pending disciplinary action or pending IAD investigation at that time did play a factor in [the] decision." (*Id.* at 156.)

Applying the *McDonnell Douglass* burden shifting analysis it is for the jury to determine whether these articulated reasons for Johnson's actions are pretextual and even if they are whether Plaintiff has demonstrated that the real reasons were discriminatory. Accepting Johnson's explanations about "good judgment" and the pending IAD investigation, the jury must consider this against Holt's position that "Johnson enumerated his criteria for choosing a station commander to include education, experience and training . . . [and that] Holt surpassed the [two successful] candidates in each category." (Pl. Br. at 24) (citing N.T. 11/04/13 at 136; N.T. 10/30/13 at 140-43.) This is for the fact-finder to determine. Defendants' motion with respect to this claim is denied.

### 3.      Section 1983 Denial of Equal Protection Claim Against Brahl

Plaintiff contends that Lieutenant Brahl intentionally discriminated against him when he (1) made remarks at roll call in May/June 2011 (prior to Plaintiff's reassignment to Troop T); and (2) initiated an IAD investigation on September 15, 2011 in connection with the "day off" incident. (Pl. Br. at 13-15.) The jury found that Brahl violated Holt's right to equal protection for the roll call comments, but was unable to determine whether Holt's right to equal protection was violated by Brahl's initiation of the IAD pursuant to the "day off" incident. (Doc. No. 93 at A.2.a.-b.) In assigning damages, the jury found that Holt suffered an actual injury and awarded him $25,000 in compensatory damages, allocating the entire amount to the roll call comments. (*Id.* at G.1.; G.2.a.; G.2.b.) The jury also awarded Holt $25,000 in punitive damages, allocating that entire sum to the roll call comments. (*Id.* at G.4.b.2.)

### a.      Roll Call Comments

Holt alleges that Brahl discriminated against him in violation of his right to equal protection by making racially discriminatory comments at roll call.  (Pl. Br. at 14.)  Brahl made several derogatory comments about Holt, calling him a "lazy piece of shit," and "another f---ing Wayne Mason," Mason being the only other black sergeant that had been under Brahl's command.  (*Id.* at 13) (citing N.T. 11/01/13 at 82, 84-85.)  Although Plaintiff concedes that the comments were "not racial on their face," he argues that they "ha[d] clear racial connotations based on the environment in which they were said and the intent of the speaker."  (*Id.* at 14.)  In making this argument, he points to the testimony of Troopers Kartsounas and Minifield, who testified that they never heard Brahl make similar comments about white troopers.  (*Id.*) (citing N.T. 11/01/13 at 82, 84-85, 96.)  Holt also points out that Trooper Kartsounas "testified [that] everyone knew Mason and Holt were the only Black sergeants [under] Brahl['s] command and 'by saying that he compared the two,' led [Kartsounas] 'to believe that is was [a] racial thing.'" (*Id.*) (quoting N.T. 11/01/13 at 82, 84-85.)

We accept the fact that "words that appear facially neutral" can be shown to have been "motivated by discriminatory animus."  (Pl. Br. at 14) (citing *Gharzouzi v. Nw. Human Servs. of Penn.*, 225 F. Supp. 2d 514, 535 (E.D. Pa. 2002) (citing *Howley v. Town of Stratford,* 217 F.3d 141 (2d Cir. 2000) (finding hostile work environment claim survived where conduct at issue, though lacking any sexual component or reference to the plaintiff's sex, could, under the circumstances of the case, reasonably be interpreted as having been motivated by plaintiff's sex); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (holding that a jury could find an intent to discriminate from evidence of use of "code words," such as "all of you" and "one of them;" "The words themselves are only relevant for what they reveal—the intent of

the speaker.")).  In this case, we find that Brahl's comparison of Holt to Mason – the only two black sergeants to ever have been under his command – are the functional equivalent of using "code words" such that a jury could infer, as it did, that those words were uttered with discriminatory intent.  The evidence that Plaintiff offered with respect to those comments was persuasive and we understand how the jury came to be convinced of the discriminatory intent of the speaker, particularly given the testimony of Troopers Kartsounas and Minifield.

It is still the case however that the jury's factual conclusion with respect to Brahl's intent in making the roll call comments, and the consequent award of damages, can stand only if Holt has made out the legal elements of the claim, including whether the comments in and of themselves constituted an "adverse employment action."  We accept that the roll call comments have evidentiary value and could contribute to a hostile work environment.  We appreciate that upon hearing about the comments Sergeant Holt "didn't feel very welcomed" into Troop T, and felt that his "character [was] assassinated."   (N.T. 10/31/13 at 32; N.T. 11/01/13 at 36.) Nonetheless, we are constrained to conclude that the comments did not, standing alone, "affect[] the terms or conditions of [Holt's] employment" such that they constituted an adverse action. *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001).  We grant Defendants' motion with respect to this allegation against Brahl, and vacate the jury's verdict and the damage awards which followed.

### b.    IAD Investigation for the "Day Off" Incident

The jury was unable to determine whether Lieutenant Brahl intentionally discriminated against Holt in violation of his right to equal protection when Brahl initiated an IAD

investigation on September 15, 2011 in connection with the "day off" incident.[4]   (Doc. No. 93 at A.2.b.)   Defendants however argue that judgment as a matter of law should be granted with respect to this allegation since Brahl failed "to put forth evidence of similarly situated individuals who Brahl treated differently [than] Holt."  (Def. Br. at 27.)  We disagree.

