IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID HOLT II, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | NO. 10-5510 |
| PENNSYLVANIA, et al., | : | |
| Defendants. | : | |

### MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    August  19, 2015

David  Holt  II  (alternately  "Holt"  or  "Plaintiff"),  an  African  American  male  and  a

Pennsylvania State Police ("PSP") Sergeant, filed this action against the Commonwealth of

Pennsylvania,  the  PSP,  retired  Captain  Steven  Johnson  ("Johnson"),  retired  Lieutenant  Gerald

Brahl  ("Brahl"),  retired  Captain  Kathy  Jo  Winterbottom  ("Winterbottom"),  and  Lieutenant

Kristal  Turner–Childs  ("Turner-Childs");  (collectively  the  "Defendants").   Through  this  lawsuit,

he  raised  Fourteenth  Amendment  equal  protection  and  First  Amendment  retaliation  claims

against  the  individual  Defendants  under  42  U.S.C.  §  1983  ("Section  1983").   He  also  brought

aiding and abetting discrimination and retaliation claims against the individual defendants under

the  Pennsylvania  Human  Relations  Act,  43  Pa.  Cons.  Stat.  §  951,  et  seq.  ("PHRA"),  and

discrimination and retaliation claims against the PSP under Title VII of the Civil Rights Act of

1964,  42  U.S.C.  §  2000e,  et  seq.,  ("Title  VII").   The  case  was  initially  tried  before  a  jury  in

October  and  November  of  2013.   Following  Defendants'  Fed.  R.  Civ.  P.  50(a)  motion,  we

entered judgment in favor of Turner-Childs and dismissed her from the case.  We also granted

1

judgment as a matter of law under Fed. R. Civ. P. 50(a) in favor of Winterbottom and Brahl on the PHRA claims and in favor of the PSP on the Title VII claims, as they concerned the acts of those two officers.  The remaining claims under Title VII and the PHRA against the PSP and Johnson and under Section 1983 equal protection and retaliation against Brahl and Winterbottom were presented to the jury.

The jury returned with a partial verdict.  (Doc. No. 93.)  It found Brahl liable under Section 1983 on two claims, finding that he had violated Holt's equal protection rights in making certain racially charged comments (hereinafter "roll call comments") and that he had violated Holt's First Amendment rights when he retaliated against him by initiating an Internal Affairs Division ("IAD") investigation for what counsel and the Court have referred to as the "day off" incident.  The jury awarded Holt $25,000 in compensatory damages and $25,000 in punitive damages on these claims, attributing 100% of these awards to the roll call comments.  The jury was unable to reach a verdict on the remaining claims.  Defendants then pursued renewal of their Fed. R. Civ. P. 50 motion for judgment as a matter of law and, in the alternative, for a new trial under Fed. R. Civ. P. 59.  (Doc. No. 95.)  We granted judgment as a matter of law on a number of these claims, including the equal protection claim against Brahl for the roll call comments. (Doc. No. 134.)  Accordingly, given the lack of a damage award as to the retaliation claim for the initiation of the investigation into the "day off" incident, Holt was awarded nominal damages of $1.00.[1]

_____

[1] We granted judgment as a matter of law in favor of Johnson and the PSP as to the race discrimination claims concerning the "Phillips incident" and Holt's removal from the "Officer-of-the-Day Roster"; in favor of Brahl as to the race discrimination claim concerning the roll call comments; in favor of Johnson as to the First Amendment retaliation claim arising from Holt's non-assignment to the Jonestown and Schuylkill Haven Stations; and in favor of Winterbottom as to the First Amendment retaliation claims regarding the non-assignment to King of Prussia Station and the IAD investigation into the "command conference" incident, an episode where Holt had allegedly

The second trial took place between October 29, 2014 and November 5, 2014.  In this trial, Holt pursued his remaining claims.  He claimed that Johnson was liable under Section 1983 for violating his equal protection rights on three separate occasions: not assigning Holt to the Reading Patrol Sergeant position; reassigning him to Staff Services Sergeant; and not assigning him to the position of Station Commander at either Jonestown or Schuylkill Haven Stations.  He also claimed that Johnson was liable under the PHRA for those same racially driven acts and further claimed that the PSP was liable for those same acts under Title VII for race discrimination.  Holt next claimed that Brahl was similarly liable under Section 1983 for violating his equal protection rights when he initiated the IAD investigation into the "day off" incident.  Plaintiff then claimed that Winterbottom was liable under Section 1983, again for violating his equal protection rights, by failing to assign him to the Station Commander position at King of Prussia Station in June 2011 and by later initiating an IAD investigation into Holt's use of less than tactful language in a communication to a superior in September 2011 (the "Schizophrenic Memo" IAD investigation).

Holt finally claimed that several acts of the Defendants were motivated by retaliatory animus for his filing of complaints with the PSP's internal Equal Employment Opportunity Office ("EEOO"), the Pennsylvania Human Relations Commission ("PHRC"), or with this Court.  Specifically, he pursued claims against the PSP, under Title VII, and Johnson, under the PHRA, claiming that Johnson's decisions to deny him either of the two Station Commander positions at Jonestown and Schuylkill Haven were made out of retaliation for his filing EEOO and PHRA complaints.  He claimed that Winterbottom was liable under Section 1983 for

---

acted in a disrespectful manner towards Winterbottom during a presentation at this conference of commanders. (Doc. No. 134.)  Judgment as a matter of law was denied as to all other claims.  (*Id.*)

retaliating against him for filing this lawsuit.

Following the close of Plaintiff's case, Defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) (N.T. 11/3/2014, at 296.)  We deferred ruling on that motion, allowing the case to proceed with the presentation of Defendants' evidence and then to be considered by the jury.  (*Id.* at 317.)  The jury found each of the Defendants liable, albeit under different statutory and factual predicates.  It found that Johnson and the PSP were liable for retaliation under the PHRA and Title VII, respectively, for Johnson's decision to not assign Holt to either of the Jonestown or Schuylkill Haven positions.  (Verdict Sheet- Liability, Doc. No. 170.)  It found that Winterbottom was liable under Section 1983 for race discrimination for not assigning Holt to King of Prussia and for initiating the investigation into the "Schizophrenic Memo."  (*Id.*)  It also found that Winterbottom was liable under Section 1983 for First Amendment retaliation for her decision to initiate that same investigation.  (*Id.*)  Finally, it found that Brahl was liable under Section 1983 for race discrimination for his initiation of the IAD investigation into the "day off" incident.  (*Id.*)  The jury also found that neither Johnson nor the PSP were liable, under Title VII and the PHRA, respectively, for race discrimination as to any of the three actions that Johnson took while Holt was under his command (*Id.*)

The jury was asked to assess damages based on the adverse action underlying each of the claims for which it found the Defendants liable.  (Verdict Sheet- Damages, Doc. No. 169.)  As to Johnson's failure to assign Holt to the two positions at the Jonestown and Schuylkill Haven stations, the jury awarded compensatory damages of $250,000.  (*Id.*)  As to Winterbottom's failure to assign Holt to King of Prussia, the jury awarded $200,000 in compensatory and $300,000 in punitive damages and awarded identical compensatory and punitive damage sums

4

regarding her later decision to initiate the "Schizophrenic Memo" IAD investigation.  (*Id.*)  As to Brahl's initiation of the IAD investigation into the "day off" incident, the jury awarded $300,000 in compensatory and $425,000 in punitive damages.  (*Id.*)  The aggregate award was $1,975,000, with $950,000 attributed to compensatory damages and $1,025,000 attributed to punitive damages.

Following the verdict, Defendants filed "Defendants' Post-Trial Motion Pursuant to Fed. R. Civ. P. 50(b) and 59 for Judgment as a Matter of Law or, in the Alternative, for a New Trial" (Def. Motion, Doc. No. 176), as well as their brief in support.  (Def. Br., Doc. No. 184.)  Plaintiff then filed his opposition.  (Def. Br., Doc. No. 192.)  Oral argument was held on Defendants' Motions on June 4, 2015.  Due to this Court's decision, under Fed. R. Civ. P. 59(d), to review the *sum* of as opposed to the mere *entitlement to* punitive damages, we invited and received additional briefing by the parties on that discrete issue.  (Doc. No. 196, 198, 199, 200.)   The matter is now ripe for resolution.

I.      **FACTUAL HISTORY**

A.  **Troop L**

Holt has been employed by the PSP since 1994 and was promoted to his current rank of sergeant in 2006.  (N.T. 10/29/2014, at 36-37.)  Throughout his employment, he was stationed at various locations and with different troops.  As is relevant here, he was transferred to Troop L and its Reading station in March 2008.  (*Id.* at 38.)  During this time, Johnson was the Captain of that troop.  (*Id.* at 39.)

Holt's initial position at Troop L was as Special Projects Coordinator.  (*Id.* at 46; N.T. 10/30/2014, at 64-65.)   This position focused on the execution of "Special Enforcement

Programs" such as DUI checkpoints and the collection of data from the stations within Troop L. (N.T. 10/29/2014, at 46; N.T. 10/30/2014, at 109.)  It involved some supervision, with Holt testifying that that he was "second in command" for 23 personnel, although Holt's testimony did not expand upon the extent of his supervisory responsibilities.  (N.T. 10/29/2014, at 46; N.T. 10/30/2014, at 180-81.)

In the fall of 2008, Holt ran into a problem which became the opening event of the difficulties between him and his command.  (N.T. 10/30/2014, at 50.)  He testified that, at that time, he was approached by a young trooper about his mother, who had been charged with assaulting an elderly guest in a nursing home.  (*Id.* at 51.)  The trooper told Holt that the victim had later passed away and that a hearing had been scheduled in the case.  (*Id.* at 51.)  The matter was being handled by local police, not the PSP.  (*Id.* at 53.)  Nonetheless, Holt, in apparent support of the trooper, went to the Magistrate's District Office, in uniform, to inform the District Justice or prosecutor that the victim had passed away.  (*Id.* 51-52.)  It appeared that the District Justice was concerned about Holt's inquires and told him to leave the courthouse.  (*Id.* at 52, 58.)  Holt complied and contacted his Lieutenant, telling him that he would likely receive a call from the District Justice, which did later occur.  (N.T. 10/30/2014, at 52.)  Holt had not informed his superiors of his decision to attend the court proceeding, nor did he take leave for the time he was in court.  (*Id.*)  An IAD investigation was then initiated by Johnson in October 2008 and, in April 2009, sustained by him,[2] resulting in a three day suspension and ineligibility for promotion through December 2010.  (*Id.* at 70; N.T. 11/3/2014, at 252.)  Winterbottom was involved in the investigation, having been employed by Internal Affairs.  (N.T. 10/30/2014, at 179.)  Holt

---

[2] It was not explained what "sustaining" an IAD investigation involves.  We assume from context that it means that it was founded and would provide a basis for discipline.

testified that she requested the District Attorney pursue charges against Holt for interfering with a criminal investigation but the DA declined.  (*Id.* at 179.)

In December 2008, Holt was called to the scene of an emergency situation involving a gunman who had earlier discharged his firearm at law enforcement.  (N.T. 10/29/2014, at 43.) Holt was the highest ranking officer at the scene from Troop L, but Lieutenant Bob Queen from the PSP's Special Emergency Response Team ("SERT"), was the highest ranking official on the scene overall.  (*Id.* at 44.)  The matter resolved without any apparent difficulty.  The next day Holt met with Johnson regarding the incident.  (*Id.* at 45.)  While Holt claimed he was not told he had done anything wrong and was in fact commended, Johnson testified that Holt, as the highest ranking member of Troop L on the scene, should have taken charge and assumed the position of "Top Commander." (*Id.*; N.T. 11/3/14, at 89.)  Johnson explained that SERT was on the scene to be used as a tool to address the emergency.  (N.T. 11/3/14, at 89.)  Johnson stated that Holt did not follow proper procedure when he let Corporal Leo Luciani, a lower ranking trooper, take charge of the situation.  (*Id.*)  Consequently, Johnson testified, he directed Holt's lieutenant, Lieutenant White, to review proper SERT procedure with Holt.  (*Id.* at 90-91.)  Holt was implicated in a flawed strategic decision made by Corporal Luciani in dealing with the gunman which gave rise to an internal affairs investigation addressing Corporal Luciani's actions but also referenced Holt's performance and the need for Holt to be educated on proper procedure.  (*Id.* at 92.)

In January 2009, a Patrol Sergeant position became vacant at the Reading station.  (N.T. 10/29/2014, at 47-48.)  Given the higher level of responsibility and supervision it called for, Holt saw this as a stepping stone toward making lieutenant.  (*Id.*)  He informed the two lieutenants

above him at Troop L of his interest in the position, so that he might be considered by Captain Johnson.  (*Id.*)  Johnson did not give Holt the assignment.  (*Id.* at 49-51.)  He initially made Corporal Wayne Elser the acting patrol sergeant and then then awarded the permanent position to Sergeant Andrew Wenger.  (*Id.* at 49-50.)  Wenger had already worked as a Patrol Sergeant in Troop M and had experience both in the crime and patrol units.  (*Id.*, at 50-51.)  Johnson testified that despite Holt having more time in as sergeant, he chose Wenger over Holt given his greater supervisor experience and specific experience working this same position at a much larger station. (N.T. 11/3/2014, at 116-17.)  This contrasted with Holt's experience which was focused on administrative and patrol work.  (*Id.*)  The jury found that Johnson was not liable for violating Holt's equal protection rights as to this decision.  (Verdict Sheet- Liability, Doc. No. 170.)

Around that same time, Johnson reassigned Holt to Staff Services Sergeant.  (N.T. 10/29/2014, at 53.)  This position was not patrol related and was primarily concerned with securing evidence, maintaining automobile parts inventory, and ensuring that the Troop has an adequate supply of uniforms.  (*Id.* at 53-55.)  Holt testified that this position was the "least desirable" of the sergeant positions in the troop and lacked significant supervisory responsibility. (*Id.* at 54.)

Johnson told the jury that it was his understanding, from what his lieutenants had told him, that Holt was under substantial stress in his prior assignment and that the Staff Services position would be less stressful.  (N.T. 11/3/2014, at 248-49.)  Holt testified that although he had taken a voluntary course on dealing with workplace stress, he had not told anyone at work that he was having personal problems.  (N.T. 10/29/2014, at 42, 55; N.T. 11/3/2014, at 86-87.)  He also stated that he was not given an evidence key, which he said was unusual and made it more

difficult to properly do the job.  (N.T. 10/29/2014, at 58).  Johnson, however, testified that the Staff Services Sergeant is not normally given an evidence key.  (N.T. 11/3/2014, at 93-94).

Holt told the jury he was not told why he was reassigned and that this involuntary reassignment was "absolutely catastrophic because in most cases you'll never get promoted to lieutenant . . . because the consensus is you can't do your job."  (N.T. 10/29/2014, at 54-57.) The jury, nevertheless, determined that Johnson did not violate Holt's equal protection rights by assigning him to this position.  (Verdict Sheet- Liability, Doc. No. 170.)

On April 6, 2009 Holt filed an internal complaint with the PSP's Equal Employment Opportunity Office (hereinafter "EEOO complaint).  (*Id.* at 57.)  In this complaint he asserted that Captain Johnson had racially discriminated against him by denying him the Reading Patrol Sergeant position, by reassigning him to Staff Services Sergeant, and by not giving him a key to the evidence room.  (*Id.* at 60.)  Holt received a responsive letter from the PSP dated May 5, 2009, which stated that Johnson had been asked about Holt's internal complaint.[3]  (*Id.* at 61.)

In July 2009,[4] two Station Commander positions opened up within the Troop, one at Schuylkill Haven and the other at Jonestown.  (*Id.* at 64.)  Holt communicated his interest to his lieutenant who then passed that information on to Johnson.  (N.T. 10/29/2014, at 64.)  Holt stated that he had a strong interest in both positions in that a Station Commander involves the greatest level of responsibility a sergeant in the PSP can have and is looked upon positively by management when promotion to lieutenant is considered.  (*Id.* at 64-65.)

---

[3] Later that month, Holt filed a second complaint, this time with the Pennsylvania Human Relations Commission ("PHRA complaint"), alleging both race discrimination and retaliation.  (N.T. 10/29/2014, at 61-62.)  Holt received the PSP's response to the PHRA complaint on September 11, 2009, the content of which was not presented at trial. (*Id.* at 63.)

[4] The exact dates when these vacancies came available or were filled were not presented at trial.

He was passed over for both positions.  Sergeant Paul Gaspich was assigned the Jonestown Station position.  (*Id.* at 65-66.)  Gaspich had been a sergeant for two years less than Holt and had experience as staff services sergeant and as a crime sergeant.  (*Id.* at 66.)  Holt pointed out, however, that he had no patrol experience as a sergeant and had not taken part in certain voluntary training as Holt had done.  (*Id.*)  Sergeant Stephen Stinsky was assigned the Schuylkill Haven position.  (*Id.*)  Stinsky had eighteen months less experience as a sergeant and less experience in patrol than Holt and had not taken the same voluntary training courses as Holt.  (*Id.* at 66, 74-75.)  He did, however, have experience in criminal investigation, patrol, the Bureau of Emergency Services, and as a station commander.  (N.T. 11/3/2014, at 103-04, 118-19, 130.)  Holt testified that he was not aware of any disciplinary issues regarding these two men.  (N.T. 10/30/2014, at 81.)

On July 27, 2009, after losing out on these positions, Holt filed a second PHRA complaint.  (N.T. 10/30/2014, at 76-78.)  In October 2010, Holt filed this action,[5] pursuing claims against the PSP, Johnson, and Lieutenant Kristal Turner-Childs, an officer whose liability has since been addressed and whose actions are not at issue in the present Motion.  (N.T. 10/29/2014, at 80.)

**B.  The Transfer to Troop T**

In the spring of 2011, Holt pursued a voluntary transfer from Troop L to Troop T and indicated a preference for assignment to the King of Prussia as opposed to the Pocono station, both of which had vacant Station Commander positions.  (N.T. 10/29/2014, at 82.)  Lieutenant Brahl, with whom he had no prior contact, would soon become his direct supervisor at Troop T

---

[5] The lawsuit was later amended in May of 2011 and again in October of 2011; in the later amendment, Brahl and Winterbottom were added as defendants.  (N.T. 10/29/2014, at 80-81.)

while Captain Winterbottom, who had become the newly appointed commander of the Troop, was one step above Brahl in the chain of command.  (*Id.* at 83.)

While his transfer was pending, Holt heard from several members of Troop T that certain disparaging remarks about him had been made by Brahl in front of members of the Troop during King of Prussia Station's morning "roll call."  (*Id.* 83-84.)  While the timing is imprecise from the testimony, Brahl had made reference to Holt on more than one occasion in the spring of 2011.  (*Id.* at 84-86; N.T. 11/3/2014, at 34, 248.)  The substance of these comments was to the effect that Holt should "pull [his] card" — meaning withdraw his transfer request — in that he would not be getting the King of Prussia position and would instead be "banished" to the Poconos, 72 miles from King of Prussia.  (N.T. 10/29/2014, at 84; N.T. 10/30/2014, at 106.)  Witnesses called by Holt testified that Brahl told the troopers that Holt was "not wanted in Troop T," that he "was a lazy piece of shit," "stupid," would not be in a position to "mess up" what Brahl had "built up" in King of Prussia, and that as long as he and Winterbottom were in charge, Holt would not get to King of Prussia.  (N.T. 10/29/2014, at 84; N.T. 10/30/2014, at 248-49.)  Brahl also referred to Holt as "another Wayne Mason," a reference to an African American sergeant who was forced out of his position following a series of problems at the station.   (N.T. 10/29/2014, at 84; N.T. 11/3/2014, at 194-96).  Brahl was reported as saying "I got Wayne Mason in a year, I'll get Holt in six months," apparently a reference to the time it took for Mason to be demoted.  (N.T. 10/29/2014, at 84.)  Holt testified that when he heard of these comments, he was emotionally "devastated," believing that they had "undermined [his] authority" and "absolutely obliterated" his character and reputation in the eyes of the troopers who heard them. (*Id.* at 86-87.)  Holt's testimony was supported by Corporal Jeffrey Taylor, who was at Pocono

11

Station at the time.  Taylor testified that, during the pendency of Holt's transfer, Brahl called him and made similar negative remarks while telling him not to help Holt out in his transition to his new position.  (N.T. 11/3/2014, at 46-47.)  Taylor told the jury that Holt was not assigned a corporal to help transition him into the station, in contrast with the transitions of three other white sergeants.  (*Id.* at 47.)