Holt testified that even though he did not inform Brahl that he was going to take the following day off, he did ask his corporal to put him on leave for the following day.  (N.T. 10/31/13 at 69, 73-74.)  He further stated that members of Troop T call out sick in the same manner as he did "all the time," but Brahl had never initiated an IAD investigation against any of them.  (*Id.* at 74.)  Moreover, the fact that the only IAD investigations that Brahl ever initiated during his time at Troop T were against Holt and Mason is evidence from which the jury could infer that Brahl purposefully discriminated against Holt.  (N.T. 11/05/13 at 109.)  As such, Defendants' motion as to this claim against Holt is denied.

### 4.    Section 1983 Denial of Equal Protection Claim Against Winterbottom

Holt contends that Captain Winterbottom intentionally discriminated against him when she did not assign him to the Station Command position at King of Prussia on June 22, 2011 and

---

[4] On August 29, 2011, Holt took an annual leave day off.  (N.T. 11/01/13 at 20.)  He did not notify Brahl.  (*Id*. at 22.)  Brahl e-mailed him the next day and directed that "[i]n the future if you are taking the day off, let me know by phone or by e-mail."  (*Id*. at 21) (Def. Exh. 8.)  Two weeks later, on September 13, 2011, Holt took another annual leave day off.  (*Id.* at 26.)  He notified his corporal that he was taking the day off, but he did not notify Brahl.  (N.T. 10/31/13 at 69.)  The next day, Brahl ordered Holt to provide a written explanation as to why he did notify him that he was taking the day off.  (N.T. 11/05/13 at 134.)  On the following day, September 15, 2011, Holt provided the written explanation.  (*Id.*)  Brahl found the correspondence to be insubordinate and initiated an IAD investigation.  (*Id.*at 134-36.)

when on September 2, 2011 she initiated an IAD investigation against him when he wrote to Lieutenant Brahl that certain of his "instructions were schizophrenic."[5]  (Pl. Br. at 15.)

### a.       Non-Assignment to KOP in June 2011

Defendants argue that we should grant their motion for judgment as a matter of law with respect to Winterbottom's non-assignment of Holt to KOP on June 22, 2011 on the basis that "Holt put forth no evidence for the jury to disbelieve Winterbottom's articulated legitimate reasons for her decision[] or that an invidious discriminatory reason was more likely than not a motivating or determinative factor in [her] decision[]."  (Def. Br. at 26.)  Winterbottom testified that she assigned Holt to Pocono Station instead of KOP since there were certain issues with the troopers and corporals at Pocono that needed to be addressed by a more experienced sergeant like Holt.  (N.T. 11/05/13 at 152.)  Holt testified however that, upon arriving at Pocono, he found the station to be running efficiently.  (N.T. 10/31/13 at 39-41.)  He also testified that he is aware of a white sergeant in Troop T, David Devitt, who also requested that Winterbottom assign him to a station closer to his home, and that Devitt's request was granted.  (*Id.* at 42-43.)  Given the somewhat imprecise rationale which Winterbottom gave as her reason for not assigning Holt to KOP, and considering that Defendants do not dispute Holt's evidence of a similarly situated

---

[5]  At trial, we also instructed the jury to consider whether Winterbottom "intentionally discriminated against [Holt] when she initiated an IAD investigation on September 7 [2011] in connection with the command conference incident."  (N.T. 11/06/13 at 44.)  Defendants however point out that "the evidence established that Lieutenant Stackhouse initiated the IAD investigation into the 'command conference' incident not Winterbottom."  (Def. Br. at 26) (citing N.T. 11/05/13 at 179.)

Plaintiff concedes this point.  He does not bring up the issue in his brief, and he states in his statement of facts that "[o]n September 7, 2011 Lt. Stackhouse initiated an [IAD] investigation against Holt for insubordination at the command conference towards Winterbottom."  (Pl. Facts at 16.)  In oral argument, Plaintiff expressed this same view.  As such, we dismiss the allegation against Winterbottom that she violated Holt's right to equal protection by initiating the IAD pursuant to the command conference incident.

comparator who requested and was assigned to a station closer to his home, we conclude that it is for the jury to determine whether Winterbottom's decision was guided by purposeful discrimination.   Defendants' motion for judgment as a matter of law with respect to this allegation is denied.

**b.      IAD Investigation for the Schizophrenic Memo**

On September 2, 2011, Winterbottom initiated an IAD investigation alleging insubordination for the language that Holt used in his August 23, 2011 memo to Brahl, where Holt stated "when you are trying to run a station it becomes very challenging to keep up with numerous deadlines relating to the same incident when the *instructions are schizophrenic*." (N.T. 10/31/13 at 47-48; N.T. 11/05/13 at 94) (Pl. Exh. 27.A) (emphasis added.)   Holt asserts that Winterbottom purposefully discriminated against him by initiating the investigation pointing to evidence that no other IAD investigation had ever been initiated for the use of "insulting language."   (N.T. 11/05/13 at 101.)   Defendants contend that Plaintiff has not rebutted Winterbottom's articulated legitimate reason for initiating the investigation, that she believed the correspondence to be insubordinate, and that they are thereby entitled to judgment as a matter of law on this claimed instance of discrimination.

We acknowledge that Winterbottom has proffered a legitimate non-discriminatory reason for initiating the IAD investigation.   We also acknowledge that if the jury were to accept that explanation, it would presumably conclude that she did not act with purposeful discrimination. The jury however had before it both the comparator evidence and some evidence of antagonism. Again we conclude that it is for the jury to make the determination whether Winterbottom's decision was guided by purposeful discrimination.   Defendants' motion for judgment as a matter of law with respect to this allegation is therefore denied.