On May 24, 2011, Holt, having already been told, at least unofficially, that he would end up in Troop T, e-mailed Winterbottom, the Troop's new captain.  (N.T. 10/29/2014, at 81-82.)  In the e-mail Holt stated that he would prefer an assignment to King of Prussia given its proximity to his home and noted, without naming Brahl, that he was "hearing rumors that he intended to send me to Pocono Station and possibly allow a newly promoted sergeant to assume command at the King of Prussia Station."  (*Id.* at 90.)  Both Brahl and Holt's former lieutenant were copied on the e-mail.  (*Id.* at 89.)  He did not receive a response from Winterbottom.  (*Id.* at 101.)  In June 2011, Sergeant Dave Devitt received the King of Prussia position over Holt, who was assigned to Pocono station.  (*Id.* at 113)

Devitt was a newly promoted sergeant, who had worked in the Bureau of Research and Development just prior to his promotion.  (*Id.* at 114.)  As of this time, Holt had four and a half years time as sergeant and, unlike Devitt,[6] had taken part in the two voluntary training courses.  (*Id.* at 114-15.)  Winterbottom testified that she had placed Devitt at King of Prussia and Holt at Pocono given her opinion that King of Prussia would be a better fit for a newly promoted sergeant and Pocono would be a better fit for a more seasoned sergeant.  (N.T. 11/3/2014, at 210-15.)  She testified that Pocono had been suffering from "low morale, low [enforcement]

---

[6] Devitt remained at King of Prussia for about five months and was then transferred to Bowmansville station, which was closer to his home.  (N.T. 10/29/2014, at 119.)

statistics," and several troopers were having performance issues.  (*Id.* at 210.)  King of Prussia Station was seen as a better fit for Devitt in that it was said to be running well and Devitt would be able to call on Lieutenant Brahl, who was stationed onsite, to help acclimate him to the job. (*Id.* at 215.)

Holt was displeased with the outcome given that the King of Prussia station was the largest station in the PSP and apparently offered better overtime opportunities.  (N.T. 10/29/2014, at 116-17.)  He testified that by virtue of being assigned to Pocono, his commute was an extra hour which placed a strain on his relationship with his family.  (*Id.* at 117.)

Holt also stated that after assuming his assignment to Pocono on June 25, 2011, he looked at the station's statistics and noted that, under his supervision, the July 4th enforcement statistics were better and that "as far as [he] was concerned, [Pocono Station] w[as] performing above average."  (*Id.* at 111-12.)  Implicitly disagreeing with Winterbottom, Holt testified that "generally speaking the morale [at Pocono] was high" upon his arrival.  (*Id.* at 113.)

On July 13, 2011, Holt missed his troop orientation meeting having "completely forgot about it." (N.T. 10/29/2014, at 91-92.)  The meeting had been set up to help acclimate new transfers to the unique characters of the Troop, given its responsibility for the Pennsylvania Turnpike.  (*Id.*; N.T. 11/4/2014, at 53.)

Brahl issued a "Supervisor's Notation"[7] for Holt which confirmed the missed conference, and requested that Holt sign the notation, which Holt refused to do.  (N.T. 11/3/2014, at 160.) On July 15, 2011, the two met to discuss Holt's refusal to sign the notation.  (N.T. 10/29/2014, at 91-93.)  During this meeting, Holt told the Lieutenant that he felt the notation was improper

---

[7] A "Supervisor's Notation" is an entry into a trooper's personnel file to indicate a positive or negative act which is temporary in nature and remains in one's file for one year.  (N.T. 10/3/0214, at 98; N.T. 11/3/2014, at 161.)

because it was an overly harsh disciplinary measure, was worded in a manner he believed was "beyond the pale," and was being employed by Brahl to "create a paper trail" to document every minor mistake he made.[8]  (*Id.* at 93; N.T. 10/30/2014, at 91-99.)  Holt then told Brahl of the fact that he had a lawsuit pending for race discrimination and retaliation.[9]  (N.T. 10/29/2014, at 91.) He also asked Brahl about the roll call comments, which he felt were based on race.  (*Id.* at 97.) Brahl denied making the comments except for the comparison to Mason, which he said was made because both men had preferred King of Prussia but were assigned to Pocono.  (*Id.* at 97.)

That same day, following the meeting with Brahl, Holt e-mailed Winterbottom, stating that he was "seriously contemplating" filing a race discrimination complaint against a member of Troop T who had made "a pattern of disparaging and derogatory" remarks about him and who had committed "harmful acts" against him.  (*Id.* at 101-04.)  He testified that he was "on the fence" regarding pursuing a complaint against Brahl, so left him unnamed, although he felt that Brahl had already "destroy[ed his] character and [his] reputation."  (*Id.* at 103-04.)  Holt reminded Winterbottom of his October 2010 lawsuit as well.  (*Id.* at 104.)  In response, Winterbottom requested that he meet with her in person to discuss his complaint of discrimination.  (*Id.* at 105.)  The two then met on the morning of July 18, 2011, although Holt arrived late for the meeting.  (*Id.*; N.T. 11/3/2014, at 74.)  Holt described Winterbottom as "nasty and confrontational."  (N.T. 10/29/2014, at 106.)  He testified that Winterbottom did not believe he was being discriminated against, that Holt had a "bad attitude," and had essentially caused his own problems.  (*Id.*)  Holt explained to her that other troopers would support his allegations and

---

[8] The notation read, in pertinent part, "[t]his is unacceptable behavior especially from a station commander and a future occurrence will not be tolerated."  (N.T. 10/30/2014, at 95.)

[9] On July 13, 2011, Holt sent an e-mail to Brahl as to why he was unwilling to sign the notation.  (N.T. 10/29/2014, at 95.)

described Brahl's derogatory comments but, when Winterbottom asked him to identify the other troopers, he refused to give her their names, telling her that he would do so "at some [later] point in time." (*Id.*; N.T. 10/30/2014, at 115-16.) Winterbottom testified that during this meeting she also discussed with Holt rumors to the effect that he had been "bad mouthing or criticizing the department." (N.T. 11/4/2014, at 80.) She testified that Holt admitted to expressing his distrust of Internal Affairs in front of his station. (*Id.*) Winterbottom explained to him that it was "not appropriate to criticize the department or the higher ups of the command staff." (*Id.*) According to Holt, Winterbottom was not receptive to his allegation of race discrimination and that "she basically told me to get out of her office." (N.T. 10/29/2014, 106.) Following the meeting, Winterbottom testified that she spoke with Brahl to discuss the remarks that Holt had mentioned. (N.T. 11/3/2014, at 226.) Brahl claimed that the comparison to Mason was not of a racial nature but was a reference to the work ethic of both men. (*Id.*) Winterbottom explained that she did not look further into the incident given that she had spoken to Holt and Brahl, the only two individuals that she knew had relevant information, and that Holt had not asked her to file a complaint. (*Id.* at 228.)

### C. The "Schizophrenic Memo"

In August 2011, Holt received orders originating from PSP Command to respond to certain inquiries regarding a military awards ceremony to be held by the PSP. (N.T. 10/29/2014, at 120-22.) On August 2, 2011, he received "special order" via e-mail, and was told to provide the names of any individuals under his command who were veterans with military awards and whether they were interested in attending the ceremony. (N.T. 10/30/2014, at 6-7, 121.) A deadline of August 8, 2011 was imposed. (*Id.* at 121.) The appropriate information regarding

one trooper was given to Stackhouse on August 8, 2011 by e-mail but did not include information as to a second trooper's attendance. (*Id.* at 9-10.)  On August 9, 2011, Stackhouse then asked for information regarding whether the second trooper would attend and also noted that the earlier August 8 e-mail was not sent properly up the chain of command, but rather had been improperly sent by one of Holt's troopers directly to a high ranking officer. (*Id.* at 10.) Holt apologized for the violation of the chain of command and noted that he would gather the missing information. (*Id.*)  He did so and provided the information to Lieutenant Stackhouse, albeit after the August 8 deadline. (*Id.*)

A second set of instructions was then handed down requesting information regarding whether guests would attend the ceremony. (*Id.* at 13-4.)  A deadline of August 16, 2011 was imposed. (*Id.* at 14.)  Holt missed that deadline, as he had the first, but provided the information two days later. (N.T. 10/30/2014, at 125.)

On August 22, 2011, at Winterbottom's request, Brahl e-mailed Holt requesting a formal explanation for his failure to provide the requested information by the proper deadlines. (*Id.* at 16-17, 126-27; N.T. 11/4/2014, at 85-86.)  He responded on August 23, 2011, noting that the instructions were confusing and "schizophrenic" and that Lieutenant Stackhouse was late in relaying the request to him. (N.T. 10/30/2014, at 17-18.)  Holt testified that his use of the word "schizophrenic" was meant to indicate that the instructions were confusing and claimed that he would not "see anything wrong with" calling a commanding officer "schizophrenic." (*Id.* at 135-137.)  He noted that he had believed the deadline was August 17, 2011 and also explained that he was confused by a third set of instructions received on August 23, 2011.[10] (*Id.* at 127-32.)  Holt

---

[10] On August 23, 2011 Holt had received further instructions regarding whether troopers required hotel accomodation. (N.T. 10/30/2014, at 14-15, 128-29.)

did not hear back from Brahl regarding the memo. (*Id.*) Winterbottom then initiated an IAD investigation concerning the language used in Holt's memo. (N.T. 10/30/2014, at 182.) Holt testified that this ultimately resulted in the loss of one day's pay.[11] (*Id.* at 138-39.) It was explained that IAD investigations are required for any formal discipline in the PSP, beyond Supervisor's Notations, and are generally performed by independent investigators who look into the facts and determine what, if any, discipline is appropriate.[12] (N.T. 11/4/2014, at 62-63, 87.)

### D.  The "Day Off" Incident

Soon thereafter Holt again ran into a problem following his failure to directly notify Brahl about taking a day off. He testified that the common practice for taking days off, per regulation, was to input a request into the PSP computer system which would then e-mail that information to the officer's supervisor for approval. (N.T. 10/30/2014, at 22-23, 140.) The regulations mandated that days off be approved. (*Id.* at 206.) During late August 2011, Holt had taken off on three different occasions and had the request input into the "system." (*Id.* at 25-26.) On the last of these occasions, he had fallen ill and had taken off by calling into his station from home, requesting that his corporal put him in for a day off. (*Id.*) Consequently, on August 30, 2011, Brahl informed Holt by e-mail that he (Holt) must inform him (Brahl) via e-mail or phone regarding future days off. (*Id.* at 26-27.) Brahl testified that he had been made aware of several of Holt's absences only after calling up the station to find that he was not there. (N.T. 11/4/2014, at 60.)

On September 12, 2011, Holt decided that he would take off the following day. (*Id.* at

---

[11] Holt testified that these disciplinary measures are subject to union grievance procedures and originally the PSP had intended to dock him one week's pay. (N.T. 10/30/2014, at 138.)

[12] Even a written reprimand cannot be issued without such an investigation. (N.T. 11/4/2014, at 62.)

28.)  He did not e-mail or call Brahl to inform him of his intentions but rather told his corporal to put him into the computer system to be off the next day.  (*Id.* at 27-28.)  Holt testified that he misinterpreted Brahl's e-mail to mean that he only had to inform his lieutenant via phone or e-mail if he took off *while at home*, in that Brahl's e-mail request had followed the incident where he had taken off from home as opposed to having input the information while personally on station.  (N.T. 10/30/2014, at 28-29.)  On September 13, 2011, Brahl requested an explanation, in memo form, as to why he "disobeyed a direct order."  (*Id.* at 29.)  Two days later, Holt responded by memo stating that he had misunderstood Brahl's request.  (*Id.* at 30)  Holt also took the opportunity to tell Brahl, despite this not being responsive to his request, that he felt his request was designed to "introduce [him] into the discipline system" and that he felt that Brahl was forcing him to write a "ridiculous correspondence" which could have been better communicated by phone.  (*Id.* at 30-32, 163-67.)

On September 15, 2011, Brahl initiated an IAD investigation regarding insubordination arising out of the day off incident and Holt's attendant memo.  (*Id.* at 21, 171.)  Later that month, Holt filed internal EEOO complaints against Brahl and Winterbottom.[13]  (*Id.* at 33-34.)

Holt testified he did not recall specifically the results of the IAD investigation, explaining that he had a different IAD investigation ongoing at the time and that one resulted in a written reprimand and the other a two day suspension.[14]  (*Id.* at 172.)  There was no testimony on the

---

[13]   During this same time period, September 2011, Holt was asked about his interest in transferring to King of Prussia to take on the Station Commander position he had previously lost out on.  (N.T. 10/30/2014, at 106-07).  He testified that he declined to pursue the position, citing his commitment to those he was working with at Pocono and the fact that his family had already adjusted to his new position.  (*Id.*)

[14]  It was unclear from Holt's testimony if the "other" IAD he was referring to was that regarding the "Schizophrenic Memo" or an entirely different occurrence.  It would appear to be the latter scenario in that Holt stated that the "Schizophrenic Memo" investigation had merely resulted in the loss of one day's pay.  (*Id.* at 138.)  The documentation, received into evidence but not published to the jury, shows that the "day off" IAD investigation

nature, permanence, and effect of the written reprimand.[15]

## II.      DISCUSSION

We begin by addressing the Motion for Judgment as a Matter of Law on liability and then consider Defendants' Motion for a New Trial and the issue of damages.  We will consider the claims in chronological order, beginning with those against Johnson, then Winterbottom, and finally Brahl.

### A.  Judgment as a Matter of Law

#### 1.  Standard of Review

"[A] party in a civil jury trial that believes the evidence is legally insufficient to support an adverse jury verdict will seek a judgment as a matter of law by filing a motion pursuant to [Fed. R. Civ. P.] 50(a) before submission of the case to the jury, and then (if the Rule 50(a) motion is not granted . . .) a [post-trial] motion pursuant to Rule 50(b)."  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 396 (2006).  In ruling on a Rule 50(b) motion, we must determine "whether viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (internal quotation marks omitted).  "Although judgment as a matter of law should be granted sparingly, we will grant it where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict."  *Id.* (quoting *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)).  Accordingly, "[t]he question is not whether there is

---

resulted in only a written reprimand.  (Pl. Ex. 29-J.)

[15] We note that, while not published to the jury, the written reprimand was received into evidence and simply described the events leading to the investigation, which were largely undisputed, and set out what particular regulations Holt had violated.  (Pl. Ex 29-J.)

literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Id.* (citing *Gomez*, 71 F.3d at 1083 (citations omitted)).

### 2.  Johnson & the PSP: Retaliation

Johnson and the PSP were found liable under the PHRA and Title VII, respectively, for retaliation, but not for race discrimination, arising out of Johnson's decision to pass over Holt and assign other sergeants to the Station Commander positions at Jonestown and Schuylkill Haven.  Given that the PSP is only liable through the acts of Johnson and because the legal standards under the PHRA mirror that of Title VII, our discussion of these two intimately related claims will focus purely on the acts of Johnson and the Title VII standard.  *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318 (3d Cir. 2008).

To make out a prima facie claim of retaliation under Title VII, "a plaintiff must tender evidence that: '(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against h[im]; and (3) there was a causal connection between h[is] participation in the protected activity and the adverse employment action.'"  *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995)).

 As is relevant here, Plaintiff's filing of his internal EEOO complaint and the complaint with the PHRA are both protected activities.  *See, e.g. id.* at 341 (describing the "participation clause" and "opposition clause" categories of protected activity).  Unlike in a claim alleging discrimination, the Supreme Court has made clear that retaliation falls under a unique standard in determining whether an action is sufficiently adverse to be actionable. *Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 61-68 (2006).  In order to constitute an adverse action in a retaliation claim, the act must be "materially adverse" such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[16]  *Id.* at 68 (internal quotation marks omitted).  Here, we have no difficulty finding that Johnson's two decisions to not assign Holt to either of the Station Commander positions, which were seen as career stepping stones, held in some esteem by members of the PSP, and which were, in effect, promotions in stature, albeit not in rank, could be deemed materially adverse, that is they may have deterred a reasonable person from pursuing claims of discrimination.  *See id.*

We have concern here, however, as to whether sufficient evidence of causation has been established.  In analyzing causation, a court must look to "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period," *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (internal quotation marks omitted), as well as any other evidence from the record probative of retaliatory animus.  *See, e.g. Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 548 (E.D. Pa. 2013).  Timing alone, that is the time between the protected activity, or knowledge thereof, and the adverse action, is rarely sufficient evidence of retaliatory animus and will suffice only where the timing is "unusually suggestive."  *See Morrissey v. Luzerne Cnty. Cmty. Coll.*, 117 F. App'x 809, 816 (3d Cir. 2004) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).

It is beyond dispute that for evidence to be probative of retaliatory animus, the defendant must be aware of the protected activity and that temporal proximity, without knowledge of the activity, will not support a claim of retaliation.  *See Drwal v. Borough of W. View, Pa.*, 617 F.

---

[16] This is contrary to Plaintiff's assertion that the substantive standard of adversity under both discrimination and retaliation causes of action are coextensive.  (Resp., at 9.)

Supp. 2d 397, 424 (W.D. Pa. 2009) ("the unusually suggestive temporal proximity between plaintiff's complaint and adverse employer action can only be found to be coincidental in the absence of Chief Holtgraver's knowledge at the relevant time about the discrimination complaint."); *see generally Ambrose v. Township of Robinson, Pa.,* 303 F.3d 488, 493 (3d Cir.2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").  Here, the evidence established that the EEOO Complaint was filed on April 6, 2009.[17]  (N.T. 10/29/2014, at 57-60.) A letter from the PSP dated May 5, 2009 showed that Johnson had been interviewed concerning Holt's EEOO complaint.  (*Id.* at 61.)  Accordingly, Johnson was made aware of Holt's complaint sometime between April 6, 2009 and May 5, 2009.