**B.      Claims of Retaliation**

Holt brought a First Amendment retaliation claim under 42 U.S.C. § 1983 against all three of the remaining individually named Defendants, a Title VII retaliation claim against the PSP, and a PHRA aiding and abetting retaliation claim against Johnson.  We set out the legal standards for each of these causes of action.  We then discuss Holt's Section 1983 retaliation claim against Johnson, together with the Title VII claim against the PSP and the aiding and abetting PHRA claim against Johnson, as those claims are predicated upon Johnson's conduct. Finally, we will consider Holt's Section 1983 retaliation claims against Brahl and Winterbottom.

**1.      Legal Standards**

**a.      First Amendment and Title VII Retaliation Claims**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or of the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."  *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001) (citing *Ranking v. McPherson*, 483 U.S. 378, 383-84 (1987).   "[R]etaliation for the exercise of constitutionally protected rights . . . 'is itself a violation of rights secured by the Constitution actionable under Section 1983.'"  *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (quoting *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990)).   To establish the elements of a retaliation claim, a plaintiff must prove "(1) that [he or she] engaged in a protected activity; (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  If a plaintiff establishes the three elements of the claim, "[a] defendant

may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Id.* (citing *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)).

The elements of a *prima facie* case of retaliation under Title VII are essentially the same. A plaintiff must put forth evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). If the employer succeeds in establishing the *prima facie* case, "the familiar *McDonnell Douglas* approach applies in which 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct." *Id.* at 342 (citing *Krouse v. Am. Sterilizer Co.*, 126 F.2d 494, 500-01 (3d Cir. 1997). Once the employer has stated such a reason, "the plaintiff must produce evidence that either '(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that [retaliation] was more likely than not a motivating or determinative cause" of the adverse employment action. *Dellapenna v. Tredyffrin/Easttown Sch. Dist.,* 449 F. App'x. 209, 213 (3d Cir. 2011) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

## 2.     Protected activity

As discussed *supra,* in order to establish a First Amendment retaliation claim, and in order to establish a *prima facie* case of Title VII retaliation, a plaintiff must first show that he engaged in protected activity. At trial, and for purposes of his First Amendment retaliation claim, the jury was instructed that Holt's April 2009 EEO complaint, his May and July 2009

PHRA complaints, and the filing of his federal lawsuit in October 2010 constituted protected activity as a matter of law.  (N.T. 11/06/13 at 46-47.)  The jury was also instructed that his April 2009 EEO complaint and his May 2009 PHRA complaint constituted protected activity for purposes of the Title VII retaliation claim.  (*Id.* at 47.)

Defendants do not dispute that our instruction on protected activity with respect to the Title VII claim was correct.  They do however dispute our instruction as applied to Holt's First Amendment retaliation claims.

### a.      Waiver

Defendants argue that Holt's EEO complaint, the PHRA complaints, and the filing of this federal lawsuit are not protected activities, and we should grant judgment as a matter of law on these claims on this basis.  Before considering their argument, we must first consider Plaintiff's claim that Defendants have waived their right to raise this issue as they did not object when we instructed the jury that Holt's activity was, in fact, protected.  (Pl. Br. at 4) (citing *Kemether v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 1999 WL 1012957, at *5 n.2 (E.D. Pa. Nov. 8, 1999)   ("[Fed.R.Civ.P.] 51 requires that objection to jury instructions be raised prior to jury deliberation."))

Our instruction was as follows:

> Now, as relevant here, Plaintiff filed three what we call "EEO" complaints.  That's Equal Employment Opportunity complaints – one in April of 2009 against Captain Johnson and two in September 2011 against Lieutenant Brahl and Captain Winterbottom.   Sergeant Holt also filed charges with the Pennsylvania Human Relations Commission in both May and July of 2009 against the Pennsylvania State Police alleging discrimination and as to your consideration predicated upon the conduct of Captain Johnson.  The plaintiff also filed this federal lawsuit in October of 2010.  All of these activities are what we refer to as "protected activity."  Plaintiff had an absolute right to file these actions, to file these – and to file this complaint and that

> right is protected and he can't be discriminated against predicated
> – simply predicated upon the filing of these complaints for taking
> that protected activity.

(N.T. 11/06/13 at 46-47.)

We acknowledge that Defendants did not directly raise the objection to our instruction to the jury that Holt's activity was protected.   They did however argue the issue of whether Holt's activity was protected for purposes of the First Amendment retaliation claim at length in the presentation of their Rule 50(a) oral motion.  (N.T. 11/05/13 at 230-310.)  We are satisfied that they properly preserved the issue, and we will address their argument on the merits.  *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 278 (3d Cir. 1998) (finding an objection reserved where "the district court was fully apprised of [the party's] position, and it would serve no purpose to require counsel to have formally reasserted the objection after the charge had been given to the jury.")

### b.      The Merits

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."  *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001). Speech on a matter of public concern is protected under both the Free Speech Clause and the Petition Clause of the First Amendment.  *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2500 (2011).  Determining whether speech is a matter of public concern is a question of law for the court to decide.  *Connick v. Myers,* 461 U.S. 138, 148 n.7 (1983).  We make this determination by looking at the "content, form, and context of a given statement, as revealed by the whole record."  *Id.* at 147-48.

"A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community."

*Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003) (quotations and citation omitted).  Speech of a purely personal nature will not qualify as a matter of public concern.  *Id.*  Nonetheless, when government employees file grievances over the conditions of their employment it can be a matter of public concern where the litigation serves "as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public."  *Borough of Duryea, Pa.*, 131 S.Ct. at 2500 (internal quotations omitted).  As such, speech motivated by private concern can qualify as protected so long as it is a matter which also concerns the public.  *See also Rankin v. McPherson,* 483 U.S. 378, 386 n.11 (1987) (stating that "[t]he private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern.").