The refusal to assign Holt to either of the two Station Commander vacancies occurred sometime in July 2009, although the exact dates were not provided at trial.  We find that this timing is insufficient to show retaliatory animus alone.  *See Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014) ("We have found that a temporal proximity of two days is

---

[17] While Holt also engaged in protected activity by filing his PHRA complaint later in May of 2009, there was no evidence that Johnson was aware of that filing at the time he made the Station Commander decisions and, in fact, the testimony, which went uncontradicted, showed that he was not made aware of the PHRA complaint until after his July 2009 retirement, which occurred after the adverse action at issue.  (N.T. 11/3/2014, at 97-98.)  It cannot, therefore, bear upon our retaliation analysis in that one cannot retaliate against an activity of which they are unaware.  *See Brown v. Boeing Co.*, 468 F. Supp. 2d 729, 737 (E.D. Pa. 2007) ("If the employer is not aware of the protected activity, there can be no charge of retaliation.") (citing *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 505 (3d Cir.1997)); *Fahnbulleh v. Carelink Cmty. Support Servs., Inc.*, No. CIV.A. 08-5055, 2009 WL 4591712, at *6 (E.D. Pa. Dec. 4, 2009) ("The fact that Tully was unaware of Plaintiff's complaints of sexual harassment when Tully decided to terminate Plaintiff is fatal to Plaintiff's retaliation claim."); *Bedford v. Se. Pa. Transp. Auth.*, 867 F. Supp. 288, 293 (E.D. Pa. 1994) ("If the person who decided that plaintiff's employment should be terminated had no knowledge that she had engaged in the protected activity in question, then clearly he could not have retaliated against her for so doing."); *see also Red v. Potter*, 211 F. App'x 82, 85 (3d Cir. 2006) (affirming summary judgment where the plaintiff had not shown material issue of fact that those who demoted knew of her EEO filings at the time of the decision); *Drwal,* 617 F. Supp. 2d at 422 ("Although plaintiff asserts that the chain-of-command policy and the West View police department 'grapevine' suggest that Chief Holtgraver was aware of plaintiff's complaint, the court finds that this inference is based upon speculation and does not constitute substantial evidence for purposes of overcoming summary judgment.").

unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive." (citations omitted)); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) (a time period of over two months was insufficient to show retaliatory causation); *McCloud v. United Parcel Serv., Inc.*, 328 F. App'x 777, 781 (3d Cir. 2009) ("The timing of the suspension of benefits (two months after the cone incident, and one month after he had filed the PHRC claim), was not particularly suggestive."); *Kier v. F. Lackland & Sons, LLC*, No. CIV.A. 14-897, 2014 WL 7192403, at *17 (E.D. Pa. Dec. 17, 2014) ("Absent some intervening antagonism, Plaintiff cannot rest solely on a temporal proximity of more than one week."); *Fischer v. Transue*, No. 1:04-CV-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (reviewing cases "suggest[ing that] the difference in time must be measured in days, rather than in weeks or months, to establish causation on its own"); *Urbanic v. Donahoe*, No. CIV.A. 11-805, 2013 WL 1149914, at *6 (W.D. Pa. Mar. 19, 2013) (two to three months was not unusually suggestive); *Allen v. Nutrisystem, Inc.*, No. CIV.A. 11-4107, 2013 WL 1776440, at *6 (E.D. Pa. Apr. 25, 2013) a*ff'd*, 546 F. App'x 98 (3d Cir. 2013) (more than one a month was not unusually suggestive).

We now look to whether the evidence of retaliatory motive, in its entirety, is sufficient to support the jury's verdict. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) ("In cases such as this one where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test …'" (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3d Cir. 2003))).  The record shows that Johnson had concerns about Holt's capabilities when he initiated the IAD investigation against him regarding the courthouse incident in October 2008.  Johnson had also reassigned Holt to the

23

Staff Services Sergeant in January 2009 and denied him the Patrol Sergeant position on two occasions around that same time.  All of this occurred before the protected activity and is therefore not probative of retaliatory animus.  *See, e.g. Gairloch v. Pa. State Univ.*, No. 4:13-CV-00900, 2015 WL 106581, at *11 (M.D. Pa. Jan. 7, 2015) (a pattern of antagonism prior to protected activity did not show causation); *see generally Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007) (the operative analysis regarding a pattern of antagonism concerns the "intervening period" between the protected activity and adverse action).  There is no evidence to support any suggestion of retaliatory animus from the relevant time period between Johnson's knowledge of the Complaint in April (or very early May) and the July decision, which would allow a reasonable jury to find in Holt's favor.[18]  Rather, the evidence indicates that Johnson had substantial questions about Holt's professional ability prior to the protected activity and that assessment carried over following the protected activity.

Plaintiff asserts that he was more qualified than the two individuals who were assigned the Station Commander positions.  However, Johnson's legitimate, non-retaliatory reasons for picking those candidates, which focused on their more varied backgrounds, were not meaningfully put into question at trial.  *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (in pretext cases, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

---

[18] Sometime in April 2009, Johnson sustained the IAD investigation he had earlier initiated regarding the courthouse incident.  Even if we assume that Johnson had done so after being aware of Holt's complaint, it would not establish retaliatory motivation in that "[a]n employer's decision to proceed 'along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" *Mitchell v. Miller*, 884 F. Supp. 2d 334, 362 (W.D. Pa. 2012) (quoting *Clark County School District v. Breeden,* 532 U.S. 268, 272 (2001) (per curiam)).  Moreover, that incident alone would be insufficient to establish a pattern of antagonism following the protected activity.  *See Hibbard v. Penn-Trafford Sch. Dist.*, No. CIV.A. 13-622, 2014 WL 640253, at *19 (W.D. Pa. Feb. 19, 2014) ("One act does not establish a pattern.").

a reasonable factfinder could rationally find them 'unworthy of credence, and hence infer that the employer did not act for [the asserted] . . . reasons.") (internal quotation marks omitted); *see also Youssef v. Anvil Int'l*, 595 F. Supp. 2d 547, 562 (E.D. Pa. 2009) ("Plaintiff can not rely on his own allegations that he was best qualified for the positions as evidence of pretext.")  In fact, one of the sergeants that was assigned the position, Sergeant Stinsky, had previously performed the very job at issue in a neighboring troop, while the other, Sergeant Gaspich had both patrol and criminal investigation unit experience, which contrasted with Holt's experience, which was essentially limited to patrol work.[19]  (N.T. 11/3/2014, at 119-20.)  Johnson explained that patrol work was "pretty much half of the [Station Commander] job," with the criminal investigation aspect also being "very important."  (*Id.* at 119.)  There was also no indication that the other two had any disciplinary blemishes on their record, which, as concerned Holt, had given Johnson "a lot of concern."  (*Id.* at 252.)  Johnson noted that Holt's behavior at the courthouse had reflected poorly on his decision making ability and that as "a station commander, decision making is way up there on the list of priorities.  It's critical that somebody makes good decisions all the time."  (*Id.* 252-53.)  While Holt may have had more time as a sergeant, that alone does not put into question Johnson's decision to pass over Holt.  In fact, Johnson testified that such seniority was only really a consideration for him as a "tiebreaker" to differentiate between candidates that were otherwise substantially equal in qualifications.  (*Id.* at  247.)

In his brief, Plaintiff claims that he had more supervisor experience than Gaspich and Stinsky but the record does not bear that out.  (Resp., at 18.)  Gaspich had prior experience as a criminal investigator supervisor while Stinsky had experience performing the very same position

---

[19] Holt also had prior experience as a recruiter.  (N.T. 11/3/2014, at 215.)

of station commander.  (N.T. 11/3/2014, at 100-01, 118-19.)  Further, he claims that because he alone was eligible for promotion to lieutenant, he should have been assigned the Station Commander positions but we fail to see how such eligibility has any particular relevance to his fitness for the positions and no evidence was adduced to show that it was relevant to Johnson's decision.  (Resp., at 18.)  Holt also emphasizes the fact that Stinsky and Gaspich were white but we fail to see how their race tends to raise a substantial inference of retaliatory, as opposed to racial, animus.[20]  (*Id.*)

There is insufficient evidence to find, based on a pattern of antagonism, timing, comparator evidence, and the record as a whole, to support the jury's verdict.  Judgment as a matter of law must be entered in favor of Johnson and the PSP as to the PHRA and Title VII retaliation claims, respectively.[21]

---

[20] The fact that Holt had taken some training that the other two individuals allegedly had not is not particularly significant, given that Johnson testified that he was unaware of the voluntary training Holt had taken part in and there was no testimony tending to indicate that voluntary courses and the like were made part of personnel records or otherwise relayed to superiors.  (N.T. 11/3/2014, at 69.)  Moreover, the fact that Holt had taken two specific courses did not in any respect mean that he had "more training," it only indicated that he happened to have taken certain courses that his competitors allegedly had not.  Holt did not provide any evidence as to whether Gaspich or Stinsky had taken, or not taken, additional training courses such as to show that Holt in fact had more training than them.  Notably, one of the courses Holt had taken was not offered by the Department but was apparently offered by a third party company called Skillpath entitled "How to Deal with Professional Stress."  (N.T. 10/29/2014, at 42.)  There was no indication that Johnson took this voluntary training into account when he made the decision or that he was even aware of Holt's voluntary training.

Nor do we find particularly telling the 2008 employment evaluation of Holt that was referred to during trial, in that Plaintiff did not adduce any evidence of evaluations done concerning the performance of Gaspich or Stinsky, which could allow a jury to infer that Holt was a stronger candidate, had the latter two received lesser evaluations.  *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.").  What the jury was primarily left with was Holt's own bald assertions that he was more qualified than Gaspich or Stinsky.  *See Bernhard v. Nexstar Broad. Grp., Inc.*, 146 F. App'x 582, 586 (3d Cir. 2005) ("the fact that an employee disagrees with an employer's evaluation does not generally prove pretext").

[21] For essentially the same reasons discussed *supra*, even if Holt were to make out his prima facie case, we conclude that, considering Johnson's facially legitimate, non-retaliatory reasons for the decisions, he has not produced sufficient evidence so that a factfinder "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that [a retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### 3. Winterbottom

#### a. King of Prussia Station Commander: Race Discrimination

The jury found that Winterbottom discriminated on the basis of Holt's race, violating his equal protection rights and establishing liability under Section 1983, when she decided to assign Sergeant Dave Devitt to the King of Prussia Station Commander position, leaving Holt to be assigned to the same position at Pocono.  Section 1983 reads, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen off the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  As made clear by our Court of Appeals, "Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

Holt's claims of race discrimination under Section 1983 invoke his rights under the equal protection clause of the Fourteenth Amendment.  To succeed, plaintiffs like Holt "must prove the existence of purposeful discrimination.  They must demonstrate that they receiv[ed] different treatment from that received by other individuals similarly situated." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (internal citations and quotations omitted; alterations in original).  Section 1983 race discrimination claims follow the standard employed in Title VII disparate treatment claims and, absent direct evidence of discrimination, are analyzed under the familiar *McDonnell Douglas-Burdine-Hicks* framework applied to Title VII and

Section 1981 claims involving circumstantial evidence of discrimination.  *See, e.g. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (assuming the *McDonnell Douglas* framework applies to Section 1983 disparate treatment claims); *Ugorji v. N.J. Envtl. Infrastructure Trust*, 529 F. App'x 145, 151 (3d Cir. 2013) (applying the framework to a Section 1983 equal protection claim); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Here, the framework places the initial burden on Plaintiff to produce evidence "showing [that] (1) he is a member of a [protected class]; (2) he was qualified for the position . . . ; (3) he was denied [the King of Prussia Station Commander position]; and (4) [another person not in his protected class] with similar or lesser qualifications [was appointed to that position]."  *Palatnik v. The Home Depot, Inc.*, No. CIV. 04-1229 (RBK), 2006 WL 680981, at *8 (D.N.J. Mar. 10, 2006); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992). The evidence is uncontested that Holt is African-American and thus in a protected class, that he was qualified for the job, that he did not get the specific Station Commander position he preferred, and a newly promoted white sergeant with less experience and less qualifications was given the King of Prussia position.[22]  This is clearly the case given that Winterbottom claims that Devitt, a newly appointed sergeant, was given the position *because of his lack of experience.*

Winterbottom testified that King of Prussia station was the better situation for Devitt as it was running well and he could be helped by Lieutenant Brahl, who was stationed there, while Holt, who would be the most senior individual at Pocono, had the qualifications to take

---

[22] At oral argument, Defendants conceded that the non-assignment to King of Prussia could be found to be an adverse action and thus we will not address whether such an action is sufficiently adverse to be actionable.   (N.T. 6/4/2015, at 17-18.)  However, we note that Holt was not merely denied a position with a preferable location, but also one that, he testified, afforded more managerial responsibility, prestige, and double the amount of overtime opportunities.  (N.T. 10/29/2014, at 87, 116; N.T. 10/30/2014, at 38).

command of a station without close supervision, a station that Winterbottom claimed had been suffering from morale problems, low enforcement statistics, and where several troopers had performance or disciplinary issues.  (N.T. 11/3/2014, at 210-12.)  In essence, she asserted that the King of Prussia position was a less challenging position, befitting a newly promoted sergeant, while the Pocono position required a more experienced sergeant.

Winterbottom had only recently become the Captain of Troop T when she was called upon to make this decision.  (*Id.*)  She testified that she spoke with Brahl as well as Major Harvey Cole, an African-American, who was responsible for Troop T, both of whom relayed to her information concerning the problems afflicting Pocono.  (*Id.*; N.T. 11/4/2014, at 69)  She also testified that she had "probably" looked at the statistics for Pocono as well.  (N.T. 11/3/2014, at 210-11.)  Winterbottom told the jury that she decided to put Holt at Pocono before Devitt had applied for the position, having known that no other current sergeants, besides Holt, were on the transfer list[23] and that a newly promoted sergeant would have to transfer into the Troop.  (N.T. 11/4/2014, at 69.)  Accordingly, we are in the rare case where the Defendant is of the mind that Plaintiff is, in effect, overqualified for the position he sought.

Under the burden-shifting framework, the burden of production is then placed on Defendant to produce a "legitimate, nondiscriminatory reason" for the action.  *Marangos v. Flarion Technologies, Inc.*, 264 F. App'x 176, 181 (3d Cir. 2008).  As described, Winterbottom's allegedly legitimate, nondiscriminatory reason was that Holt, who had more experience, would be better suited to take on what she characterized as the more independent and demanding role at

---

[23] It was explained that in determining how to fill a Station Commander vacancy, Winterbottom would have had to review a list of those wishing to transfer and, if there were not at least two current sergeants wishing to transfer into these vacancies, then a newly promoted sergeant would need to be picked to be assigned to the vacancy.  (N.T. 11/4/2014, at 69.)

Pocono and the newly promoted Devitt would be best placed at King of Prussia where he could

call upon Brahl to help him learn the new position.  (N.T. 11/3/2014, at 210-15.)

In that she met her burden of production, "the plaintiff must [then] point to some

evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve

the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory

reason was more likely than not a motivating or determinative cause of the employer's action."

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  To discredit Winterbottom's explanation,

Holt:

> must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a reasonable
> factfinder could rationally find them unworthy of credence, and
> hence infer that the employer did not act for [the asserted] . . .
> reasons.  While this standard places a difficult burden on the
> plaintiff, [i]t arises from an inherent tension between the goal of all
> discrimination law and our society's commitment to free
> decisionmaking by the private sector in economic affairs.

*Id.* at 765 (internal quotation marks and citations omitted; alterations in original); *see also Kautz*

*v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) ("We have applied the principles explained

in *Fuentes* to require plaintiffs to present evidence contradicting the core facts put forward by the

employer as the legitimate reason for its decision." (citations omitted)).  Evidence relevant to the

second prong of *Fuentes* includes evidence "that the employer in the past had subjected him to

unlawful discriminatory treatment, that the employer treated other, similarly situated persons not

of his protected class more favorably, or that the employer has discriminated against other

members of his protected class or other protected categories of persons."  *Id.* at 765.  Further,

"[t]he ultimate burden of persuasion on the issue of illegal discrimination always remains with

the plaintiff." *NAACP v. Med. Ctr., Inc.*, 657 F.2d 1322, 1333 (3d Cir. 1981). Insofar as the case was presented as one of pretext and not mixed-motive, Plaintiff had the burden of showing that race was "a determinative factor" in the employment decision.[24] *See, e.g. Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 215 (3d Cir. 2000).

We now turn to whether Holt presented sufficient evidence to meet his ultimate burden of persuasion. In Holt's case, his evidence of racial discrimination, beyond the fact that a lesser qualified white officer was assigned the position he preferred, was primarily focused on calling into question the underpinnings of Winterbottom's allegedly nondiscriminatory reason. We now review the evidence bearing upon the question of pretext. First, King of Prussia was the largest station command for a sergeant in the state. (N.T. 10/29/2014, at 87.) It had about twice as many troopers and more corporals than Pocono. (N.T. 11/3/2014, at 137-38.) This raises a question from the start as to pretext, particularly where there was no evidence to show how the new sergeant Devitt would have come to rely on or even interact with Brahl beyond the fact that they were located at the same station. At the same time, it was uncontroverted that Holt would be the most senior officer at Pocono. Even though a new station commander would generally be assigned a corporal to acclimate him or her to the new position, we accept that this would not be the same as having one's direct supervisor on site. (*Id.* at 47.) This nevertheless calls into question, at least to some degree, the need to place Devitt at the same station as Brahl, given that he would be provided some guidance in acclimating into his new role at either station.

Winterbottom testified that there were problems at Pocono with enforcement statistics and morale and that there were several troopers on probationary status due to performance

---

[24] This same principle applies to Holt's other race discrimination claims which were all tried under a pretext theory.

deficiencies.  (*Id.* at 210-11.)  Holt did not dispute that several troopers there had performance problems, but his testimony and that of others put into question the alleged morale and enforcement problems afflicting Pocono.

He told the jury that when he arrived at Pocono, he found that, in fact, "morale was [generally] high," although he did note that the previous commander would not allow troopers to spend time "on station," a contentious policy that he changed.  (N.T. 10/29/2014, at 113.)  There was inconsistent testimony about the performance related statistics at Pocono.  Holt stated that upon his review of statistics from the first half of 2011 compared with the first half of 2010, enforcement was improving, and that, after the busy July 4th weekend, the station had put up enforcement statistics that were high for a station of its size.  (*Id.* at 112)  He concluded, based on his assessment of the statistics and the troopers' performance upon his arrival that, "as far as [he] was concerned, they were performing above average."[25]  (*Id.* at 112)

Retired Corporal Mike Nelson and Trooper Constantine Kartsounas offered testimony that focused on King of Prussia and Pocono.  Nelson, who had been stationed at King of Prussia for the year prior to Holt's assignment to Pocono, testified that during his time at King of Prussia, overall the morale was "poor" with "a lot" of "unhappy" people.  (N.T. 10/30/2014, at 218-19.)  He also noted that King of Prussia had poor production.  (*Id.*)  During his time at King of Prussia, he never heard of any morale or productivity problems at Pocono.  (*Id.* at 218-20.)  Kartsounas, a patrol trooper who had worked at King of Prussia from 2008 through 2011 and

---

[25] Jeffrey Taylor, the trooper who was stationed at Pocono from 2005 until 2013 and who was in charge of compiling statistics for the station, told the jury that after Holt arrived, morale and statistics improved and that both metrics were in decline prior to Holt's arrival.  (N.T. 11/3/2014, at 48-50.)  While this testimony no doubt puts into question the veracity of Holt's testimony on this point, in reviewing the sufficiency of the evidence on liability we are not to make credibility determinations.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  The jury was free to believe Holt's assessment over Taylor's.

then transferred to Pocono around August or September 2011, also testified.  (*Id.* at 241-42.)  He noted that prior to Holt's transfer to Pocono, he had not heard of any morale or productivity problems at that station.[26]  (*Id.* at 252-53.)

The evidence also showed that Devitt, after only three months at King of Prussia, had become the acting Eastern Station Commander, taking over for Brahl for a short period of time while he was away on leave.  (N.T. 11/3/2014, at 155-56, 216-17.)  Winterbottom claimed that Devitt was picked for this position because Holt was already having problems at Pocono regarding taking days off without telling Brahl,[27] coming late to the July 18th meeting concerning Holt's e-mail, and responding to inquiries from Winterbottom.  (*Id.*)  Further, when Devitt later requested a transfer to Bowmansville Station, so as to be closer to home, Winterbottom approved the request.  (*Id.* at 218-19.)

While there was contradictory evidence, we conclude that Holt put forth a sufficient quantum of evidence to allow the jury to find that Winterbottom's legitimate, nondiscriminatory reasons for picking Devitt over Holt were pretextual.  Her claim that Pocono had morale and productivity problems was challenged not just by Holt but by Nelson and to some extent Karsounas.  While she made references to difficulties in performance as measured by statistics,

---

[26] While Kartsounas and another trooper who had been stationed at King of Prussia, Maurice Minnifield, testified that King of Prussia was generally running well during the relevant time period, (N.T. 10/30/2014, at 252; N.T. 11/3/2014, at 28, 35-38), that that assessment was subject to conflicting testimony and we may not second guess the jury's apparent decision to credit Nelson's testimony over that of Kartsounas and Minnifield.  *See Witco*, 4 F.3d at 1166.