In our Memorandum Opinion on Defendants' motion to reconsider our denial of their motion for summary judgment, we addressed Defendants' argument that the EEO complaints, the PHRC complaints, and the filing of the complaint in this federal lawsuit did not constitute a matter of public concern.  *Holt v. Pennsylvania*, 2013 WL 5565612, *3-5 (E.D. Pa. Oct. 8, 2013).  In that opinion, we focused on the content of Holt's complaints, and relied on *Roberts v. Ferman*, 2011 WL 2937398 (E.D. Pa. July 20, 2011), to support our conclusion that all of Holt's complaints were constitutionally protected.  In so doing, we stated:

> Plaintiff cites to *Roberts* to support the proposition that Holt's speech is protected under the First Amendment.  In *Roberts*, then U.S. Magistrate Judge, and now U.S. District Court Judge Restrepo found that a detective's filing of employment discrimination charges, though grounded in his own interest, "containe[ed] serious allegations of . . . disparities in discipline and other treatment between Plaintiff, as the sole African-American County detective, and other Caucasian and Hispanic detectives."  Holt argues that his case is similar to *Roberts*, since his complaints also try to bring to light disparities in the treatment between him and non-African-American employees.

27

> We find Holt's legal argument persuasive.   We accept that
> questions of racial disparities in treatment within the PSP are
> relevant to the public's evaluation of that critical law enforcement
> agency.   Therefore, Holt's speech is constitutionally protected for
> purposes of his First Amendment retaliation claim.

*Id.* at *3-4 (citations omitted).   While we find the reasoning of *Roberts* to be persuasive

regarding the content of the speech, we will revisit our decision that Holt's speech is a matter of

public concern, this time placing an equal focus on the form and context of the speech.   *See*

*Connick,* 461 U.S. at 147-48.

In so doing, we are guided and persuaded by *Sharif v. Manning*, 2013 WL 3754818

(M.D. Pa. July 11, 2013) (J. Jones III).   That case also involved a PSP Sergeant – an Iranian-

American – who alleged that he was retaliated against for having filed an internal EEO

complaint against a Captain in the PSP and a federal lawsuit "alleg[ing] that an unprofessional

and unlawful culture of discrimination exist[ed] within the PSP which has caused him direct

harm and is condoned, rewarded and protected by the PSP."   *Id.* at *2 (internal quotations and

citations omitted).   Judge Jones found that the EEO complaint did not constitute a matter of

public concern, since it was a complaint which was "confidential and not an attempt to

communicate publicly." *Id.* at *12.   (citing *Borough of Duryea, Pa.*, 131 S.Ct. at 2501 (stating

that those petitions which "do not seek to communicate to the public or to advance a political or

social point of view beyond the employment context" are not matters of public concern)).   Judge

Jones confirmed the confidential nature of an EEO complaint by citing to "[t]he U.S. Equal

Employment Opportunity Commission's website [which] assures potential EEO complaint filers

that their personal information will be used only for 'record-keeping purposes' and that 'EEOC

employees are subject to strict confidentiality requirements by law.'" *Id.* at *11 n.4 (citing U.S.

EQUAL   EMPLOYMENT   OPPORTUNITY   COMMISSION,   "Confidentiality",   http://

www.eeoc.gov/employees/confidentiality.cfm (last visited June 25, 2013)). We agree with the

reasoning of *Sharif* and therefore conclude that the mere filing of an internal EEO complaint itself is not a matter of public concern.  We are unwilling, without more, to give it the status of protected activity for purposes of Holt's First Amendment retaliation claim.

We reach the same conclusion with respect to the filing of Holt's PHRC complaints. While those complaints were not filed internally like the EEO complaint, they are similarly confidential.  Plaintiff conceded at oral argument that neither his identity nor the content of his PHRC complaints were public information.  In fact, his PHRC complaints did not even reach the stage of the fact-finding conference, let alone the public hearing stage.  PENNSYLVANIA HUMAN RELATIONS                COMMISSION,              "Complaint                Process," http://www.portal.state.pa.us/portal/server.pt?open=514&objID=698150&mode=2#tttt        (last visited May 8, 2014) (A "Fact-Finding Conference," which "is often held by the commission as early as possible in the process . . . is NOT a public proceeding or a hearing;" A PHRC investigation only reaches the public hearing stage "[i]f after a probable cause finding the case has not settled.")  Accordingly, we conclude that the PHRC complaints do not constitute matters of public concern and are not protected activity for purposes of Holt's First Amendment Retaliation claim.  Defendant's motion with respect to the retaliation claim against Johsnson is granted, and these claims are dismissed.

We acknowledge that Judge Restrepo came to a different conclusion in *Roberts* where he found that the "filing of employment discrimination charges with the PHRC" could constitute a matter of public concern.  *Roberts*, 2011 WL 2937398 at *13.  However, there, the PHRC complaint process reached the stage of the fact-finding conference, and the "[p]laintiff's allegations of discrimination and retaliation" as contained within that complaint "ultimately drew the attention of local media and the local chapter of the National Association for the

Advancement of Colored People." *Roberts*, 2011 WL 2937398 at *13. Here, Plaintiff did not make his allegations public until the filing of this lawsuit, weighing against his argument that they were, in form and context, matters of public concern worthy of being considered protected activity.