[27] The evidence showed that Devitt was acting Eastern Section Commander for some period of time around mid to late August of 2011, although when this exactly occurred or for how long was unclear.  The evidence could be read to reflect poorly on Winterbottom's credibility in that Holt testified that the days he took off work were in late August which tends to show that they may have postdated the decision to give Devitt this temporary role. We note, however, that no other evidence was offered so as to call into question Winterbottom's qualms with Holt's tardiness at the July meeting or his failure to respond to inquiries in a timely manner.

no statistical evidence was presented.  One could have drawn the conclusion from the evidence presented that it was King of Prussia, not Pocono, that was in need of restorative measures.[28]

The Supreme Court has made clear that generally a prima facie case of discrimination and a showing of pretext is sufficient evidence to support a claim of race discrimination.  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Court noted that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Id.* at 147.  The Court reasoned that "[s]uch an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"  *Id.* (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).  Justice O'Connor, writing for the majority, explained that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."  *Id.* at 148.  The Court went on to hold that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.* at 148.

---

[28]  While the fact that Pocono had multiple troopers with performance problems was not contradicted, we do not find Holt's failure to rebut certain specific aspects of Winterbottom's reasoning to be fatal given that he called into question the heart of Winterbottom's reason, that is that Pocono would require a seasoned sergeant and King of Prussia would befit a novice.  *See Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006) ("the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales."); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) at 764 n. 7; *see also Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) ("We have applied the principles explained in *Fuentes* to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.").  We also note that there was no testimony to the effect that Brahl's presence at King of Prussia Station was sufficient, in Winterbottom's mind, to itself justify the decision to assign Devitt to that location.  Moreover, Holt did present evidence that called into question whether such a guiding hand was needed to acclimate Devitt into the new job given that Devitt, had he been assigned to Pocono, would have had a corporal assigned to guide him with his new position.

While the Court cautioned that this will not always be the case, it noted that the exceptions to its holding included those where the record "conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* (citations omitted). Here, the record does not conclusively reveal another nondiscriminatory reason for Winterbottom's decision nor was there "abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* Holt has put forth sufficient evidence whereby the jury could conclude that Winterbottom's reason for picking a lesser qualified white sergeant for the King of Prussia position was pretext and that the actual motivation for the decision was discriminatory.[29] Winterbottom's Motion for Judgment as a Matter of Law as to this claim is denied.

---

[29] Winterbottom is not able to avail herself of qualified immunity. In analyzing whether qualified immunity applies the court must determine whether a constitutional right was violated and, if so, whether that right was clearly established at the time the unconstitutional act occurred. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). The right to be free from racially motivated adverse action at the workplace was violated and it was clearly established at the time that Winterbottom's decision would violate Holt's equal protection rights.

Winterbottom argues that a reasonable officer in her position would not have known she was violating Holt's rights in assigning him to Pocono Station. However, given the evidence at trial, there is evidence that Pocono did not have the problems she claimed, that the reasoning behind her decision was pretext, and that the transfer to a station far away, with less responsibility, less people to supervise, less prestige, and significantly less overtime opportunities was sufficiently adverse to violate Holt's constitutional rights. *See Parker v. State of Del. Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 478 (D. Del. 1998) (denial of a transfer may be an adverse action); *Salvato v. Smith*, No. CIV.A. 13-2112, 2013 WL 3431214, at *8 (E.D. Pa. July 9, 2013) (same); *Marsh v. Sunoco, Inc.*, No. CIV. A. 06-CV-2856, 2008 WL 2876569, at *2 (E.D. Pa. July 24, 2008) ("It is well-established that a denial of overtime opportunities may constitute an adverse employment action under Title VII."); *Albright v. City of Philadelphia*, 399 F. Supp. 2d 575, 587 (E.D. Pa. 2005) (collecting cases and finding that a "[l]ack of overtime opportunities, which provide significant compensation for many police officers, is a form of reduction in compensation" and that a "substantial" denial of overtime opportunities is an adverse action "well within the ambit of Title VII"); *Whitmire v. Kvaerner Philadelphia Shipyard, Inc.*, No. CIV.A 05-253, 2007 WL 1866773, at *3 (E.D. Pa. June 27, 2007) *aff'd sub nom. Whitmire v. Kvaerner Philadelphia Shipyard*, 340 F. App'x 94 (3d Cir. 2009) (failure to train employee which denied him significant overtime opportunities was an adverse action); *Williams v. City of Harrisburg*, No. CIV.A. 1:CV-03-2339, 2005 WL 2335131, at *5 (M.D. Pa. Sept. 23, 2005) (suggesting that a transfer with less overtime opportunities would be an adverse action); *Pimentel v. City of N.Y.*, No. 00 CIV.326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) *aff'd*, 74 F. App'x 146 (2d Cir. 2003) (discussing the difference between adverse and non-adverse

### b. The "Schizophrenic Memo" Investigation: Race Discrimination

The jury found that Winterbottom violated Holt's rights under the equal protection clause by initiating the IAD investigation into the language used by Holt in the "Schizophrenic Memo." Again, we analyze this claim under the familiar burden-shifting *McDonnell Douglas-Burdine-Hicks* framework. We assume, without holding, that Holt has made out a prima facie case of race discrimination. We find that Winterbottom provided a legitimate, nondiscriminatory reason in that she deemed the e-mail underlying the investigation to be insubordinate. We also note that this allegation was, in fact, sustained by another officer. We, cannot, however, find that Holt has proffered sufficient evidence to call into question the basis of Winterbottom's nondiscriminatory reason or show that it was "more likely than not" that her decision to initiate an investigation into insubordination was racially motived. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

To support this equal protection claim, Holt identified, as a comparator, a white station commander, Sergeant Holly Storms, who had a missed a deadline. Storms had a Supervisor's Notation placed in here file but did not have an IAD investigation initiated against her. (N.T. 11/3/2014, at 181.) Critically, Storms was disciplined for merely missing a deadline, not for

---

denials of transfer requests); *see also Beyer v. Cnty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008); *Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991).

Defendant appears to make the argument that a defendant's subjective intent is not to be considered when analyzing the application of qualified immunity. (Def. Brief, at 21.) However, the objective analysis as concerns qualified immunity is focused on "whether reasonable officials could believe that their conduct was not unlawful even if it was in fact unlawful." *Larsen v. Senate of Com. of Pa.*, 154 F.3d 82, 94 (3d Cir. 1998). It does not provide immunity in any claim involving the personal motivation of a public official, which is an essential element in Section 1983 race discrimination claims. *See Grant v. City of Pittsburgh*, 98 F.3d 116, 123-24 (3d Cir. 1996). A reasonable official in Winterbottom's position would have known that making such an employment decision based on racial preference was unconstitutional. *See Beckett v. Dep't of Corr. of Del.*, 981 F. Supp. 319, 331 (D. Del. 1997) ("the contours of the Fourteenth Amendment were sufficiently clear at the time such that a reasonable official would have known or should have known that discriminating against someone who is African–American in the context of a promotion violated these rights."); *see generally Regents of the University of California v. Bakke*, 438 U.S. 265, 306 (1978) ("Preferring members of any one group for no reason other than race . . . is discrimination for its own sake. This the Constitution forbids.").

authoring a memorandum referring to her superior's instructions as "schizophrenic" or using similarly demeaning language. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998) ("In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." (citation omitted)).  Thus, the fact that Holt was more severely disciplined than Storms is not particularly telling given that the factual bases warranting the discipline significantly differed.  Moreover, no evidence was presented to otherwise establish that Storms was similarly situated, such that the lesser disciplinary measure initiated against her would be probative of discrimination.  While Storms was employed at Troop T when the notation was issued, it was not shown who issued the notation, what circumstances led to the missed deadline, or even whether Winterbottom was the Captain at the time.  *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654 (3d Cir. 2009) ("In disciplinary cases or in the context of personnel actions, for example, the relevant factors often include a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" (quoting *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir.2000)).  Given that the similarity between Holt and Storms was essentially limited to the fact that they were station commanders in Troop T, the comparator evidence fails to show that Holt was treated more severely by Winterbottom due to his race.  *See Opsatnik v. Norfolk Southern Corp.,* 335 F. App'x 220, 223 (3d Cir.2009) ("While similarly situated does not mean

identically situated, the plaintiff must nevertheless be similar in all relevant respects." (internal quotation marks omitted)); *Simpson*, 142 F.3d at 647.

Holt also argues that the fact that Brahl did not initiate an investigation into the memo, which was addressed to Brahl and not Winterbottom, shows pretext.  (Resp., at 24.)  However, that fact is not particularly probative in that it was Winterbottom who directed Brahl to have Holt, who was under Brahl's direct supervision, explain his failure to comply with orders.[30] (N.T. 11/3/2014, at 232.)  The fact that Winterbottom was arguably a stricter disciplinarian does not evince racial animus.

Holt testified that during his time at Troop T he was not aware of any other IAD investigations resulting from the language of a memo and Winterbottom noted in her testimony that during the approximately one year she spent at Troop T, the investigation against Holt was the only one she initiated.  (N.T. 10/30/2014, at 18; N.T. 11/3/2014, at 234.)   However, the fact that Holt was not aware of any similar investigations or that he was the only one subject to such an investigation is not, without more, probative of discrimination, at least where, as here, the investigation was founded and Plaintiff admitted to having committed the acts in question. While the action taken by Winterbottom seemed harsh to Holt, that does not show it was racially motivated.  *See, e.g. Emmett v. Kwik Lok Corp.*, No. CIV.A. 11-528, 2012 WL 4009721, at *9 (E.D. Pa. Sept. 11, 2012) *aff'd*, 528 F. App'x 257 (3d Cir. 2013) ("that Defendant may have departed from the progressive discipline policy set out in Defendant's employee handbook does

---

[30] Brahl had testified that while he was not personally offended by the memo, which we note was apparently directed toward criticizing the instructions from the Police Commissioner and not Brahl specifically, he did find it "disrespectful."   (N.T. 11/3/2014, at 180.)   Winterbottom explained that the language in the memo was "disrespectful" and "insubordinate" given that it was referring to instructions provided by the Commissioner and handed down by other higher ups, including herself, as "schizophrenic" which she deemed inappropriate in a paramilitary organization like the PSP.  (*Id.* at 232; N.T. 11/4/2014, at 86-87.)

not support Plaintiff's claims because there is no evidence of record that Defendant treated Plaintiff differently from an employee similarly situated"); *Chiaradonna v. Rosemont Coll.*, No. CIV. A. 06-CV-1015, 2008 WL 282253, at *6 (E.D. Pa. Jan. 31, 2008) ("Although Rosemont's decision to terminate Plaintiff was a harsh response to a verbal outburst, there is no competent evidence in the record that discrimination was more likely than not a motivating or determinative cause of Defendant's actions."); *see generally Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").  Had Holt presented specific evidence that such language and content similar to his own were frequently employed in formal memoranda or that Winterbottom had ignored similar or more troubling actions performed by non-African American officers, our assessment would differ, but such is not the case.  The only evidence on this point was from Winterbottom, who testified that she had never received any correspondence with such problematic language.   (N.T. 11/3/2014, at 234.)    Moreover, it was uncontested that Winterbottom's claim of insubordination was upheld by the Internal Affairs Division, which independently investigated the allegation and found Winterbottom's assessment to be correct.

The only other evidence that could be probative of racial animus was the earlier assignment of Holt to Pocono Station[31] and the fact that Winterbottom, in meeting with Holt on

---

[31] While this is no doubt probative evidence, we know of no cases standing for the proposition that a single prior instance of disparate treatment, particularly one where, as here, the evidence was barely sufficient to establish liability as to the earlier action, would suffice to meet Holt's burden under *Fuentes*, 32 F. 3d at 764, even when combined with the additional evidence admitted at trial.  Such a prior act does not establish that the reasoning behind Winterbottom's later decision was motivated by racial animus, particularly where, as here, the discipline Holt was subjected to was not shown to be excessive, was instituted by an independent investigator, and was based

July 18, 2011, had given a cold response to his claims of race discrimination on the part of Brahl. We are reminded that in claiming that he had heard, through other troopers, that Brahl was making derogatory comments, Holt refused to provide the names of the witnesses to Winterbottom. We conclude that there was insufficient evidence for the jury to reasonably conclude that race was a determinative factor in Winterbottom's decision. *See Fuentes v. Perskie*, 32 F.3d 759, 764. We will grant Winterbottom's Motion for Judgment as a Matter of Law on this claim.[32]

---

on acts Holt admitted to have taken. *See id.*

[32] We hold also that as to the three claims concerning the IAD investigations, judgment as a matter of law must be granted given the lack of evidence to establish cat's paw liability. The adverse actions resulting from the two investigations, as to the claims against Winterbottom, the loss of a day's pay, and, as to the claim against Brahl, the written reprimand, were disciplinary measures instituted by the PSP's separate Internal Affairs Division. The Defendants initiated the investigations but the consequent role of both Defendants was limited to the investigators interviewing them. (N.T. 11/4/2014, at 63, 87.) Accordingly, these claims could only be pursued under a cat's paw theory of liability because the decisions to discipline Holt were not made by Winterbottom or Brahl. The weight of authority holds that cat's paw liability may be employed in Section 1983 claims and we will assume, *arguendo*, that this is the case. *See, e.g. Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012) ("[A]t least five circuits have indicated that a cat's paw theory would support imposing *individual* liability under § 1983 on subordinate governmental employees with unlawful motives who cause the real decision-makers to retaliate.") However, the evidence presented as to the three Section 1983 claims based on the decisions to initiate IAD investigations was insufficient to establish such liability.

In *Jones v. Se. Pennsylvania Transp. Auth.*, No. 14-3814, 2015 WL 4746391, (3d Cir. Aug. 12, 2015), the Third Circuit was faced with the question of whether cat's paw liability would apply in the case of a supervisor, purportedly driven by retaliatory animus, who had reported alleged wrongdoing on the part of the plaintiff, resulting in an investigation and consequent discipline. *Id.* at *7-8. The court noted that the decisionmaker who ultimately imposed discipline had not simply adopted the report of the supervisor, as could support a finding of liability. *Id.* at *7. Rather, the supervisor who was claimed to have retaliated had simply "g[ot] the ball rolling with his initial report of [misconduct]," thereby sparking an investigation executed by a separate division within SEPTA. *Id.* The supervisor's only subsequent role in the investigation was his being interviewed by the investigator. *Id.* The court found the case to be a "far cry" from that in *McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011), a case where cat's paw liability was established given the decisionmakers' sole reliance on a biased supervisor's report. *Jones*, 2015 WL 4746391, at *7.

The similarity to Holt's claims is manifest and we find *Jones* apt. As to the claims against Brahl and Winterbottom, there is no indication that either individual did anything more than initiate investigations performed by the Internal Affairs Division beyond the fact that they were consequently interviewed during the investigation. There was no evidence that the IAD investigators merely rubber-stamped or adopted Winterbottom's or Brahl's allegations of impropriety or that the Defendants otherwise influenced the disciplinary proceedings. For that reason alone, the three Section 1983 claims predicated on the decisions to initiate the IAD investigations must fail.

We also find that given that it would be unclear whether the initiation of the IAD investigation here was sufficiently adverse to violate Holt's rights, Winterbottom and Brahl would be protected by qualified immunity on the claims

### c. The "Schizophrenic Memo" Investigation: First Amendment Retaliation

The jury found that, in initiating the IAD investigation into the "Schizophrenic Memo," Winterbottom was liable under Section 1983 for violating Holt's First Amendment rights by retaliating against him for the filing of his federal lawsuit in October 2010 accusing Johnson and the PSP of discrimination and retaliation for acts that occurred in 2009.  In a First Amendment retaliation claim, Plaintiff must present sufficient evidence to establish: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).  Rather than addressing the first two elements, we focus on evidence of causation as that analysis alone disposes of this claim.

Causation will be found between the First Amendment protected activity, here, the filing of the federal suit, and the retaliatory act, here, the initiation of the IAD investigation, "where the [protected activity] was a substantial or motivating factor for the alleged conduct." *Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 555 (E.D. Pa. 2013).  Our Court of Appeals has held that:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494,

---

involving the initiation of IAD investigations in light of the holding in *Jones*, even if a constitutional violation were made out. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) (to defeat qualified immunity, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Jones*, 2015 WL 4746391, at *7-8; *see also Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances").  We have alternatively addressed the merits of Plaintiff's claims notwithstanding this critical defect.

> 503–04 (3d Cir.1997); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920–21 (3d Cir.1997).  In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation.  *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000).
>
> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate.  Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take.

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  Here, the temporal proximity between the October 2010 filing and the September 2011 retaliatory act was nearly one year.  The time between Winterbottom's *knowledge* of the filing, which occurred during her time in Internal Affairs, that is sometime between the October 2010 filing itself and May 2011, when she transferred to Troop T, and her initiation of the investigation was, at the very least, over three months.  (N.T. 11/3/2014, at 206-07.)  This timing is not unusually suggestive.[33]  *See, e.g. Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004); *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014).  However, we must still consider the evidence of timing in combination with the other evidence.

We conclude that there was insufficient evidence of an ongoing period of antagonism, or other evidence, that would support a reasonable inference of retaliatory causation.  While

---

[33] Plaintiff argued, in effect, that Holt's decision to remind Winterbottom that he had a federal suit filed during their July 18, 2011 meeting somehow resets the clock as concerns temporal proximity, such that the operative analysis would require an analysis between the July 2011 meeting and the September 2011 adverse action.  They have not provided us any authority to support that argument.  We do not find it compelling.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)); *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) ("We measure temporal proximity from the date on which the litigant first files a complaint.").

Winterbottom assigned Holt to Pocono, the jury found that *racial* animus was the motivating factor behind that decision.  While we find it may still be considered evidence of retaliatory motive and, even considering the difficult meeting in July 18, 2011 between Holt and Winterbottom, we are unable to conclude that the evidence was sufficient to allow a reasonable jury to infer retaliatory causation.[34]  *See Bartos v. MHM Corr. Servs., Inc.*, 454 F. App'x 74, 79 (3d Cir. 2011) (evidence was insufficient to support a pattern of antagonism where plaintiff was subject to multiple disciplinary actions over a fourteen month period); *Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993) (a sufficient pattern of antagonism was established where plaintiff was subject to "a constant barrage of written and verbal warnings ..., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge") (internal quotation marks omitted); *Urbanic v. Donahoe*, No. CIV.A. 11-805, 2013 WL 1149914, at *6 (W.D. Pa. Mar. 19, 2013) ("a constant and consistent pattern of antagonism in the intervening [two to three month] time frame [is] sufficient to raise an inference of causation"); *Allen v. Nutrisystem, Inc.*, No. CIV.A. 11-4107, 2013 WL 1776440, at *6 (E.D. Pa. Apr. 25, 2013) *aff'd*, 546 F. App'x 98 (3d Cir. 2013) (no pattern of antagonism where plaintiff had three "write-ups" levied against her between the June 25, 2010 protected activity and September 2, 2010 adverse action which the court found was unlike the "continuous and extreme antagonistic treatment" that Third Circuit cases held found sufficient to show retaliation); *see also Neron v. Cossette*, 419 F. App'x 123, 124 (2d Cir. 2011); *see generally Wright v. Shore Mem'l Hosp.*, No. CIV. 11-5583 JBS/AMD,

---

[34] For essentially the same reasons discussed *supra*, we do not find the evidence that Plaintiff presented as comparator evidence or that concerning Winterbottom's lone use of the IAD process against Holt to be sufficiently probative of retaliation, even in combination with the other evidence, so as to support the verdict.

2013 WL 6080072, at *12 (D.N.J. Nov. 19, 2013) ("Courts in this Circuit permit an inference of causation when there is a consistent, continuous course of discriminatory treatment." (citations omitted)).  Where, as here, the internal investigation was based on actions Plaintiff admitted to have taken, where the timing was not particularly close, and no other substantial evidence of retaliation was presented,[35] we cannot find that the evidence was sufficient to allow a reasonable factfinder to infer retaliation.  We therefore grant Winterbottom's Motion for Judgment as a Matter of Law on this First Amendment retaliation claim.