With respect to the form and context of the complaint filed in this action on October 19, 2010, the limitations of the EEO and PHRC complaints do not apply. Unlike those petitions, "[a] court filing is a public communication." *Sharif*, 2013 WL 3754818 at *12. Particularly where Holt asked the Court to "enjoin the State and all employees of the State from aiding or abetting the policy practice and custom declared unconstitutional," (Doc. No. 1.), as he did in his federal lawsuit, his "contentions . . . if accepted by the jury, would clearly be a matter of public concern as they raise serious questions of racial animus and disparate treatment within this statewide policing agency." *See* our October 8, 2013 memorandum, *Holt v. Pennsylvania*, 2013 WL 5565612, *4 (E.D. Pa. Oct. 8, 2013); *see also Sharif,* 2013 WL 3754818 at *12 ( observing that while this "lawsuit inevitably and necessarily focuses only on harms which he alleges to have personally suffered . . . the broader issue of misconduct and discrimination within the PSP is a matter of public concern.") We conclude that the complaint that Holt filed in this action on October 19, 2010 is protected speech.

### 3.    Causation

In order to establish the second and third elements of the First Amendment retaliation claim, and to establish a *prima facie* case of title VII retaliation, a plaintiff must show that there was a causal connection between the adverse action and the protected activity. *Brennan v. Norton*, 350 F.3d 399, 420 (3d Cir. 2003) (holding that "[t]he causation required to establish a claim under § 1983 is identical to that required under Title VII."). In order to do so, "a plaintiff

usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism couple with timing to establish a causal link."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson v. Scott Paper, Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)).  "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation."  *Id.* (citing *Farrell v. Planters Lifesavers Co.*, 206 F. 3d 271, 281 (3d Cir. 2000)).

### a.    Johnson

Holt alleges that Johnson retaliated against him for having filed his April 2009 EEO complaint and his May 2009 PHRA complaint by not awarding him the Station Commander positions at Jonestown or Schuykill Haven in July 2009.  (Pl. Br. at 7.)  This allegation forms the sole basis for Holt's § 1983 First Amendment retaliation claim against Johnson, and his Title VII claim against the PSP.  As to these claims, the jury did not reach a verdict.

We have granted Defendants' motion for judgment as a matter of law with respect to the retaliation claim against Johnson having concluded that the EEO complaint and the PHRA complaint are not matters of public concern and are therefore not protected activity for these purposes.  However, as that analysis does not import to the Title VII claim, we now move to the question of whether there is a causal link between the adverse action and the protected activity.

Holt argues that causation can be established from the time proximity between the filing of these complaints and the adverse action, a pattern of antagonism, and the record as a whole. (Pl. Br. at 7-8.)  With respect to time proximity, Defendants cite to *Williams v. Philadelphia Hous. Auth. Police Dep't.*, 380 F.3d 751, 760 (3d Cir. 2004), for the proposition that a two

month difference between the protected activity and the adverse action (the time between the May PHRA complaint and the July non-assignment) is not unusually suggestive of retaliation and is therefore not sufficient, in and of itself, to establish causation. (Def. Br. at 19-20.) However, in *Williams*, where some two months elapsed between the protected activity and the adverse action, the Third Circuit also acknowledged that, "[i]n cases like this one, 'where the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test.'" *Id.* (citing *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3d Cir. 2003))).

Here, we conclude that the jury could infer causation from the timing of the non-assignment plus other evidence. We first observe that the two month lapse in time between the protected activity and the non-assignment is more probative of causation than the lapse of time was in *Williams*. *Williams* concerned a request for accommodation which was followed by the employee's termination two months later. *Id.* at 759-60. In that scenario, the employee could have been terminated at any time after the request for accommodation. However, here, the alleged retaliation did not concern a question of dismissal, but rather failure to reassign to a favorable station commander position – which became available only two months after the protected activity. We therefore conclude that the timing of the events plus other evidence could lead to an inference of causation, and we deny Defendants' motion with respect to the Title VII claim.

### b.    Brahl

Holt alleges, and the jury found, that Brahl retaliated against him by initiating an IAD investigation on September 15, 2011 in connection with the "day off" incident. (Pl. Br. at 9.)

(Doc. No. 93 at B.2.)    Although Holt concedes that the time proximity between Brahl's knowledge of the lawsuit and the initiation of this IAD investigation is not unusually suggestive, he argues that causation can be established by ongoing antagonism and from the record as a whole.  (Pl. Br. at 9.)

We agree.  Brahl was informed of the filing of the complaint in this federal lawsuit (the constitutionally protected activity) on July 15, 2011, two months before he initiated this IAD investigation.  This is a similar time proximity as the *Williams* case and as the filing of the PHRC complaint against Johnson and Johnson's initiation of the IAD investigation into the Philips incident.  Like Johnson's initiation of that IAD investigation, there is also clear evidence of ongoing antagonism between Holt and Brahl.  In this instance, the roll call comments, while they do not constitute an adverse action in and of themselves for purposes of the denial of equal protection claim, they certainly constitute evidence of ongoing antagonism towards Holt.  As such, Defendants' motion for judgment as a matter of law as to the § 1983 retaliation claim is denied.  We will not disturb the jury's verdict as to that finding.

### c.    Winterbottom

At trial, we instructed the jury that it was to consider three instances of alleged retaliation by Winterbottom against Holt.  (N.T. 11/06/13 at 47-48.)  The first was whether "Winterbottom retaliated against [Holt for filing the lawsuit in October 2010] by not awarding him the station command in King of Prussia in June 2011."  (*Id.*)  We will grant Defendants' motion for judgment as a matter of law on this issue as the evidence, uncontradicted by Plaintiff, shows that Winterbottom did not become aware of Holt's filing of this federal lawsuit until July 15, 2011, when Holt informed her via e-mail.  Obviously, without knowledge of the protected activity when she made the decision, her action could not be deemed retaliatory.