### 4.  Brahl: Race Discrimination

The jury found Brahl liable under Section 1983 for violating Holt's equal protection rights by initiating the "day off" IAD investigation against him.[36]  We consider Defendants' Motion as it argues that the evidence presented was legally insufficient to support a finding that Brahl engaged in an adverse action.  (Def. Br., at 16.)  Defendants assert that initiating an IAD investigation is not sufficiently adverse, insofar as it is simply a request for the employer to determine whether an employee has violated its policies and is in need of discipline.

As we have already discussed with respect to the claims against Winterbottom, Section 1983 claims follow the framework and standards used in resolving Title VII discrimination

---

[35] We consider Winterbottom's response to Holt's claim against Brahl at the July meeting as some evidence of retaliation, although we are also mindful of the relevant context, where Holt was unwilling to give her additional evidence he claimed to had available to him at the time and which he explained he would provide "at some [later] point in time."  (N.T. 10/30/2014, at 115.)

[36] In the first trial, the jury found that Brahl was liable for First Amendment retaliation arising out of this very same adverse action.  There, the jury found that Holt would not be awarded any compensatory or punitive damages, resulting in a nominal damages award of $1.00.  We denied Defendants' Motion for Judgment as a Matter of Law on that claim following the first trial.  (Doc. No. 134.)  We note that there is a significant question as to whether these two verdicts, which address *liability* for the same adverse action albeit under different theories, may stand or whether they are mutually exclusive given issues of causation.  However, given our adjudication of this claim on other grounds, we need not address this nuanced legal question, although we do address, *infra*, the issue of double recovery as it pertains to the two compensatory damage verdicts relating to the same adverse action.

claims. *See Torres v. Deblasis*, 959 F. Supp. 2d 772, 776 n. 2 (E.D. Pa. 2013) ("[T]he same legal standards for analyzing Title VII apply to Equal Protection discrimination claims brought pursuant to § 1983."); *Behrens v. Rutgers Univ.*, No. 94-CV-358 (JBS), 1996 WL 570989, at *4 (D.N.J. Mar. 29, 1996) ("When used as parallel bases for relief or companion remedies, Title VII and 42 U.S.C. §§ 1981 and 1983 require the same elements for their causes of action and courts incorporate the same standards when assessing the employment discrimination claims."); *see also Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) ("Our application of the *McDonnell Douglas–Burdine* framework is applicable to Stewart's allegation of racial discrimination under 42 U.S.C. §§ 1981 and 1983." (footnotes omitted)); *Wood v. Univ. of Pittsburgh,* 395 F. App'x 810, 816 (3d Cir.2010) ("The showing required to prove a § 1983 gender discrimination claim is identical to that required by Title VII.") (citing *Stewart,* 120 F.3d at 432)).  To be actionable in a disparate treatment claim of race discrimination, the employment action must be an "adverse employment action," which requires the Plaintiff establish:

> "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 152–53 (3d Cir.1999) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).  However, Title VII "do[es] not provide relief for unpleasantness that may be encountered in the work place. Rather [it] provide[s] a remedy only if discrimination seriously and tangibly altered the employee's ability to perform the job or impacted the employee's job benefits." *Walker v. Centocor Ortho Biotech, Inc.,* 558 Fed.App'x. 216, 219 (3d Cir.2014) (citing *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir.2004)).

*Yarnall v. Phila. Sch. Dist.*, 57 F. Supp. 3d 410, 419 (E.D. Pa. 2014); *see also Durham*, 166 F.3d at 153 ("Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the sine qua non.  If an employer's act substantially decreases an

employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found.")

The weight of authority makes clear that the issuance of a written reprimand alone is insufficient to be materially adverse. *See Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 447 (3d Cir. 2011) (finding "reprimands that do not 'effect a material change in the terms or conditions of . . . employment' cannot be considered adverse employment actions" and that even a permanent reprimand was insufficiently adverse) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)); *Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir. 2002) ("the presence of negative memoranda in Jones's personnel file, without more, is not an adverse employment action"); *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015) (a written reprimand even containing false statements is not itself materially adverse); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"); *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012) ("A written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action."); *Weng v. Solis*, 960 F. Supp. 2d 239, 248 (D.D.C. 2013) ("the Letter of Reprimand cannot constitute an adverse action because Plaintiff has failed to present evidence that the disciplinary action directly affected her job title, duties, salary, benefits, or work hours in any material manner . . . Nor is the Letter of Reprimand transformed into an adverse employment action simply because it may have increased Plaintiff's risk of suspension or termination." (citation omitted)); *c.f. Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26 (2d Cir. 2014)

(in retaliation case, the "two disciplinary citations [the plaintiff] received for insubordination over a two-year period [which were the result of the reasonable enforcement of preexisting policy], his assignment to drive particularly 'dirty buses,' one late overtime payment, and Lift Line's one-time refusal to give him a half-day off for a doctor's appointment" were not adverse actions).

We also note that the outcome of the investigation itself was not clear from the testimony, but we find that there was sufficient proof that it resulted in a written reprimand.[37]  Given the authority before us it follows that the mere initiation of an investigation,[38] resulting in a written reprimand, is not sufficiently adverse to be actionable.  *See Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) ("We have repeatedly held, however, that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action. " (citing *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004)); *Burton v. Pa. State Police*,

---

[37] The testimony concerning the "day off" IAD investigation indicated that it was sustained but Holt could not recall what the ultimate result was, noting that it was either a written reprimand or two-day suspension. (N.T. 10/30/2014, at 172.)  When defense counsel attempted to inquire into the details of the discipline, plaintiff's counsel, in fact, objected. (*Id.* at 173.)  We sustained the objection.  (*Id.*)  We conclude that from Holt's testimony he failed to prove that the result was a suspension, leaving us to accept that there was at least a reprimand.  *See Franks v. Phila. Police Dep't*, No. CIV.A. 12-1213, 2013 WL 4042600, at *5 (E.D. Pa. Aug. 9, 2013) ("The plaintiff bears the burden of proof on the elements of a Section 1983 claim by a preponderance of the evidence. Plaintiff must prove that in light of all of the evidence, his claims are more likely so than not." (citations omitted)); *Laskowski v. U.S. Dep't of Veterans Affairs*, 918 F. Supp. 2d 301, 306 (M.D. Pa. 2013) ("Plaintiffs meet [their preponderance of the evidence] burden when, in light of all the evidence, they establish that what they claim is more likely so than not so."); *Organtini v. Methacton Sch. Dist.*, No. CIV.A. 06-02213, 2008 WL 324022, at *4 (E.D. Pa. Feb. 6, 2008) (describing the line between reasonable inferences and impermissible speculation).  We find it would be reasonable to find that the IAD resulted in a written reprimand in that both outcomes that Holt described would presumably have involved at least some form of a written reprimand.

In any event, the documentation concerning this discipline, while not published to the jury, was received into evidence and shows that the investigation resulted in a written reprimand, not a suspension.  (Pl. Ex. 29-J.)

[38] Holt testified that a suspension precludes one from being promoted for one year.  (N.T. 10/30/2014, at 173.) However, it does not follow that an IAD investigation that results in a mere written reprimand, or the initiation of an IAD investigation, has that same effect.

990 F. Supp. 2d 478, 505 (M.D. Pa. 2014) *aff'd*, No. 14-1237, 2015 WL 2353023 (3d Cir. May 18, 2015) ("a mere investigation is not an adverse employment [action]"); *Russ-Tobias v. Pa. Bd. of Prob. & Parole*, No. CIV.A.04-0270, 2006 WL 516771, at *26 (E.D. Pa. Mar. 2, 2006) (an investigation is not itself an adverse action but is adverse if it results in termination);*Dawson v. Rumsfeld*, No. 1:05CV1270 (JCC), 2006 WL 325867, at *6 (E.D. Va. Feb. 8, 2006) ("the mere decision to initiate an investigation is not an adverse employment action"); *c.f. Ginger v. D.C.*, 477 F. Supp. 2d 41, 52 n. 10 (D.D.C. 2007) *aff'd*, 527 F.3d 1340 (D.C. Cir. 2008) ("mere investigations are not sufficient to support a retaliation claim").

No evidence was presented at trial as to the nature, content, or permanence of the written reprimand or whether the reprimand itself somehow had any other effect on Holt's employment.[39]  The evidence as concerned the result of the investigation indicated that there was apparently a reprimand and it was in writing.[40]  Accordingly, in that Plaintiff failed to present sufficient evidence to show that the initiation of the investigation was, or even resulted in, an

---

[39] A number of references to the progressive disciplinary system were made during trial.  However, the progressive nature of the system was not elucidated beyond the fact that varying levels of disciplinary measures could be employed by supervisors, a circumstance which inheres in virtually all disciplinary regimes.

[40] Plaintiff, in his brief, claims that the IAD investigations themselves harmed his reputation but no testimony concerning reputational harm arising from either the "Schizophrenic Memo" or "day off" investigations was offered at trial.  (Resp., at 5.)  Holt's vague testimony regarding reputational harm, which was not corroborated by any others at the PSP, simply noted that his reputation was hurt due the fact that he filed a federal lawsuit and due to Brahl's roll call comments, not due to the initiation of these two investigations.  (N.T. 10/29/2014, at 87; N.T. 10/30/2014, at 35-36.)  In fact, it was unclear whether anyone else at the PSP was aware of the investigations, or their results, beyond those that initiated them and took part in the investigatory process.

Plaintiff also asserts that because Johnson took into consideration the pending discipline that resulted from the investigation into the courthouse incident that this establishes sufficient adversity as concerns the investigation Brahl initiated.  The mere fact that Johnson took into consideration a founded investigation into allegations that he considered serious (and which were serious enough to warrant a multiday suspension) does not establish that the mere investigation and potential written reprimand that resulted from the investigation into the "day off incident," an occurrence that was of manifestly less significance, is an adverse action.  Any investigation into potential misconduct may reflect poorly on the subject of such an investigation.  It does not make it an adverse action, however.

adverse employment action, he has not made out a prima facie case of discrimination.  We will

grant Brahl's Motion for Judgment as a Matter of Law on this claim.[41]

### 5.  Issue Preclusion & the Law of the Case

Plaintiff argues that our prior adjudications concerning the issue of qualified immunity

cannot be reconsidered given the doctrine of issue preclusion (also called "collateral estoppel"),

which would have a mandatory, binding effect on our findings.  (Resp., at 14-15).  We find that

issue preclusion is inapplicable given that there is neither a prior action nor a valid, final

judgment on these claims.  *See Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976)

("there are at least four requirements which must be met before collateral estoppel effect can be

given to a prior action: (1) the issue sought to be precluded must be the same as that involved in

the prior action [i.e. a prior lawsuit]; (2) that issue must have been actually litigated; (3) it must

have been determined by a valid and final judgment; and (4) the determination must have been

essential to the prior judgment."); *Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007); *see*

*also ABC Great States, Inc. v. Globe Ticket Co.,* 316 F. Supp. 449, 451 (E.D. Pa. 1970)

(distinguishing between issue preclusion and the law of the case); *In re Le-Nature's, Inc.*, No. 8-

---

[41] Moreover, given that we are aware of no authority finding that the mere initiation of such investigations, or similar employment action, are themselves sufficiently adverse to violate the Constitution, at least when unaccompanied by an additional adverse action beyond a written reprimand, Brahl would, again, be protected from liability for damages under the aegis of qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 201, 206 (2001) (even if an action violates the Constitution, the right must be clearly established to defeat qualified immunity, that is the law should put a state actor "on notice" of the illegality of their acts); *Jones v. Se. Pa. Transp. Auth.*, No. 14-3814, 2015 WL 4746391, at *3 (3d Cir. Aug. 12, 2015) (in Title VII retaliation claim, the decision to simply initiate an investigation into alleged wrongdoing did not provide for cat's paw liability ); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("[T]he terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from [an employer's] disciplinary procedures.").  While initiating an investigation into a potential violation of workplace standards which could lead to some sort of discipline, if motivated by racial animus, would no doubt be contemptuous and an affront to the ideals of racial equality, it does not follow that a reasonable state actor would be put "on notice" that the initiation of such an investigation, founded on uncontroverted facts and not shown to be out of the ordinary, is of such magnitude as to be deemed unconstitutional.  *See Saucier*, 533 at 206.

1518, 2012 WL 363981, at *2 (W.D. Pa. Feb. 2, 2012).

We realize, however, that our prior adjudication of certain legal issues raises the question of whether a separate doctrine, the "law of the case" applies and precludes us from addressing those issues at this juncture.  Following the first trial of this case, and considering our review of the evidence presented at that trial, we denied the Defendants' renewed motion for judgment as a matter of law as to the claims discussed here.  (Doc. No.  133.)  Out of an abundance of caution, we will consider "the law of the case" doctrine despite Plaintiff's failure to invoke it.  This "doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation" and is focused on principles of "finality and judicial economy."  *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997).  "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Arizona v. California*, 460 U.S. 605, 618 (1983).

We know of no cases that stand for the proposition that a denial, as opposed to a grant, of a motion for judgment as a matter of law implicates the law of the case doctrine.  Many cases that have addressed the analogous scenario where summary judgment was *denied* have refused to hold that such a finding, which simply allows the case to progress to trial, created the "law of the case."  *See, e.g. Sikkelee v. Precision Airmotive Corp.*, 45 F. Supp. 3d 431, 444 (M.D Pa. 2014) (citing 11 *Moore's Federal Practice*, § 56.121(1)(c) (Matthew Bender 3d ed.)); *see also Ingram v. S.C.I. Camp Hill*, 448 F. App'x 275, 278 n. 3 (3d Cir. 2011) (denial of summary judgment simply meant that issue was "to be resolved at or prior to trial") (citing *Glaros v. H.H. Roberston Co.*, 797 F.2d 1564, 1573 (Fed. Cir. 1986)).  Our denial of the motion for judgment as a matter of

law following the first trial was no more than a decision to allow the claims, upon which the jury

was unable to reach a verdict, to be resolved at a second trial, always subject to further legal

consideration following the evidence presented at the second trial.[42]   *See Williams v. Runyon*,

130 F.3d 568, 573 (3d Cir. 1997) (describing the difference between a "judgment as a matter of

law in favor of [a] plaintiff" which implicated the "law of the case" and "a decision that material

facts were still in dispute" which does not).   Therefore, the doctrine does not apply here.[43]

---

[42] To hold otherwise would prove problematic in that a party, who has survived a motion for judgment as a matter of law after a first trial could, as a matter of course, invoke the doctrine whenever the jury returns a verdict in their favor in the second trial, however legally tenuous that finding may be.   We do not believe the law would countenance such a result.

[43] Even if we assume that the law of the case doctrine applies, the doctrine is discretionary as opposed to mandatory. *See Lesende v. Borrero*, No. CIV. 06-4967 DRD, 2014 WL 4199095, at *4 (D.N.J. Aug. 22, 2014) ("If the ruling is avowedly tentative or the issues especially important, it may be said that law-of-the-case principles do not apply" and noting that even where the law of the case is implicated, "[t]he doctrine does not restrict a court's power but rather governs its exercise of discretion."); *see generally United States v. U. S. Smelting Ref. & Min. Co.*, 339 U.S. 186, 199 (1950) ("[T]he 'law of the case' is only a discretionary rule of practice.").   The Third Circuit has noted:

> Although it is often said that the law of the case doctrine does not limit the power of trial judges to reconsider their prior decisions, this court has identified two prudential considerations that limit a court's authority to do so. First, the court must explain on the record the reasoning behind its decision to reconsider the prior ruling. Second, the court must take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling.   *See Swietlowich v. County of Bucks,* 610 F.2d 1157, 1164 (3d Cir. 1979).

*Williams*, 130 F.3d at 573. If the doctrine were to apply, we would exercise our discretion to reconsider our prior rulings.   For the same reasons set out as to why judgment as a matter of law must be granted as to these claims, we find it would be manifestly unjust and clear error to abide by our earlier decision, given our conclusion that the law does not allow for liability based on the evidence presented at trial. *See United States v. Naus*, 153 F. App'x 812, 814 (3d Cir. 2005) ("where the initial decision was clearly erroneous and would work a manifest injustice" a court may review and overrule the prior ruling); *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998).   Oral argument was held on this Motion and, prior to the oral argument, we specifically requested the parties discuss the applicability of the law of the case.   Plaintiff did not argue that the law of the case applied, let alone that they would be prejudiced by any decision to not abide by our earlier rulings.   We do not, in any event, see how Plaintiff could be prejudiced in this case.   Given the nature of our earlier ruling on the motion for judgment as a matter of law as to the first trial, which simply allowed the case to be tried once again before a jury, the Plaintiff was obligated to present evidence as to each and every element of his claims, as he was in the first trial, given the jury's failure to reach a verdict on these claims the first time around, and has not shown that he abstained from presenting any additional evidence in reliance on our earlier rulings. *See Williams*, 130 F.3d at 573 (assuming the trial judge had determined, as a matter of law, that exhaustion would not bar plaintiff's employment claims, plaintiff was prejudiced by the trial court's post-trial decision to find the claims unexhausted where plaintiff  apparently relied on that earlier decision by not introducing evidence on exhaustion at trial).

Moreover, we note that, as to certain claims, the evidence in the second trial differed, often materially so, from the

**B.   Motions for a New Trial & Conditional Rulings**

**1.   The Weight of the Evidence**

The Federal Rules of Civil Procedure mandate that when a court grants judgment as a matter of law, it must conditionally rule on the outstanding motions for a new trial as to those claims.   Fed. R. Civ. P. 50(c).   Defendants claim that the evidence on liability was so lacking that the verdicts cannot stand in that the jury's findings were against the great weight of the evidence. (Def. Br., at 30-31.)   The law is such that "a new trial should be granted only when the verdict is contrary to the weight of the evidence or when a miscarriage of justice would result if the verdict were to stand."   *Brennan v. Norton*, 350 F.3d 399, 430 (3d Cir. 2003).   A verdict with a reasonable or rational basis should not be set aside.   *See Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 202 (3d Cir. 1996).   We will address those claims for which we grant judgment as a matter of law first, and then address the surviving claim against Winterbottom.

As to the Title VII retaliation claim against the PSP, the PHRA retaliation claim against Johnson, the two Section 1983 claims against Winterbottom concerning the "Schizophrenic Memo" investigation, and the Section 1983 claim against Brahl, we conclude that the verdicts were not only based on legally insufficient evidence, they were also against the weight of the evidence.   For the same reasons set out *supra*, we conclude that the evidence of racial or

---

first trial.   *See In re Caterpillar Inc.*, 67 F. Supp. 3d 663 (D.N.J. 2014) (describing the exception to the law of the case where evidence differs materially from the evidence of record that was presented at the time of the earlier ruling and where the "new evidence" is less supportive of the earlier decision).   In the first trial, the temporal proximity between Winterbottom's knowledge of Holt's lawsuit and the adverse action was considerably closer and additional evidence that could be argued to be antagonistic was testified to as well.   Moreover, in the first trial, significant testimony was presented as to the process and nature of the PSP's disciplinary system which was lacking in the second trial.   (N.T. 10/31/2013, at 78-79; N.T. 11/4/2013, at 9-10, 53, 69-72.)   We note that the evidence as to Johnson and the PSP, however, was largely the same in both trials.

retaliatory animus as to all those claims, except that against Brahl, is lacking.[44]   The evidence against Johnson and the PSP, particularly with respect to the district justice courthouse incident, showed that Johnson had substantial reason to be concerned about Holt's judgment well before the protected activity.   Further, Holt failed to present any meaningful evidence of retaliatory motivation, leaving us to conclude that the jury's verdict as to the claims against Johnson and the PSP cannot stand as they were contrary to the great weight of the evidence.

The same is true of the claims against Winterbottom regarding her initiation of the "Schizophrenic Memo" IAD investigation.   Holt's comparator evidence was clearly lacking as was other evidence of either retaliatory or racially based motivation upon which a factfinder could reasonably infer that the initiation of the investigation, based on conduct Holt admitted to have performed, was driven by racial or retaliatory animus.