The second instance concerned alleged retaliation against Holt by initiating the IAD investigation pursuant to what came to be known as the "command conference" incident. (*Id.* at 48.) On August 31, 2011, at a Troop T command conference, Holt gave a presentation to which Winterbottom made some comments which Holt thought to be "embarrassing." (N.T. 10/31/13 at 56-59.) In response, Holt spoke loudly to Winterbottom and, as a result of this conduct, an IAD investigation was initiated against him for insubordination. (*Id.* at 59) (Pl. Exh. 28.) Plaintiff has however conceded that it was Lieutenant Stackhouse, and not Captain Winterbottom, who actually initiated the investigation. We therefore grant Defendants' motion for judgment as a matter of law as to this allegation and dismiss the claim against Winterbottom.

The third instance was whether Winterbottom retaliated against Holt for filing the complaint in this federal lawsuit by initiating an IAD investigation on September 2, 2011 in connection with the correspondence that he had with Lieutenant Brahl where he stated that the "instructions were schizophrenic." (N.T. 11/06/13 at 48) (Pl. Br. at 10-11.) The jury did not reach a conclusion as to this claim. Like their arguments with respect to the retaliation claims against Johnson and Brahl, Defendants argue that judgment as a matter of law should have been and should now be granted since the timing is not unusually suggestive of a retaliatory motive, and there is no evidence of ongoing antagonism for the jury to infer that Winterbottom was guided by a retaliatory motive in initiating this IAD investigation. We disagree with Defendants' argument.

Winterbottom found out about the filing of the complaint in this lawsuit on July 15, 2011, when Holt informed her via e-mail. The time proximity between her knowledge of the lawsuit and her initiation of the IAD was therefore just over a month and half, less time than in *Williams*, or with Johnson, or Brahl. Here again, while this passage of time might not be unusually

suggestive of a retaliatory motive, it could, coupled with other evidence of ongoing antagonism allow the jury to conclude that Winterbottom retaliated against Holt in initiating this IAD investigation.  We are satisfied that the record provides other evidence of antagonism such that this claim must go forward.  Defendants' motion for judgment as a matter of law with respect to this claim is denied.

### d.      Legitimate Non-Retaliatory Reasons

Defendants argue that, notwithstanding our conclusion that the jury could infer a pattern of antagonism or glean retaliatory animus from the record as a whole, we should grant the Rule 50 motion since they have proffered legitimate non-retaliatory reasons for their actions.  (Def. Br. at 23) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.")).  In that we have already determined that, for purposes of the denial of equal protection claim against the individually-named Defendants, and the Title VII discrimination claim against the PSP, that Plaintiff has offered enough evidence to give the jury a basis to consider whether the proffered legitimate reasons put forward by Defendants could be rejected, we reach the same conclusion here.

### C.      Qualified Immunity

Defendants assert that they are entitled to qualified immunity against Holt's constitutional claims under 42 U.S.C. § 1983.  (Def. Br. at 27-31.)  Before the trial, they raised qualified immunity in their answers, (Doc. Nos. 31 at 10; 32 at 11; 36 at 10; 37 at 10), their motion for summary judgment, (Doc. No. 55 at 22-24), and in their motion for reconsideration of our summary judgment order where we found that they were not entitled to qualified immunity.

(Doc. No. 60 at 6-10.)   At trial, they reasserted their qualified immunity defense in their Rule 50(a) motion. (N.T. 11/05/13 at 230-310.)   Their qualified immunity argument has therefore been preserved, and we will address their argument on the merits.

"The doctrine of qualified immunity protects government officials 'from liability or civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   We must therefore examine 1) whether a defendant's conduct violated a constitutional right; and 2) whether the right was clearly established at the time.   *Id.*   In order to determine "whether the right was clearly established," we must consider whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."   *Saucier v. Katz*, 533 U.S. 194, 202 (2001).   "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time."   *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).   Accordingly, "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition."   *Id.* (citing *Saucier* 533 U.S. at 201.)

## 1.    Holt's Constitutional Claims

### a.    Denial of Equal Protection Claims

With respect to Johnson, we granted Defendants' motion for judgment as a matter of law in connection with the initiation of the IAD pursuant to the Philips incident and Holt's removal from the Officer-of-the-Day roster.   The remaining denial of equal protection claims against Johnson therefore concern the non-assignment to the Reading Patrol Sergeant position in January and February 2009, the reassignment to Staff Services Sergeant in March 2009, and the non-assignment to Station Commander at Jonestown or Schuylkill Haven in July 2009.

With respect to Brahl, we granted Defendants' motion for judgment as a matter of law in connection with the roll call comments.  The initiation of the IAD for the "day off" incident in September 2011 is therefore the only remaining denial of equal protection claim against Brahl. With respect to Winterbottom, there are two allegations in connection with the denial of equal protection claim: (1) the non-assignment to KOP Station in June 2011; and (2) the initiation of the IAD for the "schizophrenic" memo on September 2, 2011.

Defendants do not seriously dispute that Holt's Fourteenth Amendment right to equal protection is a clearly established right of which a reasonable police officer would have known. We find that, as a matter of law, the right to be free from discrimination in the workplace is a well-established right that does not entitle a defendant to qualified immunity.  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1479 (3d Cir. 1990) (finding that "[t]he general right which the jury found them to have violated, the right to be free of discrimination based upon sex in the workplace, was well grounded in law and widely known to the public by 1986"); *Cruz-Smith v. Sinclair*, 2011 WL 3652462, *4 n.10 (E.D. Pa. Aug. 19, 2011) (citing *id.* at 1479-80) (finding that "the right to be free from discrimination in the workplace based on sex and national origin was clearly established" since August 2008).