On the contrary, we find the evidence readily sufficient to infer that Brahl acted out of racial animus, given his repeated comments to other troopers which could be found to have been based on racial stereotypes.   However, for the same reasons discussed *supra*, we find that the verdict was against the weight of the evidence given that there was insufficient evidence for a jury to find that the initiation of the investigation, the results of which were not presented at trial, was sufficiently adverse to be actionable.[45]   Accordingly, we conditionally grant the Motion for a New Trial as to these claims.

---

[44] Moreover, as to the three claims concerning the IAD investigations, there was a lack of evidence to show that Winterbottom or Brahl sufficiently influenced the disciplinary decisions so as to support a finding of cat's paw liability.

[45] To the extent that Brahl's initiation of the investigation could be found to be an adverse action, we would find that the verdict was *not* against the weight of the evidence given the strong evidence of racial animosity presented at trial.

We do not find the jury's verdict as to the remaining equal protection claim against Winterbottom concerning the failure to assign Holt to King of Prussia, however, to be "against the great weight of the evidence."  The question of whether Winterbottom's claimed reasons for her decisions were valid hinged upon credibility determinations of a close nature which the jury could permissibly find to favor Plaintiff.  *See Rapine v. Harrah's Atl. City*, No. CIV.A. 204CV00590LDD, 2006 WL 724548, at *4 (E.D. Pa. Mar. 21, 2006) *aff'd sub nom. Rapine v. Marina Associates*, No. 06-2391, 2007 WL 2988630 (3d Cir. Oct. 15, 2007) ("A verdict is against the great weight of the evidence 'when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991))).  While we note that Taylor, the only other witness who had firsthand knowledge of the state of Pocono prior to Holt's arrival, discredited Holt's assertion as concerned the alleged morale and statistical problems, the evidence did not so overwhelmingly favor Winterbottom so as to be against the great weight of the evidence given that the jury could reasonably conclude that Holt's own assessment of the state of Pocono Station was accurate.  *Id.* ("[I]n performing this analysis, a trial court may not usurp the prime function of the jury, and thereby denigrate the jury system, by substituting its own judgment for that of the jury simply because the court might have reached a different conclusion.")

## 2. Passion or Prejudice

A new trial may be awarded when a court determines that the jury's verdict is the result of "passion or prejudice."  *Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir. 1993) *modified*, 13 F.3d 58 (3d Cir. 1993).  We reject Defendants' contention, (Def. Br., at 31-32.), that the verdict here

resulted from "passion or prejudice," simply because liability was close, the damages unusually high, and the jury had asked the court as to who would ultimately be responsible for damages. *See Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 352 (3d Cir. 2001) ("[T]he size of the award alone [is not] enough to prove prejudice and passion." (quoting *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 114 (3d Cir. 1999)); *Dunn*, 1 F.3d at 1384 (large verdict did not show passion or prejudice); *Wade v. Colaner*, No. CIV.A. 06-3715-FLW, 2010 WL 5479629, at *20 (D.N.J. Dec. 28, 2010) ("[T]he jury's decision to send a note to the Court asking whether, in the event punitive damages were awarded, [the defendant] would be the only source of the funds, does not evidence passion or prejudice.").

Nor do we find compelling Defendants' argument that the fact that the testimony that concerned Holt's failure to be promoted to lieutenant shows that the verdict was the product of passion or prejudice.  (Def. Br., at 32.)  The jury was instructed that "the question of promotion from sergeant to lieutenant is not part of the case and you're not to consider any damage award for loss of additional pay or benefits pertaining to whether or not there had been a failure to promote from sergeant to lieutenant."  (N.T. 11/5/2014, at 33.)  While the award was high, we do not assume that the jury would fail to heed our instruction to disregard certain evidence concerning Holt's failure to be promoted to lieutenant.

We also do not see how the fact that the jury awarded a lesser sum in compensatory damages for the station commander related claim against Winterbottom than the claim against Brahl establishes that the verdict was the result of "passion and prejudice."  While it was no doubt peculiar that the jury awarded less for the adverse action that Holt clearly complained about the most, the fact that the jury may have been confused by the vague and muddied

testimony on damages offered by the Plaintiff and allocated damages in a less than precise manner does not show that their decision resulted from passion or prejudice.   Accordingly, we conclude that a new trial is not warranted on these grounds.

### 3. Damages

We begin our analysis of damages by considering Defendants' Motion for a New Trial as concerns the surviving claim against Winterbottom.   We will then conditionally rule on the Motion for a New Trial regarding damages as to those claims where we have granted judgment as a matter of law in favor of defendants and where we have also conditionally found a new trial is warranted, on the grounds that those verdicts were also against the weight of the evidence.[46]

### a.   Compensatory Damages: King of Prussia Station Commander

### i.   The Legal Standard for Remittitur

Defendants have moved for a new trial or, alternatively, for remittitur, based on what they claim are unreasonably large damage awards.   The Third Circuit directs that "[a] remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole, *i.e.,* to remedy the effect of the employer's discrimination."   *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995) (citations omitted); *see Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986) ("The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive.").   It is this Court's "obligation . . . to ensure that the compensatory damage

---

[46]   While we have already conditionally granted a new trial as to these claims in light of the minimal evidence on liability, out of an abundance of caution, we will conditionally rule on additional bases for a new trial.   *See* Fed. R. Civ. P. 50(c).

award finds support in the record and that the jury did not 'abandon analysis for sympathy.'" *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 352 (3d Cir. 2001) (quoting *Gumbs v. Pueblo International, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987)).  Further, "where no clear judicial error or 'pernicious influence' can be identified but where the verdict is so large as to shock the conscience of the court: the court [should] order[] plaintiff to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur [is] refused, to submit to a new trial." *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983).  Accordingly, we must determine whether the award is "clearly unsupported and/or excessive," *Spence*, 806 F.2d at 1201, and, if that is the case, we must remit the award that exceeds the maximum amount that the evidence supports.  *Kazan*, 721 F.2d at 914.

### ii.  The Testimony

The jury found that Holt was entitled to $200,000 in compensatory damages and $300,000 in punitive damages due to Winterbottom's failure to assign him to the King of Prussia Station.  The testimony at trial as to Holt's harm arising specifically from this decision was limited to Holt's own testimony and focused primarily on the longer commute that this assignment to Pocono entailed, one more hour in each direction than King of Prussia, and the strain that the longer hours had on his home life.  Holt testified that, in this regard, "there is a little bit of resentment [from his wife] because I have long days [due to the commute] and she has all this responsibility on herself in addition to getting our daughter to her extracurricular activities as well." (N.T. 10/30/2014, at 41.)  Holt also explained that because of his inability to take care of certain childcare duties, he and his wife "had to pick up extra day care responsibilities for when [his wife] has to work." (*Id.* at 40.)  Notably, however, in September

2011, when the position Holt had preferred at King of Prussia again became vacant, he declined to apply for it, out of a sense of loyalty toward the men and women under him at Pocono and given that his "family had already made the adjustment" to his new position.[47] (*Id.* at 106)

On direct examination and relating to damages, Holt was asked how "the actions of the Defendants in [his] time at Troop L and Troop T affect[ed his] personal and home life at all?" (N.T. 10/30/2014, at 36-37.) He responded by describing certain problems related to "anxiety," "acid reflux," and "hypertension," problems that required medication, as well as "isolation" and anger, that he attributed to the actions of the Defendants, in a general sense. (*Id.*) Holt noted that at some point he sought out treatment from a psychologist and therapist but his testimony in this area was limited. (N.T. 10/30/2014, at 37, 41.) He did not explain whether he ended treatment with the psychologist although his sole reference on this point was in the past tense when he testified: "I saw a psychologist." (*Id.* at 37.) It was unclear whether he saw the psychologist once or multiple times. He also explained that he no longer saw his therapist but that he had seen her "once every two weeks." (*Id.* at 37, 41.) He did not testify about when this occurred or how long he pursued such treatment.

Understanding that this testimony certainly provides a basis for compensatory damages, it does not provide insight into what particular actions or which particular defendants caused him this particular harm. We do observe that Holt did elaborate on the emotional harm he suffered as a result of Brahl's racially charged comments. (N.T. 10/29/2014, at 87.) Those comments, however, were not the basis of any adverse action in this trial and, moreover, the claim against

---

[47] Holt initially claimed that this job was offered at a later date by a new captain who had taken over for Winterbottom after her retirement. (N.T. 10/30/2014, at 106-07.) However, after being impeached with a September 27, 2011 e-mail Holt had sent to Police Commissioner Frank Noon that addressed the vacancy, Holt admitted that the position indeed became available around September of 2011. (*Id.* at 107-08.)

Brahl has not survived.  Holt testified that because of Brahl's comments, "my work ethic, my morale, my professionalism, and my character was [sic] just assassinated. . . my character and my reputation were just absolutely obliterated."  (*Id.*)  He also asserted that those comments "directly attributed to [his] not getting the King of Prussia Station [Commander position]."  (*Id.*) We accept, however, that this testimony could bear on Holt's emotional fragility and reaction to his denial of the King of Prussia position.  This is all the more troublesome here, in that only one of his claims remains.  Moreover, without expanding on his therapy treatment, or even indicating *when* it occurred, it remains unclear whether the therapy was due to Johnson's, Winterbottom's, or Brahl's actions, or a combination thereof, or whether it provided any relief.[48]

---

[48] Similarly problematic was Holt's very general allegations concerning how the events had affected him professionally, in that the testimony did not differentiate between the various actions of the Defendants and, as is pertinent here, did not address Winterbottom's decision to not assign Holt to King of Prussia with any specificity. The testimony was as follows:

> Q. Now based on everything that we just talked about from your time at Troop L to your time at Troop T, how did that affect your employment with the Pennsylvania State Police?

> A. Well, it was catastrophic. The four positions that I was passed over for, two of those guys got promoted. One guy transferred. One gentleman retired and got a job comparable to the station that he actually supervised when he was a station commander. That's number one.

> Number two, I am viewed as toxic by the command staff because I stand up for myself. I am the guy that everybody says, "Oh, he's the one that filed the lawsuit." I don't really care what they think because it was my life and my career that was being messed with. That is number two. I have a reputation that is going to follow me because of this to the day I retire.

> Number 3, I gave the Department an opportunity to remedy this. Had they held these people accountable we wouldn't be here today, ladies and gentlemen, so as a black sergeant, I made one complaint, two complaints, three against white commissioned officers, and the Pennsylvania State Police Department tells me there is nothing there. But these same white officers made complaints against me and they are founded, so I get suspended without pay and lose money as a result of that, okay?

> I haven't been able to get promoted and I have been working my tail off to see that that happens, but I have been held back because of their actions, okay? I have spent money out of my pocket, $8,000 to $10,000 to pursue justice because

Holt's testimony regarding his medication management was similarly generalized.  He did not testify as to whether medication provided him relief, be it partial or total.  No medical evidence in the form of testimony from a physician, psychologist, or other expert was presented nor were medical records offered to support his testimony.  No other witnesses, not even his wife or family, offered any testimony on this point.  While Holt had called past and present co-workers to the stand, their testimony was focused on liability, not damages.

### iii.   The Availability of Emotional Damages

We do not find that the fact that Plaintiff's testimony was the sole evidence of his emotional distress, the only harm that was in any way connected to his non-assignment to King of Prussia, is fatal to his damages claim.  The law is clear that expert testimony is not required to establish a basis for emotional damages.  *Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir. 1994). Moreover, while the Third Circuit has yet to expressly rule on whether a plaintiff's own testimony is sufficient to support an award of emotional damages, *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (declining to "decide whether a verdict for emotional distress may ever be supported solely by a plaintiff's own testimony"), the weight of authority holds that a plaintiff's own testimony alone is generally sufficient to support some award of emotional damages.  *See, e.g. Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) ("A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden [of showing emotional damages].");  *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1254 (4th Cir. 1996) ("[A] plaintiff's testimony, standing alone,

---

the Department wouldn't hold up their responsibility and didn't care that I was being discriminated against and retaliated against.

(N.T. 10/30/2014, at 35-36.)

can support an award of compensatory damages for emotional distress based on a constitutional violation; however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages."); *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) (following *Price*); *Rakovich v. Wade*, *819 F.2d 1393, 1399 n. 6 (7th Cir.1987) vacated on reh. in banc on other grounds*, 850 F.2d 1180, *cert. denied*, 488 U.S. 968 (1988) ("when the injured party provides the sole evidence [of emotional distress], he must reasonably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements."); *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292, 305 (E.D. Pa. 1997) (plaintiff's own testimony was sufficient to support an emotional damages award, albeit one lower than that which the jury had awarded).  Accordingly, we find that Holt's testimony alone may support an award for emotional harm.  However, it does not follow that that testimony alone supports the substantial compensatory damages Holt was awarded.  *See Valentin*, 986 F. Supp. at 305 (while plaintiff's testimony alone sufficed to establish entitlement to an award of emotional damages, the evidence was insufficient to support the jury's award for $209,000).

### iv.  The Amount of the Award

In order to assess the reasonableness of the award, we begin with the uncontroversial principle that "[i]n Section 1983 actions, where it is determined that a party's constitutional rights were violated, a plaintiff seeking 'substantial damages should be awarded only to compensate actual injury.'"  *Lighthouse Inst. for Evangelism v. City of Long Branch*, No. CIV 00-3366 (WHW), 2010 WL 1491079, at *6 (D.N.J. Apr. 13, 2010) (quoting *Pryer v. C.O. 3 Slavic,* 251

61

F.3d 448, 453 (3d Cir.1994)); *see also Saleh v. Upadhyay*, 11 F. App'x 241, 261 (4th Cir. 2001) ("An award of compensatory damages under § 1983 must be proportional to the actual injury incurred.... Compensatory damages for emotional distress must be proven by competent, sufficient evidence." (internal quotation marks and citations omitted)); *Young v. Pleasant Valley Sch. Dist.*, No. 3:07-CV-00854, 2012 WL 1827194, at \*20 (M.D. Pa. May 18, 2012) *aff'd*, 601 F. App'x 132 (3d Cir. 2015) ("to the extent Plaintiff may recover compensatory damages against Defendant Pleasant Valley, she is only entitled to compensatory damages that have been linked to an actual injury"); *see generally Carey v. Piphus*, 435 U.S. 247, 263 (1978) (in due process claim, damages would not be presumed and plaintiff must "convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself"); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986) ("[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts."). We are reminded that "[a] jury has very broad discretion in measuring damages; nevertheless, a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket. There must be a rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987). An award is not deemed excessive, however, simply because the court, had it been the factfinder, would have awarded some lesser amount. *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989).

Here the evidence of compensatory damages was emotional in nature. While Holt explained that he was forced to take days off work and spend money in order to pursue his

lawsuit, such sacrifices are not remunerated by way of compensatory damages.  *See Tighe v. Purchase*, No. 1:11-CV-224, 2015 WL 1962304, at *2-3 (W.D. Pa. May 1, 2015) ("Under long-standing principles of American law . . .the costs and expenses one incurs in funding litigation are not recoverable as compensatory damages."); *see generally Fox v. Vice*, 131 S. Ct. 2205, 2213 (2011) (describing the "American Rule" where each party "generally. . . bear[s] his own litigation expenses").  Holt also testified to increased overtime opportunities in King of Prussia but did not provide any evidence on what he would have earned in overtime pay.  (N/T 10/30/2014, at 38.)  The jury was instructed not to consider the costs Holt incurred in litigating his case or loss of pay as compensable harm.  (N.T. 11/5/2014, at 42-43.)

Our review of the caselaw[49] and the evidence adduced at trial leads us to find that the $200,000 compensatory damages award "shocks the conscience" and is "clearly unsupported" given the limited evidence of harm that could reasonably be attributed to Holt's non-assignment to the King of Prussia station, a position which, just a few months after his transfer to Pocono, Holt no longer wished to pursue.  *See, e.g. Clopp v. Atl. Cnty.*, No. CIV.A. 00-1103 JEI, 2002 WL 31242218, at *3 (D.N.J. Oct. 7, 2002) ("A court may look at awards in similar cases in determining whether an award is excessive.").  While our review of other cases shows that

---

[49] While we look to other cases for guidance, we are not bound by them. *See Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989) ("an examination of awards in other cases involving similar injuries serves as a helpful guide to whether a particular award is excessive.  We are nonetheless mindful that each verdict revolves around a unique set of facts and circumstances." (citations omitted)); *see also Blakey v. Cont'l Airlines, Inc.*, 992 F. Supp. 731, 736 (D.N.J. 1998).  We note that Holt's case is factually unique and that juries are given wide discretion in quantifying harm that is inherently inexact, and thus we do not simply rely on the awards from other cases but use those awards, and the reasoning in those courts' opinions, for guidance.  *See Gumbs*, 823 F.2d at 773 ("Although we do not rely on verdicts in other cases to determine whether the verdict in this case is excessive, the rationale of the court in determining the excessiveness of verdicts with comparable injuries offers us some guidelines."); *Waldorf v. Shuta*, 142 F.3d 601, 623 (3d Cir. 1998) (discussing the difficulty that inheres in reviewing awards in other cases given the inexact nature of compensatory damage awards); *see also Tormenia v. First Investors Realty Co.*, 251 F.3d 128, 138 (3d Cir. 2000).  We are also mindful that the value of money changes over time and thus we consider the effects of inflation in considering past awards.  *See E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1286 (7th Cir. 1995) ("Comparability of awards must be adjusted for the changing value of money over time.").

psychological harm can often result in substantial damage awards, it also supports our finding that the award here, given the evidence presented, is manifestly excessive.[50] *See Zielinski v. SPS Technologies LLC*, No. CIV.A. 10-3106, 2011 WL 5902214, at *9-10 (E.D. Pa. Nov. 22, 2011)

---

[50] We have also looked to cases outside our circuit for guidance. *See Molloy v. Blanchard*, 115 F.3d 86, 93 (1st Cir. 1997) (upholding approximately $18,000 in damages for emotional harm and damage to personal and professional reputation arising out of sex discrimination and procedural due process claim in connection to nine and a half week suspension); *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (upholding $50,000 in race discrimination and retaliation failure to promote case where plaintiff's career advancement was "stonewalled for almost one year" but where all evidence of emotional harm was plaintiff's own testimony); *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir. 1996) (upholding award of $100,000 for plaintiff who "suffered depression, weight loss, intestinal troubles, and marital problems, [where] she had been sent home from work because of her depression, and . . . she had to consult a psychologist" and award of $75,000 for plaintiff that "suffered [from] depression, sleeplessness, and marital problems" following plaintiffs' transfers which were effectively demotions); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994) ($25,000 award upheld for "for mental anguish, humiliation, and loss of reputation" where plaintiff was discharged in First Amendment Retaliation claim); *Moore v. Freeman*, 355 F.3d 558, 564 (6th Cir. 2004) (in FLSA retaliation case, although $40,000 emotional damages "could be reasonably described as fulsome," where plaintiff put forth "evidence that the stress of losing his job demoralized him, strained his relationships with his wife and children, and negatively affected his sleeping habits and appetite" it was not clearly excessive); *Hulbert v. Wilhelm*, 120 F.3d 648, 656 (7th Cir. 1997) (upholding $100,000 in compensatory damages in retaliation action where physical and emotional distress, lasting over two years, was witnessed by family and coworkers, the plaintiff sought medical attention for physical and mental symptoms, and he ultimately resigned as a result of the stress arising from the retaliatory conduct); *Ross v. Douglas Cnty., Neb.*, 234 F.3d 391, 397 (8th Cir. 2000) (upholding $100,000 in a race-based hostile work environment, race-based disparate treatment, and retaliation case where plaintiff suffered "emotional and physical injury" and where plaintiff was "forced to take a lower-paying job, without health benefits for his family" which resulted in severe financial strain); *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1265-66 (10th Cir. 1995) (taking into consideration that "[n]o treating physicians or psychologists testified and both Plaintiffs continue to work in their chosen field" in reviewing emotional distress awards of $250,000 per plaintiff which were found to be "clearly . . . excessive" and ultimately struck down as being the result of "passion and prejudice"); *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1314-18 (11th Cir. 2000) *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (in multi-plaintiff suit damages for racial discrimination attributed solely to failures to assign or transfer, the jury provided awards of $10,000 (in three cases), $25,000 (in one case), $40,000 (in one case), and $50,000 (in two cases)); *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 73 (E.D.N.Y. 2002) *aff'd*, 93 F. App'x 260 (2d Cir. 2004) (reducing award from $300,000 to $75,000 in discrimination and retaliation claim as to a plaintiff who was diagnosed with "acute stress disorder", treated with a psychologist, and was forced to take disability leave, and, following his later termination, was temporarily unable to find work, resulting in the loss of his car and house and strained relationships with his family; "the Court, for its comparative analysis, . . . looked to cases entailing a plaintiff's general testimony of humiliation and stress, without medical corroboration, resulting in family and/or personal problems, and . . . discerned that damages have generally been awarded in the range of $5,000 to $100,000."); *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 Civ. 2762(JGK), 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003) (award reduced from $140,000 to $10,000 where plaintiff was transferred to another, less desirable department with same salary but did not seek medical attention); *Holness v. Nat'l Mobile Television, Inc.*, No. 09 CV 2601 KAM RML, 2012 WL 1744847, at *5 (E.D.N.Y. Feb. 14, 2012) *report and recommendation adopted as modified*, No. 09-CV-2601 KAM RML, 2012 WL 1744744 (E.D.N.Y. May 15, 2012) ($50,000 compensatory damages award in discrimination and retaliation case involving the provision of lesser work assignments and three failures to promote where plaintiff sought treatment from a psychologist, withdrew from his family, and suffered an "emotional breakdown," but where no medical documentation or corroborating evidence was presented).