The dispute between the parties instead centers around whether we can take Defendants' subjective state of mind into account in the qualified immunity calculus.  (Def. Br. at 29.) Defendants argue that we cannot, since "[w]hat matters is whether a reasonable official, in the defendant's position, possessing the factual knowledge and information that the defendant possessed, would have understood that his or her actions contravened clearly established constitutional requirements."  (*Id.*)  More specifically, they argue that, with respect to "Holt's equal protection claims against Winterbottom and Johnson for their managerial decision about

Holt's employment assignments and Holt's equal protection claim against Brahl for the 'day off' incident, reasonable officials, in their positions, possessing the factual knowledge and information that they possessed, would have understood that the law allowed them to take the action they took without violating Holt's equal protection rights."  (*Id.* at 31.)

We must reject Defendants' argument.  While we observe that the qualified immunity analysis has been "purged . . . of its subjective components" in that it is irrelevant whether "[d]efendants in fact knew they were violating plaintiffs' constitutional rights," this "is distinct from the question of whether a public official, in taking official action that but for an improper motive would not be legally proscribed, in fact harbored the improper motive."[6]  *Grant v. City of Pittsburgh,* 98 F.3d 116, 123-24 (3d Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815-16 (1982)).  Like *Grant,* where the plaintiffs alleged that the decisions of the Pittsburgh City Council and the Historic Review Commission "were motivated not by the public interest but by partisan political or personal reasons having nothing to do with historic preservation," *Id.* at 119, the claims against Johnson, Winterbottom, and Brahl are "precisely the sort[s] of claim[s] where clearly established law makes the conduct legal or illegal depending upon the intent with which it is performed." *Id.* at 125 (citations omitted).  As discussed *supra*, Defendants would be held liable for denying Holt's right to equal protection were the jury to infer that racial discrimination was a motivating or determinative factor in the adverse employment actions.  As such, we must reject the purely objective inquiry advocated by the Commonwealth, *see Grant,* 98 F.3d at 125

---

[6] Defendants point to *Crawford-El v. Britton*, 523 US. 574 (1998), decided by the Supreme Court after *Grant*, to support their proposition that a defendant's subjective state of mind should not be taken into account for purposes of the qualified immunity analysis.  While *Crawford-El* did reaffirm *Harlow*'s elimination of the "subjective component of the immunity defense," as *Grant* stated, this "is distinct from the question of whether a public official, in taking official action that but for an improper motive would not be legally proscribed, in fact harbored the improper motive."  *Grant v. City of Pittsburgh,* 98 F.3d 116, 124 (3d Cir. 1996).

(reasoning that such an inquiry "would essentially insulate government officials from liability for the very harm our substantive due process precedents have sought to redress"), and we find that Defendants' are not entitled to qualified immunity for the remaining denial of equal protection claims against them.

### b.      First Amendment Retaliation Claims

With respect to Johnson, we granted Defendants' motion for judgment as a matter of law in connection with the non-assignment to the Station Commander position at Jonestown or Schuykill Haven.  Since that was the only alleged instance of retaliation against Johnson, we have dismissed the First Amendment retaliation claim against him, and we need not consider it for purposes of qualified immunity.

With respect to Brahl, the only instance of alleged retaliation is the initiation of the IAD for the "day off" incident in September 2011.  With respect to Winterbottom, the only instance of alleged retaliation is the initiation of the IAD investigation on September 2, 2011 in connection with the "schizophrenic" memo.   Both of these retaliation claims are predicated upon Brahl and Winterbottom having learned, on July 15, 2011, of Holt having filed the complaint in this federal lawsuit in October 19, 2010.  Defendants argue that Brahl and Winterbottom are entitled to qualified immunity "[s]ince the law was not clear that Holt's complaint in this matter contained protected speech under the First Amendment."  (Def. Br. at 31.)

In making this argument, Defendants point to *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488 (2011), which was decided on June 20, 2011, over two months before the initiation of the IAD investigations.  In the Third Circuit, prior to the Supreme Court's decision in *Borough of Duryea*, "a public employee who [] petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance [was] protected under the Petition Clause from retaliation

for that activity, even if the petition concerned a matter of solely private concern." *Foraker v. Chaffinch*, 501 F.3d 231, 236 (3d Cir. 2007) (citing *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994)). *Borough of Duryea* abrogated the Third Circuit's holding in *Foraker*, holding that speech which had been protected under the Petition Clause is now subject to the same "public concern" test as speech which is protected under the Free Speech Clause. *Borough of Duryea*, 131 S.Ct. at 2491 ("As under the Speech Clause, whether a petition related to a matter of public concern will depend on its 'content, form, and context . . . as revealed by the whole record'") (citing *Connick v. Myers*, 461 U.S. 138, 148-49 (1983)). Defendants then argue that, because the Third Circuit had not held, "[i]n the intervening period between *Borough of Duryea* and the alleged retaliatory actions by Brahl and Winterbottom . . . that complaints that contain allegations of everyday employment disputes are protected speech under the First Amendment," reasonable officials in their position would not have known that Holt was protected under the First Amendment for having filed the complaint.[7]  (Def. Br. at 31.)