($250,000 in emotional distress damages remitted to $100,000 in hostile work environment and disparate treatment case involving termination where evidence of emotional harm was limited to plaintiff's own testimony); *Shesko v. City of Coatesville*, 324 F. Supp. 2d 643, 652 (E.D. Pa. 2004) ($20,000 in compensatory damages awarded in discriminatory failure to promote case where Plaintiff testified to feeling depressed and had difficulty performing her job each day); *Hall v. Pa. Dep't of Corr.*, No. 3:CV-02-1255, 2006 WL 2772551, at *22 (M.D. Pa. Sept. 25, 2006) (reducing emotional damages award to $75,000 in hostile work environment and retaliation case involving a failure to promote where, *inter alia*, Plaintiff's testimony was the sole evidence of emotional harm); *Mondzelewski v. Pathmark Stores, Inc.*, No. CIV. A. 96-359 MMS, 2000 WL 654137, at *24 (D. Del. Mar. 20, 2000) (pain and suffering award for ADA discrimination and retaliation claim was set, consequent to statutory cap, at $209,000 where Plaintiff had mental breakdown, was at times suicidal, and, for several month could not work, and the emotional harm was substantiated by his physicians, wife, and coworkers); *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292, 305 (E.D. Pa. 1997) ($209,000 in emotional damages reduced to $52,250 where entirety of evidence on emotional damages, following retaliatory termination, was plaintiff's own testimony); *Glass v. Snellbaker*, No. CIV.A. 05-1971 JBS, 2008 WL 4371760, at *20 (D.N.J. Sept. 17, 2008) (in retaliation claim, where plaintiff was unconstitutionally forced into retirement and his own testimony was the only evidence of emotional harm, emotional damages of $250,000 were reduced to $50,000); *Hurley v. Atl. City Police Dep't*, 933 F. Supp. 396, 423 (D.N.J. 1996) *aff'd*, 174 F.3d 95 (3d Cir. 1999) (noting, albeit over fifteen years ago, that "[a]wards for emotional distress in discrimination cases arising under § 1983, § 1981, and Title VII rarely come close to $575,000, and typically are for less than

$50,000"[51] and that "[w]here very large awards have not involved concrete economic damages, they have often been subject to remittitur or been vacated") (citations omitted) (collecting cases); *Murphy v. City of Phila. Dep't of Recreation*, No. 07-CV-4104, 2011 WL 3652480, at \*5 (E.D. Pa. Aug. 19, 2011) (upholding $100,000 in emotional damages for retaliation claim supported by testimony of "great emotional pain, anguish, anxiety and depression, [which] resulted in [the plaintiff] becoming physically ill and experiencing severe stress and strain in her various personal relationships, including those with her children. Plaintiff also testified that she suffered from these symptoms for more than a year and that she sought treatment from several doctors and therapists with little, if any relief" while noting that upholding the award was a "close call").

Here, Holt's testimony as concerned the assignment to Pocono was focused on the fact that the station was one more hour away than the one he preferred and that this caused him to lose two hours of time which he could spend at home and otherwise, which put strain on his personal life and familial relations.  No other specific stress or symptoms were linked to this particular employment action although his general description of anxiety and other symptoms could certainly be partially linked to this particular event.[52]  No family members, coworkers, medical specialists, or other individuals testified to support the notion that this adverse action

---

[51] Adjusted for inflation in accord with the United States Bureau of Labor's Consumer Price Index, $50,000 in 1996 has the same purchasing power as $75,441.68 in 2014, the year that the second trial took place, and $75,782.35 in 2015.  U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, http://data.bls.gov/cgi-bin/cpicalc.pl (last visited June 24, 2015).

[52] Holt's testimony tended to indicate that his failure to be assigned the Station Commander positions at Jonestown and Schuylkill Haven were of some particular significance in that they were seen as stepping stones for career advancement in the PSP, yet there was no comparable testimony showing that the denial of the King of Prussia position was of similar significance.  During opening statements, Holt's counsel testified that King of Prussia had "more responsibility" but evidence to that effect was not expanded upon at trial beyond the fact that King of Prussia was a larger station and generally required more supervisory responsibility.  We do find that the additional responsibility and prestige as well as the inability to avail oneself of King of Prussia's overtime opportunities could be aggravating and cause emotional harm.

caused any effect on his wellbeing nor were any witnesses presented to corroborate the extent of his emotional harm more generally. We are also guided by the fact that the adverse action at issue was not a demotion, termination, or other act of comparable severity but rather the failure to be assigned to the location he preferred, an assignment, just months later, he no longer desired.[53] Holt was provided a Station Commander position, just not the one he preferred at the time. Accordingly, we find that the compensatory damages must be reduced to $50,000, resulting in a remittitur of $150,000 on this claim. We conclude that such a sum is the maximum award that the evidence reasonably supports and will adequately compensate Plaintiff for the harm he suffered.

### b. Punitive Damages: King of Prussia Station Commander

Defendants claim that punitive damages are not warranted in this case. However, we find that the record supports Plaintiff's entitlement to punitive damages.[54] We also find the jury's

---

[53] Plaintiff cites to two Third Circuit cases, *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565 (3d Cir. 2002) and *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354 (3d Cir. 2001), which he claims are similar. (Resp., at 25.) These cases both involved substantial jury awards. In *Gagliardo*, the plaintiff was fired in violation of the Americans with Disabilities Act and the plaintiff and family members testified to profound emotional changes following plaintiffs termination, which had "transform[ed] from a happy and confident person to one who was withdrawn and indecisive." *Gagliardo*, 311 F.3d at 573-74. The Third Circuit upheld the $1.55 million award. *Id.* In *Evans*, the Third Circuit upheld the district court's remittitur which reduced an emotional damage award from $1.15 million to $375,000. *Evans*, 273 F.3d at 354-56. There Plaintiff had been denied a promotion, a slight that had been worsened by nine other refusals to promote, and which had "traumatized" her to the point where her distress would at times cause her to become ill. *Id.* at 355. There the evidence of such harm "was not comprised of [plaintiff's] testimony alone. *Id.* The court in *Evans* noted that $375,000 was "well above most emotional distress awards," but given the district court's detailed reasoning for its remittitur and the "extremely deferential [manifest abuse of discretion] standard of review" applied to such decisions, the court upheld the award. *Id.* at 355-56. We find these cases readily distinguishable given that the adverse action here was of manifestly less severity, there was no evidence of emotional harm beyond Holt's own statements, and Holt's own limited testimony was generally of a convoluted and unclear nature concerning which actions and defendants resulted in which harm.

[54] We reject Defendants' argument that judgment as a matter of law is warranted as to the claim of punitive damages concerning Winterbottom's decision to not assign Holt to King of Prussia Station. In federal civil rights cases, the act at issue need not be "outrageous,", *Alexander v. Riga*, 208 F.3d 419, 430-31 (3d Cir. 2000), rather punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). As is pertinent to civil rights cases, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad v. Am. Dental Ass'n*, 527 U.S.

punitive damage award of $300,000 to be unreasonable and shocking to the judicial conscience, particularly in light of our reduction in the compensatory damage award, which mandates remittitur on that ground as well.[55]

Unlike compensatory damages, which are focused on making a plaintiff whole, "punitive damages serve a broader function; they are aimed at deterrence and retribution."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  While awards of punitive damages must comport with the constitutional right to due process, *see, e.g. id.* at 412, the award may also be reviewed for excessiveness, warranting remittitur, under the "shocks the conscience" standard applied to compensatory awards.  *See, e.g. Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 29 (1st Cir. 2010) (reviewing a punitive damage award "under the traditional common law excessiveness standard rather than the Due Process excessiveness standard" and finding that that

---

526, 536 (1999) (Title VII case); *see Whittaker v. Fayette Cnty.*, 65 F. App'x 387, 393 (3d Cir. 2003) (applying *Kolstad* in a Section 1983 suit).

The jury was free to find that Winterbottom, a captain in the PSP aware of the civil right protections afforded her fellow employees, maintained such a culpable state of mind when she intentionally discriminated against Holt in the workplace and sent him to a station with less responsibility, less prestige, and substantially less overtime opportunities than the station Holt requested.  *See Kolstad*, 527 U.S. at 536; *see also Marsh v. Sunoco, Inc.*, No. CIV. A. 06-CV-2856, 2008 WL 2876569, at *2 (E.D. Pa. July 24, 2008); *Parker v. State of Del. Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 478 (D. Del. 1998).  The evidence of Winterbottom's state of mind hinged on credibility determinations, determinations that the jury could permissibly find supported an award of punitive damages.  Accordingly, we will not grant summary judgment concerning Plaintiff's entitlement to punitive damages here.

[55]  Defendants' brief was focused on the excessiveness of the compensatory award as well as the threshold issue of whether punitive damages should be awarded at all but did not address the amount of punitive damages awarded. (Def. Br., at 30-32.)  Even if the sum of the punitive damage award was not adequately presented as a basis for the Defendants Motion for a New Trial, this Court informed the parties of its view that the punitive damage awards may be excessive and provided them an opportunity to address the issue.  (Doc. No. 196.)  Accordingly, assuming that the Defendant did not adequately set out the *sum* of punitive damages as a basis for its Motion for a New Trial, this Court exercises its discretion under Fed. R. Civ. P. 59(d) to address the issue and need for remittitur "on our own accord.  *See Lesende v. Borrero*, 752 F.3d 324, 334 (3d Cir. 2014) ("The first and second sentences of Rule 59(d) grant the District Court power to order a new trial on its own accord under two circumstances: first, 'for any reason that would justify granting one on a party's motion' if the court enters its order within twenty-eight days of the entry of judgment; and second, '[a]fter giving the parties notice and an opportunity to be heard, ... for a reason not stated in the motion.'" (quoting Fed. R. Civ. P. 59(d)); *see also Kelly v. Moore*, 376 F.3d 481, 484 (5th Cir. 2004); *Peterman v. Chicago R.I. & P.R. Co.*, 493 F.2d 88, 92 (8th Cir. 1974); Moore's Federal Practice § 59.11[2][b] (3d ed. 2011).

"standard is the same as for compensatory damages: the award should not be disturbed unless it is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand" (quotations and citations omitted)); *Rush v. Scott Specialty Gases, Inc.*, 930 F. Supp. 194, 201 (E.D. Pa. 1996) *rev'd on other grounds*, 113 F.3d 476 (3d Cir. 1997) (*Gore* and its progeny do not affect the trial court's review of an award for excessiveness separate and apart from the constitutional inquiry); *Wood v. Allstate Ins. Co.*, No. CIV. A. 96-4574, 1997 WL 602796, at *7 (E.D. Pa. Sept. 19, 1997); *see generally Cortez v. Trans Union, LLC*, 617 F.3d 688, 716-17 (3d Cir. 2010) (discussing "the differences between a constitutionally reduced verdict and a remittitur").   The Third Circuit has suggested, however, that in determining whether a punitive damage award shocks the conscience, a court should, nevertheless, look to the factors set out by the Supreme Court in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), which addressed the *constitutionality* of an award of punitive damages. *See Brilla v. Pettit*, 57 F. App'x 947, 949 (3d Cir. 2003); *see also Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (applying *Gore* to the common law standard).

In determining whether a punitive damage award comports with constitutional limits, the Supreme Court held that courts must look to "three guideposts," which are: "the degree of reprehensibility of the [act]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases."   *Gore*, 517 U.S. at 575.  The Court has noted that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."   *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (quoting *Gore*, 517 U.S. at 575)).

Later in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), the Court went beyond due process, instead relying on principles of Federal maritime common law, when it was faced with an "outlier" punitive damages award arising from the *Exxon Valdez* oil spill. *Id.* at 481. There the Court found that, in applying *maritime law*, a ratio of one to one, compensatory to punitive damages, was the appropriate upper limit for punitive damages in such cases but also noted that "[i]n this case . . . the constitutional outer limit may well be 1:1."[56] *Id.* at 515 n. 28. However, the Court was faced with a reckless, not intentional, act which was of some significance. *Id.* at 493-94 ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure."). The Court also pointed out that "heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect." *Id.* at 494. We now address the three *Gore* guideposts.

---

[56] The Court emphasized the unique nature of the case before it and the interrelated importance of limiting damages in that regard, noting:

> Our review of punitive damages today, then, considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute.
>
> …
>
> [W]e are acting here in the position of a common law court of last review, faced with a perceived defect in a common law remedy. Traditionally, courts have accepted primary responsibility for reviewing punitive damages and thus for their evolution, and if, in the absence of legislation, judicially derived standards leave the door open to outlier punitive-damages awards, it is hard to see how the judiciary can wash its hands of a problem it created, simply by calling quantified standards legislative.

*Exxon*, 554 U.S. at 502, 507 (2008).

### i.  Reprehensibility

The Third Circuit has instructed that:

> In measuring the degree of reprehensibility, we are to consider: whether the harm caused was physical as opposed to economic; whether the defendant's actions evinced indifference to or reckless disregard for the health or safety of others; the financial vulnerability of the victim; whether the conduct was repetitive or isolated; and whether the harm was the result of intentional malice, trickery, deceit, or mere accident.

*Dee v. Borough of Dunmore*, 474 F. App'x 85, 89 (3d Cir. 2012) (citations omitted).  We note that there was evidence that Winterbottom's decision was motivated by intentional malice but it did not involve the more serious employment actions, such as termination or demotion, that are commonly encountered in employment discrimination cases and which, on their face, involve a greater potential for harm.  *See generally Gore*, 517 U.S. at 575 (the degree of reprehensibility factor "reflects the accepted view that some wrongs are more blameworthy than others").  There is no evidence of substantial economic[57] or physical harm, financial vulnerability of the victim, a significant pattern of repetitive racist action on the part of Winterbottom, or other factors that weigh in favor of the magnitude of the award.  This factor weighs heavily in favor of finding the award impermissibly high.

### ii.  Disparity Between Harm and Punitive Damages

Given our remittitur of the compensatory damages award, there is great disparity between the harm Holt experienced, quantified at $50,000, or could have potentially suffered,[58] and the

---

[57] While there was evidence that Holt's position at Pocono provided less overtime, Holt did not provide testimony so as to quantify how much  more money he would have made at King of Prussia.

[58] We are reminded that in analyzing the second guidepost it is not purely the difference between the actual harm and the punitive damages that is at issue; rather, we must also consider the "potential harm."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (the second factor looks to "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award").  Here, the actual and potential harm are

$300,000 punitive damage award that the jury imposed.  The Supreme Court has explained that

while "no bright-line ratio" exists for assessing the propriety of a punitive damage award:

> Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mut. Life Ins. Co. v.* ] *Haslip*[, 499 U.S. 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.  499 U.S. at 23–24. We cited that 4–to–1 ratio again in *Gore.* 517 U.S. at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.,* at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.,* at 582, or, in this case, of 145 to 1.

*State Farm*, 538 U.S. at 425.

We note that similar cases involving civil rights violations have generally involved no

more than low middle single digit ratios between punitive and compensatory damages.  *See*

*Medcalf v. Trs. of Univ. of Pa.*, 71 F. App'x 924, 925 (3d Cir. 2003) (sex discrimination case

where $71,996 in lost wages and medical benefits, $18,130 in compensatory damages, and

$25,170 in punitive damages were awarded); *Keenan v. City of Philadelphia*, 983 F.2d 459, 462,

472 (3d Cir. 1992) (following remittitur and appeal, compensatory damages of $640,000 split

between 5 plaintiffs compared to $666,666.63 of punitive damages between three defendants);

*Shrey v. Kontz*, 981 F. Supp. 2d 333, 337 (M.D. Pa. 2013), *appeal dismissed* (Dec. 23, 2013)

---

substantially coextensive.  We are not faced with a case where a defendant's acts could have caused profound damage but where that risk has not largely been realized.

($45,000 punitive to $14,553.09 compensatory damages resulting in ratio of 3.09:1 upheld); *Garner v. Meoli*, 19 F. Supp. 2d 378, 392 (E.D. Pa. 1998) (ratio of approximately 3:1 punitive to compensatory damages); *Bonenberger v. Plymouth Twp.*, No. CIV.A. 96-403, 1998 WL 472469, at *1 (E.D. Pa. July 27, 1998) *aff'd sub nom. Bonenberger v. Plymouth Twp.*, 202 F.3d 253 (3d Cir. 1999) ($20,000 in compensatory and $50,000 in punitive damages against municipal defendant and $22,000 in compensatory and $25,000 in punitive damages against individual defendant); *Lafate v. Chase Manhattan Bank (USA)*, 123 F. Supp. 2d 773, 790 (D. Del. 2000) ($100,000 compensatory and $100,000 punitive damages, the latter reduced from $500,000); *Holness v. Nat'l Mobile Television, Inc.*, No. 09 CV 2601 KAM RML, 2012 WL 1744847, at *5-6 (E.D.N.Y. Feb. 14, 2012) *report and recommendation adopted as modified*, No. 09-CV-2601 KAM RML, 2012 WL 1744744 (E.D.N.Y. May 15, 2012) ($50,000 in compensatory and $50,000 in punitive damages in discrimination and retaliation claim involving three failures to promote and assignments to perform lesser tasks); *but see Gore*, 517 U.S. at 582 ("low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages."); *Laymon v. Lobby House, Inc.*, 613 F. Supp. 2d 504, 516 (D. Del. 2009) (employment discrimination and retaliation plaintiff, who was awarded only $1,500 in compensatory damages, could still recover $25,000 in punitive damages, the latter reduced from $100,000).  This factor weighs in favor of reducing the punitive damage award, which, as it now stands, involves punitive damages six times that of the remitted compensatory damage award.

### iii.   Civil penalties Authorized or Imposed in Comparable Cases

As to the third guidepost, we note that Section 1983 does not provide a statutory reference point for damage awards.  *See Sherman v. Kasotakis*, 314 F. Supp. 2d 843, 876 (N.D. Iowa 2004) (due to the lack of a comparable civil penalties, "some courts have found the third guidepost of limited utility in assessing the reasonableness of a punitive damages award for a civil rights violation"); *see generally DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003) ("The final *Gore* factor compares the punitive damages award with the civil and criminal penalties for comparable misconduct.   The rationale for this consideration is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award." (citations omitted)).   However, the $300,000 cap applied to Title VII cases is of at least some relevance. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) ("There are no 'civil penalties' [under Section 1981] for the type of conduct for which Potomac was held liable in this case.   In applying this guidepost, however, several courts have analogized to Title VII's $300,000 damages cap"); *see also Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) ("Although a comparison to the Title VII cap may be instructive, to some degree, when analyzing the third *Gore* guidepost, we will not apply the Title VII cap by analogy to employment discrimination cases under § 1983.").   While Title VII may be of limited relevance, this weighs in favor of retaining the award, an amount that is within the range of damages allowable under Title VII, a civil rights statute that, like Section 1983, applies to race-based employment discrimination.

Whether looking to other awards falls within the third *Gore* guidepost is unclear.[59] *Compare Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013) (treating the analysis of comparable cases as relevant but an inquiry separate and apart from the third *Gore* guidepost albeit in a case involving the "shocks the conscience" standard) *with Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 55 (1st Cir. 2009) (finding that a comparison with comparable cases is part of the third *Gore* guidepost); *Ondrisek v. Hoffman*, 698 F.3d 1020, 1030 (8th Cir. 2012) (same); *Kerwin v. McConell*, No. CIV.A. 05-93, 2008 WL 4525369, at *7 (W.D. Pa. Sept. 30, 2008) (same); *and Waits v. City of Chicago*, No. 01 C 4010, 2003 WL 21310277, at *6 (N.D. Ill. June 6, 2003) (same); *see generally* Colleen P. Murphy, *Comparison to Criminal Sanctions in the Constitutional Review of Punitive Damages*, 41 San Diego L. Rev. 1443, 1447 n. 26 (2004) ("Several lower courts since *Gore* have interpreted the third guidepost to require comparison to other punitive awards."); Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, and the Outlier Dilemma*, 66 Hastings L.J. 1257, 1310-12 (2015) (studying hundreds of cases from state and federal courts applying *Gore* and finding that in 14% of cases, courts have compared the punitive damage award to those in other cases and describing a trend toward such an approach).   Insofar as *Gore* speaks of "civil penalties authorized or *imposed* in comparable cases", this could be read to suggest that this analysis may be treated as part of the third *Gore* guidepost.   *Gore*, 517 U.S. at 575 (emphasis added).   By surveying comparable cases it may be said that a court may better determine whether the defendant was given constitutionally adequate "fair notice" that their conduct could provide for

---

[59] This distinction may be largely academic in this case, where concerns of due process are not at issue.  *See Payne v. Jones*, 711 F.3d 85, 104-05 (2d Cir. 2013) (looking to other cases following the three-factor *Gore* analysis in applying the shock the conscience standard).

the extent of liability imposed through punitive damages.  *Waits*, 2003 WL 21310277, at *6; *see also  Gore*, 517 U.S. at 574-75 (finding that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose" and that the three guideposts help ensure "fair notice" is provided).   However, our Court of Appeals has suggested that the third guidepost is focused on "legislative judgments," manifested, for instance, by statutory penalties, and has not found a comparison to awards provided in other cases to be relevant to the third guidepost.  *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.,* 181 F.3d 446, 468 (3d Cir.1999) (finding the third guidepost inapt in a tort and contract case and noting that "[t]he appropriate comparison, the [Supreme] Court suggested [in *Gore*], is between the statutorily authorized financial penalty (when there is no imprisonment) and the punitive damages award"); *see also CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 189-90 (3d Cir. 2007) (the third guidepost was "not instructive" in a tort case).   We find that, regardless of any comparison to similar cases in the third guidepost,[60] the award is clearly excessive and must be reduced.

---

[60] In any event, our review of other civil rights employment cases shows that punitive damage awards are generally within the $100,000 range, while in cases of a particularly egregious nature, awards can be significantly larger, which would support our conclusion that the award here must be reduced.  *Compare Medcalf*, 71 F. App'x at 925 ($25,170); *Saleh v. Upadhyay*, 11 F. App'x 241, 248 (4th Cir. 2001) ($35,714 in national origin discrimination and $19,580 in retaliation claim); *Bonenberger v. Plymouth Twp.*, 1998 WL 472469, at *1 (in discrimination case, $50,000 against municipal defendant and $25,000 against individual defendant); *Laymon*, 613 F. Supp. 2d at 516 ($25,000); *Lafate*, 123 F. Supp. 2d at 790 ($100,000); *and Holness v. Nat'l Mobile Television, Inc.*, No. 09 CV 2601 KAM RML, 2012 WL 1744847, at *6 (E.D.N.Y. Feb. 14, 2012) *report and recommendation adopted as modified*, No. 09-CV-2601 KAM RML, 2012 WL 1744744 (E.D.N.Y. May 15, 2012) ($50,000 in discrimination and retaliation case where plaintiff was assigned tasks below his skill level and passed over for three promotions); *with Keenan*, 983 F.2d at 472 (punitive damage award of $666,666.65 between three defendants); *Bogle v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003) (punitive damages of $2 million per plaintiff which varied by defendant in the range of $100,000 to $700,000); *Rojas v. Town of Cicero*, No. 08 C 5913, 2011 WL 6753992, at *1 (N.D. Ill. Dec. 22, 2011) ($350,000).  In looking to other cases, we are of course cognizant Holt's case is a unique one and we are engaged in a fact-specific inquiry.

In that $300,000 in punitive damages awarded by the jury is grossly excessive and shocks the judicial conscience, a remittitur in the amount of $250,000 is needed, resulting in a punitive damage award of $50,000.  We find this amount is the maximum supportable amount and will adequately punish the Defendant and deter future misconduct.

Given our remittitur of the compensatory and punitive damage awards, Plaintiff is given the option to either consent to the remittitur and accept the new award or, alternatively, pursue a new trial.  *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010) ("[A] court must afford a plaintiff the option of a new trial when it attempts to reduce a jury award because it believes the amount of the verdict is not supported by the evidence.").  In that liability and damages are inseparably interwoven in this case, should Plaintiff not consent to the remittitur, a new trial on both liability and damages must be held.  *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931); *Hurley v. Atl. City Police Dep't*, 933 F. Supp. 396, 426 (D.N.J. 1996) *aff'd*, 174 F.3d 95 (3d Cir. 1999).

### c.  Damages: Conditional Rulings

#### i.  Johnson & the PSP: The Non-Assignment to Jonestown and Schuylkill Haven

The jury awarded Holt $250,000 in compensatory damages for Johnson's failure to assign him the positions at Jonestown and Schuylkill Haven.  As discussed *supra*, the testimony concerning emotional harm was presented in a generalized sense.  However, a jury could certainly have found that some of Holt's generalized emotional distress originated from Johnson's act, despite the lack of testimony specifically addressing how this specific event

caused Holt any particular distress.  We find that a remittitur of $200,000 would be proper, amounting to a total compensatory award of $50,000.

> ### ii. Winterbottom: Initiating the Investigation into the "Schizophrenic Memo"

The jury awarded Holt $200,000 in compensatory and $300,000 in punitive damages arising from Winterbottom's decision to initiate an IAD investigation into the "Schizophrenic Memo."  For much the same reasons discussed previously, we find that the compesatory damages are excessive.  While the testimony indicated that this investigation resulted in the loss of one day's pay, Holt did not provide evidence as to how much money he lost due to the suspension and did not relate any specific psychological harm to this event.  Again, we consider that the investigation and the loss of a day's wage may very well cause distress to an individual, however, we also note that where, as here, the investigation was into acts that Holt admitted to have taken, the harm would not be expected to be as severe as that arising from an investigation based on fabricated events.  Accordingly, we find that a remittitur of the compensatory damages would be proper in the amount of $190,000, resulting in an award of $10,000.

We find that punitive damages are inappropriate in that even if Winterbottom was deemed to have acted intentionally, out of either racial or retaliatory animus, there was no evidence to show that she knew that such an act, that is initiating an investigation into misconduct based on uncontroverted facts, risked violating Holt's federal rights.  Winterbottom cannot be said to have the state of mind sufficient to support an award of punitive damages. Something beyond a mere finding of liability must be shown to support an award of punitive damages. *See, e.g. Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978) ("[D]espite its utility

as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief."). Where, as here, Plaintiff simply established liability but did not show that Winterbottom knew that her act risked violating Holt's constitutional rights, punitive damages may not be awarded.  *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 527, 536 (1999) (for punitive damages to be available under Title VII,  "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages" and that the focus is not on "the employer's awareness that it is engaging in discrimination, but [rather on] its knowledge that it may be acting in violation of federal law."); *Whittaker v. Fayette Cnty.*, 65 F. App'x 387, 393 (3d Cir. 2003) (applying *Kolstad* in a Section 1983 suit); *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004) ("Where the underlying liability for deprivation of a federally protected right under § 1983 rests on a finding of intentional conduct, then, the state of mind requirement for the availability of punitive damages limits those damages to that 'subset of cases,' in which a plaintiff also adduces evidence that permits an inference that the defendant was aware of the risk that those intentional acts would violate federal law." (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999)); *Iacobucci v. Boulter*, 193 F.3d 14, 26 (1st Cir. 1999) (applying *Kolstad* to a Section 1983 case and noting that "[t]he special showing needed to trigger eligibility for punitive damages . . . pertains to the defendant's 'knowledge that [he] may be acting in violation of federal law, not [his] awareness that [he] is engaging in discrimination.'" (quoting *Kolstad*, 527 U.S. at 535)); *Soderbeck v. Burnett Cnty., Wis.*, 752 F.2d 285, 291 (7th Cir. 1985) ("The words used to mark off the domain of punitive damages—words like 'maliciously,' 'wantonly,' 'oppressively,' 'spitefully'—

indicate that punitive damages, like criminal fines which they resemble, are reserved for cases where the wrongfulness of the defendant's conduct is conspicuous, implying that its wrongfulness is apparent to the person who engages in it, and not just to a lawyer" and thus upholding decision to not allow punitive damages in case of political discrimination); *Jackson v. Dallas Sch. Dist.*, 954 F. Supp. 2d 304, 314 (M.D. Pa. 2013) (applying *Kolstad* to Section 1983 claim); *see also Taylor v. Howe*, 280 F.3d 1210, 1212 (8th Cir. 2002); *see generally Kolstad*, 527 U.S. at 536 (describing the subjective inquiry applied to the availability of punitive damages).

There was no evidence that Winterbottom would have known that merely initiating an investigation, which was not shown to be an excessive or unusual procedure, into acts that Holt admitted to having taken, could be an unconstitutional wrong. Accordingly, Winterbottom could not be said to have acted with the state of mind sufficient to establish Plaintiff's entitlement to punitive damages.[61] *See Powell*, 391 F.3d at 16; *see also Jones v. Se. Pa. Transp. Auth.*, No. 14-3814, 2015 WL 4746391, at *7-8 (3d Cir. Aug. 12, 2015) (the mere initiation of an investigation, without more, which later resulted in discipline, did not provide for cat's paw liability in a Title VII retaliation claim); *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (where plaintiff "ha[d] his weapon stripped from him, ha[d] his duties changed, [was] ordered to undergo a psychiatric evaluation, receiv[ed] a negative performance evaluation, receiv[ed] a 30-day suspension, and [was] transferred," following his

---

[61] In reviewing the caselaw, we have considered retaliation cases applying the "material adversity" standard used in Title VII claims which largely, if not entirely, parallels the "ordinary firmness" standard applied to First Amendment claims. *See Hoffman v. Dougher*, No. CIV.A. 1:05-CV-0906, 2008 WL 148877, at *10 n. 12 (M.D. Pa. Jan. 14, 2008) (reading the First Amendment and Title VII standards of adversity as coextensive); *Bowyer v. D.C.*, 910 F. Supp. 2d 173, 201 (D.D.C. 2012) *aff'd sub nom. Bower v. D.C.*, No. 13-7012, 2015 WL 4079800 (D.C. Cir. July 7, 2015) (reading the two standards as "very similar (if not identical)"); *see generally* John Sanchez, *The Law of Retaliation After Burlington Northern and Garcetti*, 30 Am. J. Trial Advoc. 539, 565 (2007) (the "ordinary firmness" standard applied to First Amendment retaliation claims "seems strikingly similar if not identical" to the "material adversity" standard applied in Title VII cases).

decision to make an allegedly joking comment, the excessive discipline could be considered materially adverse and retaliatory); *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("an employee does not suffer a materially adverse change in the terms and conditions of employment [establishing an adverse action] where the employer merely enforces its preexisting disciplinary policies in a reasonable manner"); *Burton v. Pa. State Police*, 990 F. Supp. 2d 478, 513 (M.D. Pa. 2014) *aff'd*, No. 14-1237, 2015 WL 2353023 (3d Cir. May 18, 2015) (internal investigations are not materially adverse); *Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 549-52 (E.D. Pa. 2013) (an internal investigation is not materially adverse, however, an investigation based on allegedly falsified facts leading to suspension is); *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 427 (D.N.J. 2009) (where investigation was based on falsified facts and resulted in three day suspension, action could be found materially adverse); *see generally Kolstad*, 527 U.S. at 536-37.   Judgment as a matter of law is granted as to the recovery of punitive damages as to Winterbottom's initiation of the investigation into the "Schizophrenic Memo" as to both the equal protection and First Amendment retaliation claims.[62]

### iii.   Brahl: Initiating the Investigation into the "Day Off" Incident

The jury awarded Holt $300,000 in compensatory and $425,000 in punitive damages for the decision to initiate an investigation into the "day off" incident.   In the first trial, the jury

---

[62] Moreover, considering the slight harm that Holt suffered, or could have suffered, due to the investigation and the relatively minor nature of the resulting discipline, which was, in any event, grounded in fact and indeed sustained by the actual investigators, and mindful of the three guideposts established by the Supreme Court, we would find the punitive damage award excessive as well.   Winterbottom's action was not particularly reprehensible given the nature of the act and the harm, be it actual or potential, was minor, resulting in manifest disproportionality.   The magnitude of the act and the harm does not approach that of other civil rights cases supporting substantial awards.   *See, e.g. Keenan v. City of Phila.*, 983 F.2d 459 (3d Cir. 1992).   A remittitur of $290,000 would be appropriate, resulting in a punitive damage award of $10,000.

found that Brahl had in fact retaliated against Holt in violation of his First Amendment rights when he initiated this very same investigation and awarded Holt no compesatory damages, resulting in a nominal damage award of $1.00.   Defendants argue that insofar as a jury had already compensated Holt for the initiation of this investigation, although under a different legal claim, he may not recover on this claim, in that it would provide two compensatory awards for the same harm.[63]   We agree.   To hold otherwise would result in a double recovery and it "goes without saying that the courts can and should preclude double recovery by an individual."[64] *Gen. Tel. Co. of the Nw. v. E.E.O.C.*, 446 U.S. 318, 333 (1980); *see also Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 383 (1st Cir.1991) ("[R]ecovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory."); *Medina v. D.C.*, 643 F.3d 323, 328 (D.C. Cir. 2011).   Where the adverse action underlying the equal protection and First Amendment retaliation claim are the same, it would constitute an impermissible double recovery for Holt to be awarded compensatory damages for the same emotional distress caused by the same adverse action underlying both claims.   *See Flitton v. Primary Residential Mortgage, Inc.*, No. 2:03CV481DAK, 2008 WL 850159, at *1 (D. Utah Mar. 28, 2008) (insofar as the "emotional damages from being terminated as a result of gender discrimination and/or retaliation are inextricably linked and coextensive," the bar on double recovery is implicated and therefore where plaintiff recovered on a retaliation claim at a first

---

[63] While Defendants raised this argument orally, it was not included in their briefing.   However, even assuming this were to constitute a waiver, double recovery may be raised by a court *sua sponte*.   *See, e.g. Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1079 (10th Cir. 2008); *Rice v. D.C.*, 818 F. Supp. 2d 47, 58 (D.D.C. 2011).

[64] Even if no double recovery were implicated, we would find the award excessive and in need of remittitur.   Again, the testimony as to emotional harm was general and did not in any manner link any particular harm to this event.   Notably, Holt was unable to recall what that outcome of this investigation was.   Moreover, we again are reminded that the investigation was launched to investigate actions that Holt admitted to have taken.   Accordingly, we would find that an award of $8,000 would be the maximum sum supported by the record.

trial, she could not pursue damages in a discrimination claim at the second trial based on the same adverse action); *Perkins v. Fed. Fruit & Produce Co.*, No. 11-CV-542 JAP-KLM, 2013 WL 2112230, at \*24-26 (D. Colo. May 14, 2013), *appeal dismissed* (July 29, 2013) (finding that "the emotional distress damages awarded for discriminatory discharge are subsumed in and duplicative of the emotional distress damages awarded to [the plaintiff] on his retaliatory discharge claim" and that "[the plaintiff] cannot recover damages for the distress he experienced after he was discharged under both discriminatory discharge and retaliatory discharge theories.") Here, the first jury found that the initiation of this investigation caused him no compensable harm.  Holt cannot have a second bite at the apple.  Accordingly, we find that this compensatory damage award would constitute a double recovery and conditionally rule that that award be vacated and a $1.00 award of nominal damages be provided in its place.

The limitation on double recovery, however, does not affect our analysis of punitive damages.  *See Medina*, 643 F.3d at 329 ("Punitive damages, unlike compensatory damages, are not aimed at making a plaintiff whole; thus the rule against double recovery is inapplicable when the damages awarded are punitive.").  However, for essentially the same reason discussed above as to Winterbottom, we do not find that punitive damages are appropriate given that there was no evidence that Brahl was aware that his decision risked violating federal law, particularly where it merely resulted in a reprimand.[65]  *See Jones*, 2015 WL 4746391, at \*3; *Powell*, 391 F.3d at 16; *Leavitt*, 465 F.3d at 91; *Jackson*, 954 F. Supp. 2d at 314; *see generally Kolstad*, 527 U.S. at 536-

---

[65] We do not find that the lack of compensatory damages would itself preclude an award of punitive damages here where an award of nominal damages is warranted.  *See Paul v. Hearst Corp.*, 261 F. Supp. 2d 303, 307 (M.D. Pa. 2002) ("courts have allowed awards of punitive damages where the actual damages were nominal or nonexistent")

37.  Accordingly, no punitive damages may be awarded and judgment as a matter of law must be granted as to this claim of punitive damages.[66]

## III.    CONCLUSION

For the reasons set forth above, we find that judgment as a matter of law must be granted in favor of Johnson, the PSP, and Brahl as to all relevant claims.  Judgment as a matter of law must be granted in favor of Winterbottom as to the equal protection and First Amendment retaliation claims involving the initiation of the IAD investigation but will be denied as to the equal protection claim regarding her failure to assign Holt to King of Prussia Station.  However, insofar as the compensatory and punitive damage awards provided by the jury as to that surviving claim were impermissibly excessive, we will order a remittitur of $150,000 on the award of compensatory damages and $250,000 on the award of punitive damages.  Should Plaintiff accept the remittitur, a judgment in favor of Holt and against Winterbottom in the amount of $50,000 compensatory damages and $50,000 punitive damages will be entered.  Should Plaintiff not accept the remittitur, a new trial will be ordered on the claim.   An appropriate order follows.

BY THE COURT:


 /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

---

[66] Moreover, we would also find, for largely the same reasons discussed above as to Winterbottom, that the punitive damage award was excessive even if Holt was entitled to punitive damages on this claim.  We also recognize that unlike in the case of the investigation Winterbottom initiated, it was not even clear what resulted from the investigation.  Additionally, insofar as there are compensatory damages recoverable on this claim, we are mindful of the need for proportionality.  Accordingly, we would note that a remittitur of the punitive damage award in the sum of $415,000 would be appropriate, resulting in a punitive damage award of $10,000.  We find that this would sufficiently deter and punish the conduct at issue.