We do not agree with Defendants' argument.  A reasonable official, in the positions of Brahl and Winterbottom at the time of the allegedly retaliatory actions, would have known that the complaint contained more than just allegations of everyday employment disputes.  In Holt's July 15, 2011 e-mail to Winterbottom, Holt wrote that he "currently ha[d] a Federal Race Discrimination Law suit [sic] filed in Federal Court against Captain Steven Johnson and the Department," and he also referenced the comparison that Brahl made between him and Wayne Mason, stating that he was considering filing a complaint of racial discrimination for those

---

[7] We observe that Defendants' argument is focused on the content of the complaint, as opposed to the form or context in which the complaint was initiated.  As such, we consider Defendants to have conceded that the only question for our consideration here is whether the content of the speech is protected under the First Amendment.

comments, and that he "also believe[d] that some of the acts that [we]re being committed against [him were] retaliatory in nature because of [the] pending Federal Lawsuit." (Pl. Exh. 16.) When Holt informed Brahl of the lawsuit, he similarly told him that that he "had filed a federal lawsuit against the department for race discrimination and retaliation." (N.T. 10/31/13 at 33.) As such, both Brahl and Winterbottom knew or are charged with knowing that the lawsuit involved allegations of racial discrimination and retaliation, not only against Captain Johnson, but against the PSP as well.

In light of this knowledge, *Borough of Duryea* points us to our conclusion that the law was clearly established such that a reasonable official in their position would have known that Holt's speech in the complaint was protected. Although Holt's allegations in this lawsuit naturally focus open employment matters which are personal to him, by putting Brahl and Winterbottom on notice that the lawsuit involved more widespread allegations of racial discrimination and retaliation in the department, a reasonable official in their position should have known of the broader reaching implications of the lawsuit. As the *Duryea* court stated:

> The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign.
>
> Petitions to the courts and similar bodies can [] address matters of great public import. In the context of the civil rights movement, litigation provided a means for the "distinctive contribution of a minority group to the ideas and beliefs of our society." *NAACP v. Button*, 371 U.S. 415, 431 (1963). Individuals may also "engag[e] in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *In re Primus*, 436 U.S. 412, 431 (1978). Litigation on matters of public concern may facilitate the informed public participation that is a cornerstone of democratic society. It also allows individuals to pursue desired ends by direct appeal to government officials charged with applying the law.

*Borough of Duryea,* 131 S.Ct. at 2500.

Our conclusion is further buttressed by Judge Restrepo's holding in *Roberts v. Ferman,* 2011 WL 2937398 (E.D. Pa. July 20, 2011), that a detective's filing of employment discrimination charges was protected activity under the First Amendment.  Those charges, while grounded in the detective's own interest, "contain[ed] serious allegations of . . . disparities in discipline and other treatment between Plaintiff, as the sole African-American County detective, and other Caucasian and Hispanic detectives."  *Id.* at 3-4.  Although district court decisions are not the "binding precedent in this circuit . . . [they] may be relevant to the determination of when a right was clearly established for qualified immunity analysis."  *Doe v. Delle*, 257 F.3d 309, 321 (3d Cir. 2001).  Given that the *Roberts* decision was issued on July 20, 2011 – one month after *Borough of Duryea*, and one and a half months before the alleged retaliatory activity – and that *Roberts* also involved an African-American police department employee making allegations of racial discrimination, we find *Roberts* to be particularly persuasive in this regard.  On this note, we also observe that Defendants have not pointed us to any authority to indicate that any courts in our circuit have declared that the filing of a complaint in a similar § 1983 action is not a matter of public concern.  As such, we find that Defendants are not entitled to qualified immunity on Holt's First Amendment retaliation claims.

>    **D.** **Damages**

The jury found that Holt suffered an actual injury, and awarded him $25,000 in compensatory damages, having allocated the entire amount to the roll call comments.  (Doc. No. 93 at G.1.; G.2.a.; G.2.b.)  The jury also awarded Holt $25,000 in punitive damages, having allocated that entire sum to the roll call comments.  (*Id.* at G.4.b.2.)  Since we have granted

judgment as a matter of law with respect to Holt's claim against Brahl for the roll call comments, we vacate the jury's award of damages attributable to the roll call comments.

The jury also found that Brahl retaliated against Holt in violation of his First Amendment rights, having been instructed that the only instance of retaliation to consider was Brahl's initiation of the IAD investigation on September 15, 2011 in connection with the "day off" incident. (*Id.* at B.2.) However, since the jury's monetary award was only for the roll call comments, it follows that the jury did not find that Holt was actually harmed on account of having his First Amendment right violated. As such, we enter an award of $1 in nominal damages. *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) ("Nominal damages . . . are the appropriate means of vindicating rights whose deprivation has not caused actual, provable injury") (quotations and citation omitted).

## IV.    Brahl's Motion for a New Trial

In the alternative, Defendant Brahl seeks a new trial pursuant to Fed.R.Civ.P. 50(a)(1)(A). (Def. Br. at 35.) His alternative argument for a new trial centers around his contentions that the liability verdict for the "roll call comments claim" was "against the weight of the evidence," and the damages verdict was "tainted." (*Id.* at 35-36.) The jury found that Brahl violated Holt's right to equal protection under the law for the roll call comments he made in May or June of 2011. (Doc. No. 93 at A.2.a.) The jury then found that Holt suffered an actual injury, and, allocating the entire sums to the roll call comments, awarded him $25,000 in compensatory damages and $25,000 in punitive damages. (*Id.* at G.1.; G.2.a.; G.2.b.; G.4.b.2.) However, since we have already found, as a matter of law, that the roll call comments do not constitute an adverse action, and have vacated the jury's finding of liability and damages with respect to this claim, we need not address Brahl's motion for a new trial. It is denied as moot.

## V.       CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law on the Fourteenth Amendment equal protection claims, the First Amendment retaliation claims, the Title VII racial discrimination claim, and the PHRA aiding and abetting racial discrimination claim is granted in part and denied in part.  Their motion for judgment as a matter of law on the Title VII retaliation claim and the PHRA aiding and abetting retaliation claim is denied.  The jury award is vacated, Brahl's motion for a new trial is denied as moot, and $1 in nominal damages is awarded.  An appropriate order follows.


BY THE COURT:


/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE